1

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**

2

Jonathan D. Uslaner (Bar No. 256898)

3

(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575

4

Los Angeles, CA 90067
Tel: (310) 819-3481

5

6

*Lead Counsel for Lead Plaintiff New
York City District Council of Carpenters
Pension Fund*

7

8

[Additional Counsel Appear on Signature Page]

9

## UNITED STATES DISTRICT COURT

10

## NORTHERN DISTRICT OF CALIFORNIA

11

## SAN JOSE DIVISION

12

13

IN RE DOXIMITY, INC. SECURITIES
LITIGATION

14

Case No. 5:24-cv-02281-EKL

15

**CONSOLIDATED CLASS ACTION
COMPLAINT FOR VIOLATIONS
OF FEDERAL SECURITIES LAWS**

16

CLASS ACTION

17

DEMAND FOR JURY TRIAL

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ..................................................................................................1

II.  JURISDICTION AND VENUE .........................................................................7

III. PARTIES ............................................................................................................7

IV.  SUMMARY OF THE FRAUD ..........................................................................8

    A.   The Doximity Platform ...........................................................................8

    B.   The Importance of User Engagement to Doximity.................................10

    D.   Doximity Regularly Touted Increased Engagement Across Its Platform, Including On The Newsfeed .................................................17

    E.   Unknown To Investors at the Time, Doximity Overstated Its Active Members and Falsely Touted Its "Increasing" Engagement.................19

        1.   Doximity Overstated The Number Of Active Members On Its Platform And On Its All-Important Newsfeed............................19

        2.   Doximity's Internal Dashboard Showed That the True Number of Active Members Was Far Less Than Defendants Represented................26

        3.   User Engagement Continued To Decline On The Platform Throughout The Class Period, Including On The Newsfeed....................29

        4.   Doximity's Customers Reduced Their Advertisement Spend On The Doximity Platform Due To Concerns About User Engagement With Their Ads .......................................................31

V.   THE TRUTH EMERGES ..................................................................................35

VI.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD................................................39

    A.   FALSE AND MISLEADING STATEMENTS IN 2021......................40

        1.   June 2021 Interview On CNBC's TechCheck ..........................40

        2.   August 2021 Quarterly Investor Conference ...........................41

        3.   Doximity's Business Overview Website Video ........................42

        4.   August 2021 TechCheck Interview ..........................................43

        5.   November 2021 Quarterly Investor Conference.......................44

6. November 2021 TechCheck Interview ........................................45

B. FALSE AND MISLEADING STATEMENTS IN 2022 .................................46

1. February 2022 TechCheck Interview .......................................46

2. March 2022 Morgan Stanley Investor Conference ....................46

3. May 2022 Quarterly Investor Conference ................................47

4. August 2022 Quarterly Investor Conference ...........................48

5. November 2022 Quarterly Investor Conference .......................49

C. FALSE AND MISLEADING STATEMENTS IN 2023 .................................50

1. February 2023 Quarterly Investor Conference ........................50

2. May 2023 Quarterly Investor Conference ...............................51

3. June 2023 Investor Day Conference .......................................52

VII. DEFENDANTS' MISREPRESENTATIONS AND OMISSIONS WERE MATERIAL TO INVESTORS ..............................................................53

VIII. ADDITIONAL SCIENTER ALLEGATIONS ......................................55

IX. ADDITIONAL LOSS CAUSATION ALLEGATIONS ............................61

X. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ..................................................64

XI. THE PRESUMPTION OF RELIANCE ...............................................65

XII. CLASS ACTION ALLEGATIONS ...................................................66

XIII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ....................68

XIV. PRAYER FOR RELIEF .................................................................72

XV. JURY DEMAND .........................................................................72

Lead Plaintiff New York City District Council of Carpenters Pension Fund ("Lead Plaintiff" or "NYC Carpenters"), by and through its undersigned counsel ("Lead Counsel"), brings this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, against Defendants Doximity, Inc. ("Doximity" or the "Company") and its Chief Executive Officer ("CEO"), Jeffrey Tangney ("Tangney" and, with Doximity, the "Defendants"), on behalf of itself and all other similarly situated persons or entities who purchased or otherwise acquired Doximity common stock between June 24, 2021 and August 8, 2023, inclusive (the "Class Period"), and were damaged thereby (collectively, the "Class").

Lead Plaintiff alleges the following based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters. Lead Plaintiff's information and belief are based upon Lead Counsel's investigation, which included review and analysis of, *inter alia*: (1) Doximity's statements to investors, including those made in SEC filings, in press releases, at investor conferences, and on earnings calls; (2) research reports issued by securities and financial analysts concerning Doximity; (3) interviews of former Doximity employees and industry participants, as well as a survey of licensed U.S. physicians; (4) economic analyses of securities movement and pricing data; and (5) publicly available information regarding Doximity. Lead Counsel's investigation into the factual allegations contained in this Complaint is ongoing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth in this Complaint after a reasonable opportunity for further investigation and discovery.

## I.    INTRODUCTION

1.      Doximity is a social media platform that has referred to itself as the "LinkedIn for doctors." Doximity invites all U.S. physicians to join its platform, which provides its members with free access to its "Newsfeed" and "telehealth" tools. The Newsfeed, which is the "foundation" of the platform, consists of curated medical articles, videos, and paid advertisements. The telehealth tools include a free "scheduler" and "dialer" that assist doctors in conducting remote

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:24-cv-02281-EKL

1    visits with their patients.  Because Doximity is free to join and use, Doximity's revenue is almost
2    entirely dependent on advertising dollars from its customers, who include some of the largest
3    pharmaceutical companies in the world, such as Merck, GlaxoSmithKline, and Lilly.  These
4    companies pay Doximity to host advertisements on its Newsfeed, which accounts for more than
5    90% of the Company's revenue.

6       2.   Doximity can only attract and retain the advertising customers it relies on for its
7    revenues if those advertisements reach enough members on its platform.  Thus, the number of
8    Doximity members who **actually use** (and, thus, are "engaged") on the platform—and particularly
9    its Newsfeed—is central to the Company's profitability.  As Doximity itself has acknowledged,
10   "[t]he size of our member base and our members' level of engagement are **critical to our success**."
11   As analysts noted, because Doximity's main source of revenue is its advertisements, "engagement
12   is key."  To evaluate engagement, Defendants directed investors to Doximity's level of "active
13   members," which Doximity defined as members who logged into Doximity and clicked on internal
14   links on at least a quarterly basis.

15      3.   Doximity's pitch to advertisers and investors alike focused on its ability to deliver
16   high member engagement.  Defendants characterized the Company's member base as its greatest
17   asset and repeatedly represented that this member base included "**over 80% of all U.S. physicians**
18   **as active members.**"  Defendants additionally told investors each quarter that its member
19   engagement had "**increased**" across the platform, reaching a new "**all-time high**."  Unfortunately
20   for investors, these representations were false and highly misleading.  In truth, Doximity's base of
21   active members was far less than the "over 80%" that the Company repeatedly touted.  In addition,
22   member engagement was **not** increasing, but rather was declining—including on Newsfeed, the
23   only portion of the platform driving meaningful revenues.

24      4.   The Class Period begins on June 24, 2021, the day Doximity shares began publicly
25   trading.  Defendant Tangney, Doximity's CEO, started the day by ringing the bell on the New
26   York Stock Exchange to announce Doximity's launch as a public company.  The same morning,
27   he went on CNBC's TechCheck to tout his newly-public Company to investors.  When asked to
28   describe Doximity, one of the first things he said was that "**today, we have over 80% of all U.S.**

- 2 -

*physicians as active members on the platform.*" He deemed that representation so important that he repeated it just minutes later during the same televised CNBC interview. Doximity's stock *doubled* in price that day, with its market capitalization eclipsing *$9 billion*.

5.  Defendants stuck with their successful pitch line for the rest of the Class Period, with Defendant Tangney continuing to assure investors that "over 80% of all U.S. physicians" were "active members" on Doximity. Based upon how the Company defined "active members," investors understood Defendant Tangney to be representing that over 80% of U.S. doctors used Doximity at least once a quarter, with Defendant Tangney adding that the platform could reel them in as often as "if not every day then every week."

6.  Besides repeating the representation that "over 80%" of doctors were "active members," Defendants assured investors that engagement on the Platform was continuously increasing. Quarter after quarter, Defendants repeated that engagement had increased "*across our entire platform*," with engagement reaching "*record highs*" each quarter. Defendants additionally singled out the "*record*" engagement on Newsfeed—the primary source of Doximity's revenues—telling investors that engagement on its Newsfeed continued to increase each quarter.

7.  Defendants also squelched any doubters. A few months after Doximity's IPO, a J.P. Morgan analyst report suggested that most of Doximity's members used the platform, if at all, to access its free telehealth tools—and *not* its revenue-driving Newsfeed. In response, Defendant Tangney forcefully pushed back, assuring investors and analysts at the Company's next earnings call on November 9, 2021 that engagement with the Newsfeed had "*never been higher*" and any data that suggested otherwise was "*just wrong.*" Investors could trust Defendant Tangney, he told them, because he and Doximity had reviewed the data "a bunch of different ways." After issuing these staunch denials, Defendant Tangney and Doximity carried on reporting each quarter that Doximity had achieved a "record number of quarterly active users" and reached an "all-time high" in engagement "across our entire platform."

8.  Investors bought into Defendants' repeated representations. In awarding Doximity a "Buy" rating in July 2021, securities analysts justified their "premium valuation" for Doximity by pointing to the fact that the Company was "an extremely unique asset with 80% of physicians

as active members on the platform."  Likewise, in the wake of Doximity's November 9, 2021 earnings call and Defendant Tangney's subsequent appearance on TechCheck to repeat the claim that "over 80% of all U.S. physicians are active members on our platform," multiple analysts parroted Defendant Tangney's assertion, concluding that his representations had put investor concerns about engagement on the platform "to rest."

9.      But Defendants' repeated representations and staunch denials were not true. Multiple former employees whose roles gave them clear knowledge of Doximity's actual active member base have reported that there is "*no way*" that 80% of physicians were active members of Doximity. These former employees have further explained that engagement on Doximity's Newsfeed (the only meaningful source of revenue) was significantly lower than investors were led to believe.  These accounts were confirmed by Lead Plaintiff's robust survey of U.S. doctors, which demonstrates that Doximity overstated the number of active members on its platform by *more than 65%* and that *nearly half* of the physicians who used the Doximity platform during the Class Period either *never* viewed the Newsfeed or did so *less than once per quarter*.

10.     Lead Counsel designed the survey to guarantee its results accurately reflected the national physician population, with a large enough sample size to ensure a 95% confidence level, which statisticians refer to as the "gold standard" for surveys.  The margin of error for the responses was approximately 4%, which is at the very low end of the "acceptable margin of error" in surveys and ensures that the survey results accurately reflect the number of doctors who were active members of the Doximity platform during the Class Period.

11.     Other studies corroborate the accounts of Doximity's former employees and the results of Lead Plaintiff's survey, further demonstrating that Doximity's true active member count was far less than what Defendants represented during the Class Period.  For example, one independent study conducted by the anesthesiology residency program at Westchester Medical Center and published shortly after the Class Period found serious errors in the *vast majority* of the program's residents' and graduates' profiles on Doximity.  Consistent with that study, a former Doximity employee confirmed that *more than half* of the members' basic profile information was either incorrect or left blank.  As explained by analysts at Jehoshaphat Research in their extensive

report on Doximity published shortly after the Class Period (the "Jehoshaphat Report"), these widespread errors provide powerful evidence undermining Defendants' representations touting over 80% of U.S. doctors as "active members," since the profile owners had not "shown up" to correct elementary errors in their profiles.

12.    Also consistent with Lead Counsel's survey, immediately after the Class Period, an analyst focused on healthcare stocks tested Defendants' representation that "over 80% of U.S. physicians" were "active members" on the platform.  The majority of doctors who responded to the analyst's inquiry reported that they either (i) did not use Doximity at all or (ii) only used the platform's telehealth tools, but not the Newsfeed.  These doctors, comparing their own experience to Doximity's representations, aptly concluded that Doximity had been "massag[ing] usage and engagement to drive valuation" for years.  All of these findings and accounts are consistent with the conclusion in the Jehoshaphat Report: "Ask around (*as we have*), and we're confident that you'll find a great number of doctors who 'have' Doximity profiles *but don't engage with the platform in any meaningful way*."

13.    Behind closed doors, Defendants knew the actual, less-than-represented level of engagement on Doximity's platform.  Multiple former employees have reported that Doximity utilized a "Dashboard" to keep careful track of Doximity's *actual* number of active members, with one well-placed manager noting that Defendant Tangney himself ordered the Dashboard's creation.  Another employee, who used the Dashboard several times a week for generating reports, confirmed that the number of U.S. doctors who were quarterly active members was *always* below 80% for each physician specialty and throughout the entire Class Period.  Defendant Tangney had full access to the Dashboard, and internally acknowledged the true number of active members during regular Company offsites.

14.    Declining engagement on the platform was also a major topic of discussion in Doximity employees' internal emails, instant messaging, and company meetings.  Former Doximity employees with access to the Dashboard and who worked in different departments (including client development and business analytics) reported how there was declining engagement on the platform throughout the entire Class Period, including on the Newsfeed.  These

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:24-cv-02281-EKL

employees explained that declining engagement was a frequent source of concern discussed in meetings and in internal reports during the Class Period.

15.    Internally, Doximity was also concerned with what its advertising customers would do when they found out about low engagement with their ads.  Multiple former Doximity employees reported internal concerns that customers would take their advertisement budgets elsewhere when they realized that Doximity was not delivering the engagement that customers expected.  One method Doximity's executives utilized to head off this undesirable result was to deliberately avoid providing unflattering engagement data to its customers.  A former Doximity Business Analytics Manager reported that employees were instructed to avoid providing unfavorable metrics to customers, including data on engagement with the Newsfeed, and when asked about that data, to steer customers to more favorable metrics.  The Business Analytics Manager explained that deciding how to avoid providing customers with the negative engagement data was an area of anxiety across the entire business analytics team—so much so that the Doximity Business Analytics Manager quit his job at Doximity to avoid participating in such diversionary tactics.

16.    But Defendants' strategy of diverting customers away from unfavorable engagement data was not sustainable, and Doximity's customers eventually began to question whether the engagement that Doximity claimed to deliver was real.  These customers ultimately stopped advertising on Doximity or reduced their purchase of advertisement upsells.  "Upselling," which accounted for a substantial portion of Doximity's revenue (as investors would be reminded at the end of the Class Period), was a term used to describe one-off purchases by existing customers of additional space for their advertisements during the year.

17.    The truth concealed by Defendants' Class Period misrepresentations was revealed on August 8, 2023, when Doximity reported that it was slashing its revenue guidance for fiscal year 2024.  On the investor earnings call that day, Defendants admitted that the reduction in guidance was due to a decline in upsells.  They further admitted that customers were increasingly spending their advertising dollars on cheaper banner ads on other social media platforms—a sign that customers did not believe Doximity could deliver the engaged user base it promised.

18.     Analyst reaction to the news was swift and severe.  Analysts downgraded Doximity's stock and reduced their price targets for its shares.  Analysts pinned the blame squarely on the previously concealed low user engagement metrics.  For example, analysts at Wells Fargo "question[ed] whether [Doximity's] clients are seeing a high enough [return on investment] to warrant putting more ad dollars in later in the year."  Analysts at Morgan Stanley likewise concluded that a "stronger re-acceleration in the core newsfeed" was needed, as "slowing growth" in "user engagement" at Doximity adversely impacted upsells.

19.     The market reacted harshly to these surprising revelations, with investors suffering the consequences.  Following the Company's disclosures, its share price plummeted by nearly *23%* in a single day, wiping out over ***$900 million*** in shareholder value.

## II.     JURISDICTION AND VENUE

20.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 (17 C.F.R. § 240.10b-5), promulgated thereunder.

21.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

22.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  At all relevant times, Doximity's principal executive offices were located in this District, and it conducted substantial business here.  In addition, many of the acts alleged herein occurred in this District.

23.     In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone and internet communications, and the facilities of the national securities exchanges and markets.

## III.     PARTIES

24.     Lead Plaintiff NYC Carpenters is a pension fund responsible for managing assets for the benefit of around 30,000 working, inactive, and retired carpenters and their families.  As of July 2, 2024, NYC Carpenters managed approximately $4.8 billion in assets.  As reflected in its

certification filed with the Court (ECF No. 17-2), NYC Carpenters purchased more than 200,000 shares of Doximity common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged in this Complaint.

25.     Doximity is a social media platform for U.S. medical professionals.  Doximity is incorporated under the laws of the State of Delaware, with its corporate headquarters and principal place of business in San Francisco, California.  Doximity's common stock trades on the New York Stock Exchange under the ticker symbol "DOCS."  As of July 5, 2024, Doximity had approximately 185 million shares of common stock outstanding.

26.     Defendant Tangney is the Company's co-founder, Chief Executive Officer, and a member of its Board of Directors.  Defendant Tangney was Doximity's primary spokesperson during the Class Period, regularly touting to investors the purported number of Doximity's active members and the supposedly record and increasing level of user engagement across Doximity's platform, including on the Newsfeed.

27.     Defendant Tangney directly participated in the management of Doximity's operations, had direct and supervisory involvement in Doximity's day-to-day operations, and had the ability to control and did control the Company's statements to investors.  Defendant Tangney was involved in drafting, reviewing, publishing, and making the Company's public statements, including the false and misleading statements and omissions alleged herein.

## IV.     SUMMARY OF THE FRAUD

### A.     The Doximity Platform

28.     Doximity is a specialized online platform exclusively for U.S. medical professionals.  The Company has described its platform as the "LinkedIn for doctors."[1]  In addition to member profiles, which Doximity describes as digital résumés, the Company's platform consists of: (i) a Newsfeed, which contains medical news, sponsored content, and paid advertisements; and (ii) doctor telehealth tools, which include a "scheduler" and "dialer" for doctors to conduct virtual visits with patients.

---

[1] *See, e.g.*, Saadeqa Khan, *Talking Data In Healthcare And Opportunities For Women With Dr. Bushra Anjum*, Scientiamag.com (Jul. 24, 2021).

1    29.    Membership and access to the Doximity platform and telehealth tools are free for

2    medical professionals.  Instead of charging members, Doximity earns money through selling

3    digital advertising space on the Newsfeed section of its platform.  As analysts evaluating the

4    Company have explained, "Doximity generates revenue by allowing pharmaceutical

5    manufacturers and health systems to advertise on the platform"—i.e., by "monetizing the finite

6    resource of clinician eyeballs."[2]

7    30.    Doximity's customers are pharmaceutical manufacturers, including major drug

8    companies such as Merck, GlaxoSmithKline, and Lilly.  At the start of each year during the Class

9    Period, these drug companies entered into year-long subscriptions with Doximity to purchase "ad

10   space" on the Doximity platform (also referred to as "marketing solutions").  As Doximity

11   explained in its SEC filings, "[p]harmaceutical manufacturers are able to use Doximity to run

12   highly targeted marketing campaigns in a digital format, maximizing access to important physician

13   audiences and reducing reliance on in-person sales representatives."[3]  Doximity's marketing

14   solutions promised these companies a higher return on investment than in-person visits from sales

15   representatives and other traditional advertising methods.  In addition to these year-long

16   subscriptions, Doximity offered pharmaceutical manufacturers "upsells" during the course of the

17   year, which were offers for one-time purchases of additional advertising space.

18   31.    During the Class Period, Doximity's customers' ads were shown almost

19   exclusively on the Newsfeed section of the Company's platform.  As Doximity's Chief Strategy

20   Officer, Nate Gross, explained during the Class Period, "we've only really monetized this one area

21   of the platform from an eyeball perspective."[4]  The sale of digital advertisement space on

22   Doximity's Newsfeed was its "bread and butter" during the Class Period, with more than 93% of

23   its revenue coming from the sale of advertising space on its Newsfeed.[5]

24

25   _____

26   [2] March 7, 2022 SVB Leerink Analyst Report at 3; April 4, 2022 Bank of America Securities
     Analyst Report at 3.

27   [3] Doximity Form S-1 Registration Statement at 5 (May 28, 2021) ("Registration Statement").

28   [4] November 22, 2021 Piper Sandler Global Healthcare Conference at 5.
     [5] *See, e.g.*, Doximity FY 2023 Form 10-K at 51; June 16, 2022 Goldman Sachs Global Healthcare
     Conference at 2.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:24-cv-02281-EKL

1    32.    Not surprisingly, analysts were thus laser focused on Doximity's Newsfeed during

2    the Class Period, as it drove nearly all of the Company's revenues.  Analysts saw the Newsfeed as

3    "the foundation of [Doximity]" and "the primary use-case for physicians."[6]  Analysts understood,

4    and wrote research reports explaining, that Doximity's Newsfeed allowed the Company to

5    command "greater wallet share with commercial partners," that Doximity "monetize[s] primarily

6    through pharma and health system marketing campaigns" on the Newsfeed, and that ">90% of

7    [Doximity's] revenue was driven by newsfeed marketing," which was also Doximity's "main

8    driver of growth."[7] And when discussing Doximity's growth prospects, analysts pointed to the

9    Company's potential to "build[] brand equity via Newsfeed."[8]

10    **B.    The Importance of User Engagement to Doximity**

11    33.    Because Doximity generated nearly all of its revenues through digital advertising

12    on the Newsfeed, user engagement on the Newsfeed was paramount to the Company's success.

13    Doximity could only attract and retain advertising customers, who were the driving force of its

14    revenue, if its advertisements were viewed by a large number of doctors.  As analysts explained,

15    Doximity's success depended on "the delivery of advertising content or 'impressions' to targeted

16    members," and "[i]f active usage of the Doximity platform is not very high for many users, then it

17    could limit how much Doximity's customers will be willing to spend on advertising on the

18    platform."[9]

19    34.    Doximity competes with various social media platforms, as well as health-related

20    websites and mobile apps, for its customers' advertising dollars.  Its competitors include major

21    technology companies with online networking and collaboration tools, such as LinkedIn and

22    Facebook, as well as niche platforms designed for medical professionals, like Sermo and

23    Medscape.  To compete with these social media platforms, Doximity must show its pharmaceutical

24

25    [6] July 19, 2021 William Blair Analyst Report at 9, 18.

26    [7] July 19, 2021 William Blair Analyst Report at 5, 14; July 19, 2021 Morgan Stanley Analyst
      Report at 7; October 31, 2022 Wells Fargo Analyst Report at 2; June 8, 2023 Piper Sandler Analyst
27    Report at 4.
      [8] *Id.*
28    [9] May 18, 2022 Piper Sandler Company Note at 1; September 12, 2022 Alumbra Analyst Report
      at 1.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:24-cv-02281-EKL

company customers that it can deliver higher member engagement than its competitors—i.e., that by choosing to advertise on Doximity, their ads will reach more doctors than they would on other platforms.  As industry analysts have noted, "[t]here are few things that tell you more about the overall health of your app than a good, hard look at user engagement."[10]

35.     Doximity itself has acknowledged the importance of member engagement to the Company's bottom line.  In each SEC quarterly and annual filing during the Class Period, Doximity expressly recognized that "[t]he size of our member base and our members' level of engagement are **critical to our success**."[11]  Doximity additionally acknowledged that a decrease in member engagement would render the Company "less attractive to our pharmaceutical manufacturer and health system customers" and that, if Doximity were unable to "maintain and increase [its] member base and member engagement, [its] revenue, operating results, financial condition, business, and future growth potential may be adversely affected."[12]

36.     Analysts likewise recognized the importance of user engagement to Doximity.  In their research reports, analysts emphasized that "[e]ngagement is key on the Doximity platform due to the majority of revenues coming from its Marketing Solutions segment which would likely drive less spending if physician engagement declines."[13]  They further added that "the size of DOCS' network and the level of engagement from members within the network is a key indicator of the success of the company."[14]  Analysts also explained that "higher engagement" would "ultimately driv[e] higher return on ad spend for [Doximity's] high margin marketing solutions," that Doximity's engagement level made the Company "more attractive to pharmaceutical manufacturers, hospitals, and health systems," and that high engagement levels at Doximity would lead "to advertising space becoming incredibly valuable, especially [for customers to] advertise their products to doctors."[15]  Analysts particularly recognized the importance of whether

---

[10] *The ultimate guide to user engagement*, Appcues.com (last visited September 11, 2024).
[11] *See e.g.*, May 27, 2022, Form 10-K at 16.
[12] *See e.g.*, May 26, 2023, Form 10-K at 16.
[13] July 19, 2021 Needham Analyst Report at 4.
[14] October 13, 2022 BTIG Analyst Report at 36.
[15] July 19, 2021 Needham Analyst Report at 6; March 7, 2022 Needham Analyst Report at 3; January 7, 2022 CrispIdea Analyst Report at 1; October 13, 2022 BTIG Analyst Report at 3.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:24-cv-02281-EKL

1    Doximity's members were "spend[ing] time viewing the Newsfeed—and thus ads."[16]

2    37.    In evaluating user engagement, social media companies are especially focused on

3    the number of "active members" on the platform.  A larger number of active members—as opposed

4    to one-off visitors—makes a social media platform more valuable for advertising customers and,

5    thus, investors.  For this reason, social media companies—including LinkedIn, Twitter, and

6    Instagram—regularly report the number of active members on their platforms.

7    **C.    Doximity Assured Investors Throughout The Class Period That Over 80% Of
        U.S. Physicians Were Active Members Of Doximity's Platform**

8

9    38.    Throughout the Class Period, Defendants represented to investors that "over 80%"

10    of U.S. physicians were "active members" of the Doximity platform.  Consistent with industry

11    standards, Doximity defined "active members" on its website throughout the Class Period as

12    follows: "[a]lso known as active users, members of a social media network that log in and click on

13    internal links on a regular basis," either "weekly," "monthly" or, at minimum, "quarterly."[17]

14    Likewise, internally at Doximity, "active members" and "active users" referred to the number of

15    members who used the platform on, at minimum, a quarterly basis.[18]

16    39.    Defendants' representation that more than 80% of U.S. physicians were "active

17    members" of the Doximity platform was the centerpiece of Defendants' public pitch throughout

18    the Class Period, and a primary reason why analysts recommended that investors purchase

19    Doximity's stock.

20    40.    The Class Period begins on June 24, 2021, when Doximity sold over $600 million

21    of stock to investors as part of its initial public offering ("IPO").  On that day, Defendant Tangney

22    appeared on CNBC's TechCheck, a television program for investors in technology companies.

23

24    [16] October 14, 2021 J.P. Morgan Analyst Report at 1.
25    [17]    *See*  https://tf-support.doximity.com/hc/en-us/articles/360039773833-44-Social-Recruiting-
        Terms-Every-Physician-Recruiter-Should-Know.  Likewise, Doximity defined "active providers"
        to mean providers that used the platform on, at minimum, a quarterly basis.  *See e.g.*, May 16,
26    2023 Presentation (identifying "380K Telehealth Unique Active Providers" on the Doximity
        Platform) and May 26, 2023 Form 10-K ("we had over 380,000 unique active providers use our
27    telehealth tools in the quarter ended March 31, 2023").
28    [18]  FE 6 explained that when active member and engagement metrics were discussed internally at
        Doximity, the Company always provided the percentage and number of quarterly active users.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:24-cv-02281-EKL

When asked by the CNBC interviewer to "tell our viewers what you guys are that makes you the LinkedIn for doctors," Defendant Tangney responded that "today we have over **80% of all U.S. physicians as active members on the platform**."  Minutes later, when asked by the CNBC interviewer about Doximity's core strengths, Defendant Tangney emphasized "**again we're over 80% of all U.S. physicians as active members**."

41.    Doximity's share price skyrocketed following Doximity's public offering and Defendant Tangney's interview on CNBC's TechCheck.  Its price more than **doubled** in a single day, closing at $53 per share and giving the Company a market capitalization of over $9.3 billion. Media outlets published articles and news alerts specifically singling out Defendant Tangney's representation that "**80% of all U.S. physicians [are] active members on the platform.**"[19]

42.    Doximity and Defendant Tangney ensured this representation was the first item inquiring investors learned about Doximity.  To that end, on its "Investor Relations" page of its website throughout the Class Period, Doximity featured a "business overview" video.  Defendant Tangney appeared at the start of the video, again representing that "**[t]oday, over 80% of all U.S. physicians use our platform**."[20]



43.    At quarterly investor conferences and during media interviews throughout the rest of the Class Period, Defendant Tangney repeatedly represented that over 80% of U.S. doctors were active members on the Doximity platform.  For example:

---

[19] CNBC TechCheck Interview With Doximity CEO Jeffrey Tangney; Doximity's stock doubles after IPO. Here's how it plans to keep the momentum going, MedcityNews.com.
[20] *See* https://investors.doximity.com/overview/default.aspx

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:24-cv-02281-EKL

- On August 10, 2021, following the Company's announcement of its first earnings report, Defendant Tangney stated, in explaining what was "driving" the results, that "*we have over 80% of all U.S. physicians as active members on our platform*."

- On November 10, 2021, following the Company's announcement of its second earnings report, Defendant Tangney emphasized to investors during an interview with CNBC that "*[o]ver 80% of U.S. physicians are active members of our platform.*"

- On February 9, 2022, reporting the next earnings call, Defendant Tangney gave another interview with CNBC where he claimed that "*over 80% of all U.S. physicians use us* to *power millions of digital interactions each day*."

- On March 10, 2022, during a Morgan Stanley Investor Conference, Defendant Tangney stressed to investors that "*we have over 80% of all U.S. physicians as active members, and they're doing millions of interactions with us each day*."

44.    Analysts credited Defendants' repeated representations that Doximity had "over 80% of U.S. physicians today as active members," identifying the 80% active user metric as an important asset of the Company and a key reason to buy its stock.  For example, in recommending that investors "BUY" Doximity's stock, analysts at Canaccord Genuity justified its "premium valuation" for Doximity by virtue of the fact that the Company was "*an extremely unique asset with 80% of physicians as active members on the platform*," noting that "[p]hysicians are the key decision makers regarding what medical procedures and drug therapies are to be utilized to treat patients [and that] having effective access to these decision makers is highly valuable."[21]  In emphasizing that investors should buy Doximity stock, analysts at J.P. Morgan also highlighted that "*over 80% of U.S. physicians [are] using the platform*, which we see as a significant moat against new entrants."[22]  Likewise, in explaining why Doximity was "[u]nique," analysts at William Blair reported that "[t]he network is the key," repeating Defendants' representation that over 80% of physicians were part of the platform and "*used daily by nearly all of them.*"[23]

45.    Defendants forcefully denied any suggestion that Doximity had fewer active members than the Company represented.  For example, on October 14, 2021, J.P. Morgan published an analyst report questioning Doximity's engagement and noting that, based on third-

---

[21] July 19, 2021 Canaccord Genuity Analyst Report at 20.
[22] July 19, 2021 J.P. Morgan Analyst Report at 13.
[23]  July 19, 2021 William Blair Supplemental Information Deck at 6.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:24-cv-02281-EKL

party data, it appeared that "[o]f the 1.8M total members on the platform," only "**~4.9%**, have a session daily with **13.9%** on a monthly basis for the month of September."[24]  In direct response to this report, during the next investors earnings call, Defendant Tangney dispelled any concerns about the number of active members on Doximity's platform.  Specifically, on the November 9, 2021 earnings call, Defendant Tangney assured investors that he and Doximity were thoroughly informed about the Company's active user metrics.  On this subject, Defendant Tangney represented that "our users and usage is … mid-double-digit percentages ***up*** from our pre-pandemic levels and any third-party data that suggests otherwise is ***just wrong***," adding "***believe me, we've looked at this a bunch of different ways***."  By emphasizing to investors that Doximity, and he personally, rigorously reviewed the data, Defendant Tangney reinforced the purported reliability of his representation that over 80% of all U.S. doctors were active members.

46.    Later during the same November 9, 2021 earnings call, the J.P. Morgan analyst who compiled "some of the spooky engagement reports" further questioned Defendants about Doximity's number of active members, pointing to third-party website tracking reports.  In response, Defendant Tangney again dismissed any concerns about his prior representations on the subject.  In elaborating why J.P. Morgan's concerns were "just wrong," Defendant Tangney retorted that "a lot of these third-party trackers" that suggested low engagement on the Doximity platform "are based on free VPN software," which supposedly produced unreliable results.  Defendant Tangney implored analysts and investors to trust him and the Company's representations about its members, stating, "there's unfortunately not a good sort of, a Nielsen sort of this space."

47.    Following the November 9, 2021 investor conference, Defendant Tangney continued his effort to squash any investor concerns about Doximity's representations about its "active members."  To that end, on November 10, 2021, the day after the investor conference, Defendant Tangney appeared on CNBC's TechCheck.  During the interview, he again specifically and unequivocally represented to investors that "***[o]ver 80% of U.S. physicians are active***

---

[24] October 14, 2021 J.P. Morgan Analyst Report at 3.

***members of our platform.***"  That same day, CNBC's TechCheck published online its interview of Defendant Tangney, headlining his representation.



48.    Analysts accepted Defendants' assurances and continued denials, including the J.P. Morgan analyst who originally questioned Doximity's representations about its active members. Following the November 9, 2021 earnings call and Defendant Tangney's subsequent appearance on TechCheck, analysts (including at J.P. Morgan) specifically highlighted and repeated Defendant Tangney's representation that "[o]ver 80% of physicians are active members" of Doximity, which supposedly made Doximity a "buying opportunity."[25]  In its report, the J.P. Morgan analyst who authored the "spooky engagement reports" explained that he would defer to Doximity's representations about Doximity's active members, as Defendant Tangney presumably "knows the actual numbers."  Piper Sandler added in its report following the November 9, 2021 earnings call that, while the market previously had been "concerned about member engagement levels," Doximity "put these concerns to rest with their FQ2 report on 11/9."  And, following Defendant Tangney's representation that Doximity had 80% of U.S. doctors as active members, Jim Cramer—the host of *Mad Money* on CNBC and an anchor on *Squawk on the Street*—told investors that "I remain convinced that doctors love [Doximity], so buy, buy, buy."

---

[25] *See, e.g.*, reports from RipShowStocks; Funstocks/bestcurrency.eth; Matevoux.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:24-cv-02281-EKL

**D.    Doximity Regularly Touted Increased Engagement Across Its Platform, Including On The Newsfeed**

49.    Defendants bolstered their representations to investors that over 80% of U.S. doctors were active members with additional assurances that member engagement was "*increasing*" across the platform, including on the Newsfeed.  As with Defendants' representations about the number of active members on the platform, analysts were acutely focused on its members' engagement on the platform—and, in particular, the Newsfeed section where Doximity showed its customers' advertisements.  This is because the greater engagement a social media platform has on the portions of its platform that feature advertisements, the more advertisers will buy digital advertising space on the platform.

50.    Throughout the Class Period, Defendants represented to investors that the level of engagement on the Doximity platform continued to increase, hitting "*record highs*" each quarter. Defendants added how, importantly, this record growth in engagement occurred "*across our entire platform*"—including, most notably, on the Newsfeed.

51.    For example, during the Company's second earnings call as a public Company on November 9, 2021, Defendant Tangney told investors that user "*engagement with our Newsfeed has never been higher*."  Then, on May 17, 2022, Defendant Tangney stated during the earnings call that "*[o]ur usage … hit fresh high[s].*"  On the next earnings call on August 4, 2022, Defendant Tangney again assured investors that "*our engagement has never been higher,*" adding that "*[a]cross all these uses, our mobile app unique weekly active users grew last quarter to 5 times the level we had just four years ago*."  Yet again, on the February 9, 2023 earnings call, Defendant Tangney told investors that Doximity achieved "*all time high* network usage in Q3," with its "quarterly active users … hit[ting] an *all-time high* last quarter *across our entire platform*."  And on the May 16, 2023 earnings call, Defendant Tangney again stated that "[o]ur usage *hit fresh high[s] in Q4*" and "*[a]cross our entire platform*, we achieved a *record number of quarterly active users*."  Defendant Tangney concluded by stressing that "[w]ith consecutive quarters of record provider engagement *across our entire platform*, I personally have never been more excited about what we're building."

52.    Analysts credited Defendants' repeated representations each quarter about increased engagement "across the entire platform," including on the Newsfeed.  In so doing, they accepted Defendants' refutation of anecdotal accounts appearing in isolated analyst reports that reported  on "conversations" with medical professionals claiming that "their primary usage of [Doximity] is via the Dialer telehealth feature rather than scrolling the Newsfeed" and that the platform was "more like a telehealth solution than a place where members spend time viewing the newsfeed – and thus ads."[26]  As Piper Sandler explained in accepting Defendants' denials of these anecdotal reports, while "[t]he market was concerned about member engagement levels … heading into FQ2 earnings," Defendants "***put these concerns to rest*** with their FQ2 report on 11/9, which saw the ***highest news feed engagement levels to date***."

53.    Other securities analysts also accepted Defendants' representations touting the supposed "increased" engagement across Doximity's platform.  These analysts highlighted this "increased" engagement as a reason to continue to buy the Company's stock.  For example, on August 4, 2022 analysts at Jefferies recommended investors "BUY" Doximity's stock despite somewhat disappointing sales results that quarter; part of the "silver lining" cited as the basis for their recommendation was Defendants' representation that "physician engagement on the platform is at all-time highs, creating strategic value."[27]  Similarly, in their research reports, analysts at Bank of America highlighted Defendant Tangney's representation that "weekly active users is 5x the level a few years ago" as a reason to continue to buy Doximity's stock, despite any macro-headwinds.[28]  Likewise, analysts at Canaccord Genuity, in detailing why they remained "bullish" on Doximity, explained that "given Doximity's strong member base and increasing engagement, we fully expect respectable growth going forward."[29]

54.    Investors continued to credit Defendants' representations about Doximity's supposed "record" and "increasing" engagement during the remainder of the Class Period.  Following the August 2022 earnings calls, analysts at Berenberg Capital Markets highlighted

---

[26] October 14, 2021 J.P. Morgan Analyst Report at 1.
[27] August 4, 2022 Jefferies Analyst Report at 1.
[28] August 4, 2022 Bank of America Securities Analyst Report at 4.
[29] August 4, 2022 Cannacord Genuity Report at 1.

Doximity's "record engagement" and, on that basis, concluded that Doximity was "still positioned as one of the best tools to market to [health care providers] and should be a share-gainer versus peers near term."[30]  In its November 2022 report, Wells Fargo analysts also noted that Doximity's "higher engagement" was central to their recommendation that investors continue to buy the Company's stock.[31]  Likewise, in its March 2023 reports, Piper Sandler analysts highlighted Defendants' representation that Doximity's "engagement hit all-time highs during F3Q23," with "engagement" on the platform identified as one of the "cornerstones of a durable network."[32]  Through Defendants' repeated representations, investors believed engagement had continued to increase to "record numbers," including on the Company's all-important Newsfeed.

E.  **Unknown To Investors at the Time, Doximity Overstated Its Active Members and Falsely Touted Its "Increasing" Engagement**

55.  Unknown to investors during the Class Period, Defendants' statements touting how "over 80%" of U.S. doctors were "active members" and how engagement continued to "increase" during the Class Period "across the platform" were false and omitted material information.  In truth, Defendants (i) overstated the number of U.S. doctors who were active members by *more than 65%*; (ii) concealed that *less than half* of U.S. doctors on the platform actually used the all-important Newsfeed on a quarterly basis; and (iii) falsely represented that engagement was increasing when, in truth, it was *decreasing* across the platform, including on Newsfeed.  As discussed below, the true facts were concealed from investors, but known to Defendants— including through a "Dashboard" ordered by Defendant Tangney that displayed the true facts in real-time to him and his colleagues.

1.  **Doximity Overstated The Number Of Active Members On Its Platform And On Its All-Important Newsfeed**

56.  As discussed above (¶¶38-48), Defendants repeatedly represented throughout the Class Period that over 80% of U.S. doctors were "active members" of the platform, which

---

[30] October 5, 2022 Berenberg Capital Markets Report at 1.
[31] November 11, 2022 Wells Fargo Analyst Report at 1.
[32] March 9, 2023 Piper Sandler Analyst Report at 3, 5.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:24-cv-02281-EKL

Doximity defined as members who used the platform on, at minimum, a quarterly basis. Lead Counsel's extensive investigation—which included, among other things, speaking with former Doximity employees, conducting its own robust and statistically reliable survey of U.S. doctors, and reviewing reports generated after the Class Period—demonstrate that this claim was false, as a far lower percentage of U.S. doctors were active members on the Doximity platform.

57.    Numerous former Doximity employees who worked with Doximity's customers as well as with its engagement data confirmed that the 80% figure that Defendants repeatedly touted was untrue. FE 1, who as a Client Services Manager was privy to information about how customers' ads were performing, reported that "***there's no way***" that 80% of U.S. doctors were active members of the Doximity platform, and that, in internal discussions during his time at Doximity, he ***never*** heard reference to the statistic that 80% of physicians were active members of the platform.[33] Similarly, when asked about the veracity of Doximity's representation that 80% of U.S. doctors are active members on the platform, FE 2 stated "***[t]here's no way … there's absolutely no way.***"[34] FE 3, who monitored the degree to which Doximity members engaged with direct messages, when asked about Doximity's representation that 80% of U.S. physicians were active members of the platform, also said "***[t]hat's false.***"[35] FE 4, who was the Chief Operating

---

[33] FE 1 was a former Client Services Manager ("CSM") at Doximity from January 2020 through April 2022. FE 1's role included communicating and being a liaison between Doximity's pharmaceutical clients and the internal Doximity teams (writers, sales representatives, engineers, and others) to get the programs that the pharmaceutical companies had approved and signed up for created and live. FE 1 worked primarily with the sponsored advertisements on the main Newsfeed. In his role, FE 1 had access to and utilized Doximity's Dashboard, which showed user engagement data. FE 1 reported to Sean Johnson, who during FE 1's tenure was a Director, of Client Services from February 2020 through March 2022 and a Senior Director from April 2022 through April 2023; Johnson is currently the Vice President, Client Services. In order to preserve the identity of former employees who provided reports for this Complaint, "he/him/his" pronouns are used throughout.

[34] FE 2 worked as a Recruiter at Doximity from January 2023 through December 2023. In that role, FE 2 was responsible for recruiting physicians for hospitals and other health systems. FE 2 was positioned to know what percentage of Doximity members were active members; as a Recruiter, he tried to contact doctors on Doximity's network to fill job postings.

[35] FE 3 was a Partner at Doximity's recruiting business from July 2022 through February 2024. FE 3's responsibilities included business development, transacting executive searches, contracting through the Chief Legal Officer and the Chief Financial Officer at Doximity corporate, and overall

Officer of Doximity's recruiting business shortly after the Class Period and who reviewed the click-through rate for messages to Doximity members, stated his belief that Doximity's claim that over 80% of U.S. physicians were active members of Doximity was a "*flat-out fabrication*."[36] FE 5, who used Doximity's Dashboard on a weekly basis from January 2021 to June 2024, confirmed that Defendants' 80% figure was *not true* based on his experience running weekly engagement reports.[37] And FE 6, whose role as a Business Analytics Manager left him particularly well-placed to know Doximity's true user engagement figures and who utilized Doximity's internal Dashboard, likewise reported that his recollection also was consistent with there being *less than* 80% of U.S. physicians as active members on the Doximity platform, adding also that it was *significantly lower* on the Newsfeed.[38] In fact, Doximity's active concealment of its lower user engagement from Doximity's customers was so troubling to FE 6 that it ultimately caused him to quit his job.

58.    To determine the actual percentage of U.S. doctors who were active members of

---

[36] being a general partner in the executive search business. As part of his responsibilities, he reviewed physician responses to job placements, including by viewing the click through rates on ads for job placements. FE 3 reported first to Arthur Cooper, President, Executive Search, then to Jason Babb, who from June 2022 through September 2023 was Regional Director of Business Development and from October 2023 through June 2024 was Regional Vice President of Sales, and then to Craig Overpeck, Senior Vice President, Commercial Operations.

[36] FE 4 was Chief Operating Officer at Doximity's recruiting business, from late September through November 2023. Prior to joining, he worked at AMN Healthcare, a healthcare staffing company, for 25 years. In his position, FE 4 reviewed reports that featured the click-through rate for job placement ads.

[37] FE 5 held a variety of positions at Doximity's recruiting business, specifically in Business Development, from 2021 through June 2024. FE 5 was promoted to Regional Director of Business Development from June 2022 through September 2023 and was Regional Vice President of Sales for the remainder of his tenure. In his roles, FE 5 had access to Doximity's Dashboard, internally referred to as "WAND," which he used in generating reports for discussions with hospitals seeking physicians.

[38] FE 6 was a Business Analytics Manager at Doximity from March 2021 through November 2023 and was promoted to Senior Business Analytics Manager for the last month of his tenure. As Business Analytics Manager, he was responsible for managing analytics for some of the key pharmaceutical companies who would then advertise on Doximity and was primarily managing analytics campaigns for the purpose of maintaining customers or growing their customer base. In his role, FE 6 had access to Doximity's Dashboard. If a pharmaceutical brand reached out and asked how its campaign advertising campaign was performing on the platform, FE 6 would work with analysts to pull the data that would show if it was doing well. FE 6 reported to Jeff Gambino, Vice President, Data Analytics.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:24-cv-02281-EKL

the Doximity platform during the Class Period, Lead Counsel conducted a robust and statistically sound survey of U.S. doctors. To conduct the survey, Lead Counsel first randomly selected 3,000 National Provider Identifiers ("NPIs"), which are unique ten-digit identifiers issued to U.S. doctors by the Centers for Medicare & Medicaid Services. These 3,000 NPIs were randomly chosen from a list of 17,262 NPIs of doctors who have agreed to participate in market research. At Lead Counsel's direction, an electronic invitation was then sent by the market research firm, Enos Answers, to each of these U.S. doctors inviting them to participate in the survey. To avoid any potential biases, the survey invitation and survey did not indicate the purpose of the survey, other than state that it concerned "healthcare." The doctors who voluntarily participated in the survey all agreed to answer truthfully to each of the questions presented and were compensated $5 for their time, regardless of the substance of their responses.

59.      First, each doctor was asked to confirm that they were a "U.S. licensed physician throughout the period between June 24, 2021 and August 8, 2023," i.e., the Class Period. The respondents all provided this confirmation. Next, the doctors were asked "[w]hich of the following platforms did you use during the period of June 24, 2021 through August 8, 2023," i.e., the Class Period. The choices presented to the doctors included "LinkedIn," "Sermo," "Doximity," "WebMD," "Facebook," and "None."

60.      The U.S. doctors who reported that they had used the Doximity platform at least once during the Class Period were then asked the following question: "During the period of June 24, 2021 through August 8, 2023, did you use the Doximity platform less than once every three months?" Of the doctors who used the Doximity platform during the Class Period, ***over one third*** of them (34.2%) reported that they used the platform ***less than once a quarter***. Including the doctors who did not use Doximity at all, ***more than half*** of all U.S. physicians (51.7%) either ***never*** used Doximity or did so on a less-than-quarterly basis—i.e., they were ***not*** "active members" based on Doximity's own definition of the term. Accordingly, Defendants' "over 80%" figure that they repeatedly touted to investors throughout the Class Period ***overstated by over 65%*** the true number of U.S. doctors who were active members of the Doximity platform.

61.      Those U.S. doctors who used the Doximity platform during the Class Period were

1    then asked whether they ever used the Newsfeed on the Doximity platform during the Class Period

2    and, if so, whether they used Doximity's Newsfeed at least quarterly.  The results demonstrated

3    that, of the U.S. doctors who used Doximity during the Class Period, approximately **one-fifth** of

4    them (19.2%) **never** used Doximity's Newsfeed at all during the Class Period and **forty-five**

5    **percent** (45%) used the Newsfeed **less than once a quarter**.

6        62.    To ensure that the survey's results may be properly extrapolated to the population

7    of U.S. doctors as a whole, Lead Counsel designed the survey with a large enough sample size to

8    ensure it produced statistically reliable results, in accordance with the prevailing standards for

9    survey research.  The survey was completed by 681 U.S. doctors, 500 of whom used the Doximity

10   platform at least once during the Class Period.  Given the number of respondents, the survey results

11   can be stated with a 95% confidence level.[39]   A confidence level of 95%, such as here, is

12   consistently regarded as the "gold standard" for surveys in academic and industry research.[40]   As

13   Timothy Chan, a former data scientist at the social media platform Facebook, explained, the 95%

14   confidence level has been the "standard from the very start of modern statistics," as it is high

15   enough to "remove[] 95% of potential false positives" while being an "achievable benchmark for

16   most fields of research to remain productive."  Chan further explained that a 95% confidence level,

17   as selected here, is "unbiased" because its selection demonstrates that the survey conductor has

18   "decided to play by the same rules that others play by," in addition to being "ubiquitous" and

19   "ensur[ing] we're all speaking the same language."[41]  Meanwhile the margin of error for the results

20   was approximately 4%.[42]   A margin of error near 4% is also a significant sign of the survey's

21   reliability:  as experts in survey and analytics have explained, "[t]he most commonly acceptable

22

---

23   [39] To calculate the sample size required for a 95% confidence level with a given margin of error,
     *see* Sample size calculator, https://www.surveymonkey.com/mp/sample-size-calculator/.
24   [40]*How Many Participants for Quantitative Usability Studies: A Summary of Sample-Size*
     *Recommendations*, NNGroup.com (Jul. 25, 2021); Tim Chan, *Understanding the Role of the 95%*
25   *Confidence Interval*, Statsig.com (Aug. 4, 2022) [hereinafter "*95% Confidence Interval*"].
     [41] *Id.*
26   [42] For computing the margin of error, *see* Margin of Error Guide & Calculator, Qualtrics.com,
     https://www.qualtrics.com/experience-management/research/margin-of-error/
27   #:~:text=A%20larger%20standard%20deviation%20means,How%20Qualtrics%20can%20help
     (last visited October 2, 2024).
28

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:24-cv-02281-EKL

margin of error used by most survey researchers falls between 4% and 8% at the 95% confidence level."[43]

63.     Other studies, such as the study conducted by Dr. Sarah Smith of Westchester Medical Center, corroborate that Doximity overrepresented the number of U.S. doctors who were active members on its platform.  In mid-August 2023, Dr. Smith published an independent study in the *Journal of Graduate Medical Education* titled "***Program Misrepresentation in the Doximity Residency Navigator***."  Reviewing the anesthesiology residency program at Westchester Medical Center's current residents and graduates, the study demonstrated that a startlingly high percentage of the "user profiles" of the "members" on the Doximity platform contained basic errors—a strong reflection of the fact that the "members" were ***not*** actively engaged on the platform.  The study documented how "***a large majority*** of Doximity profiles of the program's residents and alumni had inaccuracies," including 65% of graduates and 83% of current residents.[44]  These inaccuracies were not minor, but included outdated and incorrect descriptions of the profile owners' medical residency, specialty (i.e. type of practice), and fellowship.  "Most strikingly," the study concluded, of the current residents identified as "members" of the Doximity platform, Dr. Smith found that ***75%*** of their profiles did not even correctly list the doctors' residency programs, which further indicated that these "members" were not actively using the Doximity platform.[45]  Based on her study and experience, including discussions with other doctors, Dr. Smith concluded and told Lead Counsel that it was "***impossible***" that 80% of U.S. doctors were active members of Doximity.[46]

64.     The account of FE 2, who reviewed Doximity members profiles in his role as a Recruiter at Doximity from January 2023 to December 2023, offers further support for the results of Lead Counsel's survey of U.S. doctors and the Westchester Medical Center study.  As FE 2 explained, basic information about Doximity's "active members" in the Doximity's platform was wrong and outdated.  Consistent with Dr. Smith's findings, FE 2 reported that ***more than half*** of

---

[43] *Margin of Error: How to Find and Reduce It?*, Voxco.com, (last visited September 23, 2024).
[44] Jehoshaphat Report at 42.
[45] Sarah Smith and Apolonia Abramowicz, *Program Misrepresentation In the Doximity Residency Navigator*, 15 J. Grad. Med. Educ. 436, 436 (Aug. 2023).
[46] Dr. Smith is a Clinical Associate Professor of Anesthesiology at Westchester Medical Center.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:24-cv-02281-EKL

the listed phone numbers and email addresses of Doximity's "active members" were either not filled in or were inaccurate.  FE 2 added that member email addresses would often be years old and wrong, estimating based on his experience that *approximately 40%* of the basic information (i.e., phone numbers and email addresses) for "active members" was not filled in, and *an additional 20-30%* of this basic information about the "active members" was inaccurate.[47]  As analysts from Jehoshaphat Research noted after the conclusion of the Class Period, it is "unfathomable" that active members would allow these kinds of errors to persist—indeed, "the higher the error rate in the profiles, the *lower* the percentage of profile 'owners' who have shown up to correct the errors in their profiles."

65.    The click-through rate for messages placed on the Doximity platform further corroborate that far less than 80% of doctors were active members.  At Doximity, a click-through rate measures how many recipients of a message actually click on the message after seeing it.  FE 3 was able to see the click-through rate for his business offering—executive search, clinical search, and the staffing business.  FE 3 explained that the click-through-rate was consistently low throughout his tenure, which began in July of 2022 and lasted until after the Class Period.  Indeed, FE 3 explained that the click-through rate showed that, on average, only *8%* of Doximity's members clicked on Doximity's messages containing job positions.  FE 3 further explained, based on his 17 years of experience in executive searches, that if 80% of U.S. doctors were using Doximity's platform, he would expect a click-through rate of at least 30%—i.e., over *three-times* the actual click-through rate on the platform.  FE 4 corroborated FE 3's account, confirming that the click-through rate on messages in the Doximity platform was in the high single digits, which is inconsistent with 80% of physicians being active users of Doximity.  FE 4 likewise reported that he too would expect a click-through rate of approximately 30% (i.e., over three times the actual click-through rate) if 80% of U.S. doctors were active members on the platform.

---

[47] FE 2 explained these percentages of inaccurate and missing information about the "active members" remained the same throughout his tenure, which lasted from January 2023 through December 2023.  FE 2 added that job placements that were filled through Doximity were also down during his tenure precisely because of the lack of engagement from the "members" who supposedly used Doximity.

1
2

**2.    Doximity's Internal Dashboard Showed That the True Number of Active Members Was Far Less Than Defendants Represented**

3    66.    The true facts about Doximity's "active members" were known and readily

4    viewable across the Company, including through an interactive and proprietary Dashboard

5    available to the Company's executives, including Defendant Tangney.  Indeed, as FE 6 noted, the

6    Doximity Dashboard showing the true number of active members was created at the personal

7    request of Defendant Tangney himself.[48]

8    67.    FE 6, the Business Analytics Manager at Doximity from March 2021 to November

9    2023, described how Doximity had an internal dashboard that was accessible to, among others,

10   Defendant Tangney as well as his supervisor Jeff Gambino (Vice President, Data Analytics).[49]

11   Gambino headed FE 6's business analytics team.  FE 6 described how the Dashboard showed

12   member engagement levels on a quarterly basis in real time or close to it.  The Dashboard, among

13   other things, showed the count of quarterly active users divided by total users on the platform for

14   any given quarter and showed the percentage of members who were active based on that definition.

15   The Dashboard specifically allowed a Doximity employee to view the number of overall active

16   members, including their level of activity on a daily, monthly, and quarterly basis.

17   68.    FE 1, the Client Services Manager ("CSM") at Doximity from January 2020 to

18   April 2022, also reported that there was an internal Dashboard that she had access to and would

19   sign into. FE 1 also confirmed that everyone in his department (i.e., the client services department),

20   the sales department, the development team, and Doximity's CFO and CEO had access to the

21   Dashboard and could check the engagement metric.  FE 1 reiterated that Doximity's CEO and

22   CFO "100%" would have access to that Dashboard and that, on the Dashboard, one could see the

23   number of overall active members.  FE 1, like FE 6, confirmed that the Dashboard showed the

24

25   _____

26   [48] At Defendant Tangney's direction, Priya Manivannan created and implemented the dashboard. Ms. Manivannan was a member of on FE 6's team.

27   [49] FE 6 was responsible for managing the analytics accounts for some of the key pharmaceutical companies who would then advertise on Doximity's platform on the app.  FE 6 worked with some

28   of Doximity's big clients, including Merck (which at the time was Doximity's biggest client) and Lilly.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:24-cv-02281-EKL

number of overall active members, including the percentage of their usage on a daily, monthly, and quarterly basis.

69.    Additional Doximity executives have confirmed that Doximity tracked the number of Doximity active members on the Dashboard, which Defendant Tangney could and did access. For example, Doximity's Co-Founder and Chief Product Officer, Shari Buck, confirmed that Doximity had a Dashboard, internally referred to as "WAND," that specifically tracked "active users," measured on a quarterly basis.[50]  Ms. Buck explained that the Dashboard offered a "snapshot of [Doximity's] network vitality," providing Doximity's executives with the "immediate" ability of "knowing what is going on in the network."  Ms. Buck added that "data" is Doximity's greatest asset; that "show me the data" is one of Doximity's core values; and that "almost every decision [Doximity] make[s] is backed up and powered by [its] data."

70.    Dr. Bushra Anjum, the former Director of Data Science and Data Analytics at Doximity from October 2022 to May 2024, also reported that Doximity had an "interactive multi-level dashboard" that tracked user engagement, and specifically tracked usage on Doximity's "Newsfeed."[51]  Dr. Anjum also explained that, because Doximity's "revenue generation model is ads," it was important for the Company to "track[] the activity on ads."[52]  Dr. Anjum added that "[a] diverse audience uses our dashboard" and that, in particular, Defendant Tangney, Doximity's "CEO [was] interested in overall user engagement and product growth, and adoption."  Dr. Anjum confirmed that the Dashboard included Doximity's "actual data."  Dr. Anjum added that the Dashboard could be filtered by such criteria as "credentials" and physician "specialty," ensuring that Doximity was able to specifically determine the number of physicians who were active members of the platform.

71.    FE 5, who regularly used Doximity's Dashboard, confirmed that Defendants' 80% figure was ***not true***. FE 5 confirmed that WAND, which was the primary dashboard that Doximity used for accessing and showcasing engagement data, showed (among other things) the percentage

---

[50] Shari Buck, Unveiling Doximity's Success: Crafting a Physician-Centric Platform (2019).
[51] Bushra Anjum, *Stars and Dimensions: Data Modeling for the Analytics*, Technology.Doximity.com (Feb. 25, 2020),
[52] Stars, Dimensions, & Stories: Bushra Anjum, Ph.D., Doximity (youtube.com).

of U.S. doctors that were quarterly active users by specialty nationwide.  FE 5 explained that, throughout his tenure, he used WAND multiple times each week to look at the percentage of active users for 20 to 25 physician specialties, which accounted for approximately three quarters of all U.S. doctors.  FE 5 explained that, in **all** such instances, the percentage of quarterly active U.S. doctors, as reflected in the Dashboard, was below 80% for **all** of the types of doctors that he viewed.  FE 5 explained that his role in business development involved his looking at engagement data on WAND multiple times per week for these 20 to 25 physician types, which included, among other specialties, primary care (including Family Medicine, Internal Medicine, Obstetricians, and Pediatrics) and other physician specialties (i.e., types, including general surgery, psychiatry, radiology, and neurology).  FE 5 confirmed that during his tenure—which encompassed the entire Class Period—when he looked at WAND, the number of quarterly active members was **always** below 80% for **every physician specialty that he reviewed**.

72.    Defendant Tangney demonstrated his knowledge of the true, undisclosed number of "active members" on the platform, including on Newsfeed, during the Company's regular offsite meetings.  FE 6 confirmed that Defendant Tangney personally presented engagement metrics, including quarterly active members, during the Company's offsite meetings, which took place three to four times per year.  FE 6 added that, at these offsites in which Defendant Tangney would discuss active member and engagement metrics, the amount of quarterly active members was always provided as an update.  FE 6 recounted that during the Company offsites Defendant Tangney would also present whether a particular channel (e.g., Newsfeed) was being used more or less often.  The metrics that Defendant Tangney presented during these regular offsite meetings were consistent with what was reflected in the Company's Dashboard—i.e., the actual number of active members and engagement.  FE 6 confirmed that general trends in user engagement were also within Defendant Tangney's purview, and that Defendant Tangney would also present these metrics to employees at the quarterly offsite meetings.[53]

73.    Through their access to the Dashboard, Defendant Tangney and Doximity's

---

[53] FE 6 added that his team at Business Analytics provided Defendant Tangney with some of the inputs he would utilize in the presentations.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:24-cv-02281-EKL

executives knew that the Company was materially overstating the number of active members on the platform, including on the Newsfeed.  Doximity's other employees knew it too.  FE 6 explained that it was "definitely" a topic of conversation and a concern at the Company that  the number of active members using the Newsfeed was significantly below 80% of the U.S. physician population.

### 3. User Engagement Continued To Decline On The Platform Throughout The Class Period, Including On The Newsfeed

74. As discussed above (¶¶49-54), in addition to representing that 80% of U.S. doctors were active members of the platform, Defendants also represented that user engagement "increased" every quarter and was consistently reaching "record" highs "across the platform," particularly on the Newsfeed.  Unknown to investors at the time, these representations were false and highly misleading.  In truth, user engagement was ***declining*** throughout the Class Period and across the entire platform, including on the Newsfeed, which adversely impacted the Company's ability to complete upsells.

75. Numerous former Doximity employees have reported that user engagement on the platform was decreasing throughout the Class Period, including on the Newsfeed.  FE 1 specifically reported that engagement across the board was declining by January 2022 and continued to decline until he left the Company in April 2022.  FE 7, who began working as a Business Development Representative at Doximity in August 2022, likewise reported that, from the start of his tenure as a Business Development Representative until he left in August 2023, user engagement was declining across the platform.[54]  And FE 6 reported declining engagement rates by at least November 2022, with the decline in engagement—along with anxiety about how to hide that fact from customers—continuing until he left the Company in November 2023.

---

[54] FE 7 was a Business Development Representative at Doximity from August 2022 until August 2023 and, in that role, communicated with potential customers in order to convince them to purchase ads from Doximity.  FE 7 received performance feedback from Doximity executives Jeff Eaton (Senior Vice President, Head of Sales for the Life Sciences Business Unit from February 2022 until April 2023, and from April 2023 until July 2024 the Senior Vice President, Life Sciences Business Unit Leader, currently the Senior Vice President, Head of Sales and Revenue, Life Sciences Business Unit) and Joe Kleine (Advisor to the Chief Executive Officer of Doximity's recruiting business from April 2022 until January 2024).

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:24-cv-02281-EKL

76.     Former Doximity employees also confirmed that the Company internally recognized and specifically discussed the decline in engagement across the platform.  For example, FE 1 reported that the decline in user engagement was discussed regularly at the Company.  FE 1 specifically recalled how, beginning in January 2022, his team saw a decrease in engagement and in particular deep engagement, and that the decrease in engagement was discussed at a weekly Client Services Manager meeting around January 2022.  FE 1 also recalled that, beginning in January 2022, the Slack channel (in which client service managers communicated) "erupted" every hour with discussion and concern surrounding the decrease in engagement levels.  FE 1 explained that everyone on his team could see these discussions, and these discussions occurred daily.  FE 1 specifically recalled that Doximity's Chief Financial Officer Anna Bryson, a direct report to Defendant Tangney, participated in a meeting in January or February 2022 during which there was discussion about how user engagement was declining.  FE 1 recounted that Bryson exhibited during the meeting that she already knew that user engagement was declining.  Bryson's knowledge of declining user engagement indicated that the matter had been brought to the highest levels of the Company, which would include Defendant Tangney.

77.     Additional employees have confirmed that the decline in engagement continued throughout the remainder of the Class Period.  For example, FE 7, who started at Doximity in August of 2022 and was responsible for bringing in business from pharmaceutical companies seeking to place ads on Doximity's Newsfeed, explained that user engagement across the platform was significantly declining on the Doximity platform during his entire tenure at the Company.  FE 7 further reported that it was not just the number of active members declining, but also the amount of time that members were spending engaged in the Newsfeed, which was the largest source of revenue for the Company.  FE 7 added that there was also a drop off, including on the Newsfeed, in deep engagements, which measures more active participation from members of the platform.  The fact that deep engagement was dropping on the Newsfeed was a particular concern, FE 7 explained, because the Newsfeed was Doximity's selling point and main moneymaker.

78.     FE 6, a Business Analytics Manager and a Senior Business Analytics Manager from March 2021 until November 2023, also recounted how engagement was declining across the

platform during at least the last year of his tenure, from November 2022 to November 2023.  Like FE 7, FE 6 also recounted how overall deep engagement was also going down during this period and specifically on the Newsfeed.

79.     The decline in user engagement was widely discussed among concerned Doximity employees.  FE 7 explained that there were monthly update emails sent from the Product and Data Analytics groups at Doximity to the entire Sales Department, including FE 7, to keep them informed.  These emails reflected that user engagement was declining, with the declines across the entire platform—including, specifically, on the Newsfeed.  These monthly update emails further reflected that the percentage of users who were deeply engaged was declining.  FE 7 recounted that Doximity's Product and Analytics teams expressed concern that they were not getting as much engagement and that, as a result, revenue was going to drop.

### 4.    Doximity's Customers Reduced Their Advertisement Spend On The Doximity Platform Due To Concerns About User Engagement With Their Ads

80.     In a telling sign that user engagement was declining, Doximity's customers began to increasingly question the effectiveness and value of their advertisements on the Platform as the Class Period progressed.  In particular, Doximity's customers began to question whether the user engagement on Doximity's Newsfeed would allow them to achieve the return on investment on their ads that Doximity had promised and that they had expected.[55]

81.     Doximity's customers had only partial access to engagement figures with their specific ads.  FE 7 explained that Doximity maintained specific data on a customer's advertisement or specific piece of content and was able to share with its customers this data, including deep engagements, clicks, look-throughs, how many people read an article, how long people spent reading an article, and how many people followed a link in the article.  FE 7 reported that customers could receive engagement reports for their specific ads, through which they could see the performance of their ads after a time, and as a result customers were aware of how their ads were

---

[55] Doximity told investors that its median ROI for its customers' advertisements was 10 to 1 or more—meaning that, according to Doximity, for every dollar that its customers spent on Doximity, they would earn $10 or more on sales of their products.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:24-cv-02281-EKL

performing and saw that the user engagement numbers were not at the level the customers expected. FE 7 further explained that he participated in calls and updates to customers and heard concerns from customers about the engagement the customers believed they should be getting as opposed to what they were actually getting for their ads.

82.    Doximity was concerned that customers would not only learn engagement was declining for their ads, but across the entire platform. FE 6 explained that one metric that Doximity was particularly unwilling to disclose to customers was the low member engagement levels on the Newsfeed. As FE 6 explained, customers had an assumption that most of the user engagement on the platform was happening organically within the Newsfeed, when it was not. FE 6 knew this was an assumption of customers because he spoke with the Sales Department about it when he first joined the Company; members of the Sales Department told him that when most clients come into contracts and a relationship with Doximity, they naturally think that engagement is coming from people in the Newsfeed clicking on something. FE 6 explained that the concern at Doximity was that, if clients were to ask for Newsfeed metrics specifically and see that they were not as high as the overall engagement metrics across the platform, then they would instead advertise with one of Doximity's competitors.

83.    Doximity's response to these unfavorable engagement figures—including the unfavorable Newsfeed engagement figures—was to conceal them from customers. FE 6 explained that this instruction—i.e., to avoid disclosing the low level of engagement on the Newsfeed, and to steer customers to other metrics—caused concern for him and his team, including the Business Analytics Managers that FE 6 worked with at the time. FE 6 added that the Business Analytics Managers shared experiences from their accounts with FE 6, and the need to avoid providing these metrics to Doximity's customers was a common experience and concern for the whole analytics department at Doximity. FE 6 explained that, starting in approximately November 2022, both he and other Business Analytics Managers repeatedly raised this concern both among themselves and to Jeff Gambino. Specifically, FE 6 described how there were multiple times starting in November 2022 in which he raised concerns to Jeff Gambino that the Company was not providing key metrics of engagement on Newsfeed to its clients. Between his reports to the sales department and

Gambino, FE 6 recalled that he reported his discomfort no fewer than ten times, including raising concerns to Gambino specifically at least five times. FE 6 explained that this same concern commonly came up during weekly Business Analytics Manager meetings, which Gambino also attended. FE 6 reported that Defendant Tangney knew of the concern that they were not providing customers with newsfeed engagement numbers because they were poor, and that such concerns were raised to Defendant Tangney in April or May of 2023.

84.    Customer concerns with engagement, and how to avoid them by hiding unfavorable engagement metrics, involved some of Doximity's key customers and were escalated to Defendant Tangney. FE 6 explained that in April or May of 2023, Doximity personnel engaged in careful discussions about what metrics to provide to Merck, a key client. FE 6 explained that in the past, Doximity reported to Merck the number of total engagements over certain time periods, and the number of engagements broken out by specialty, but scrapped the way they used to report to Merck because the number of unique engagements for its ads was not going up and, if anything, was declining. In the spring of 2023, the user engagement metrics caused concern and ultimately "panic" among the team working on the account. FE 6 recalled that he escalated the issue to Gambino, who confirmed in conversations with FE 6 that Defendant Tangney had been informed about the situation with Merck, with Gambino providing comments along the lines of "Jeff is aware." Defendant Tangney was therefore aware that a major customer was pressing for information about Doximity's engagement figures that it did not want to divulge, and aware of Doximity's efforts to conceal the true engagement data.

85.    As the Class Period wore on and engagement on the platform and Newsfeed declined, customers increasingly challenged Doximity on whether the platform could really justify their return on investment ("ROI"). In order for a doctor to count as a positive return on investment for an ad, the doctor must interact with the customers' advertisement campaign. FE 6 confirmed that if providers were not engaging, it would absolutely impact ROI. For example, FE 6 explained how, after November 2022, the pharmaceutical company Lilly told FE 6 that it had run an independent analysis on the benefits Doximity delivered to its advertising campaign and discovered a **negative** ROI—which meant Lilly **lost** money by advertising on Doximity's platform.

FE 6 explained that Doximity subsequently ran the results and could only confirm what Lilly had reported.  FE 6 immediately escalated the issue to Jeff Gambino.

86.    Ultimately, FE 6 could no longer tolerate the growing discomfort with how Doximity was handling its reporting of user engagement to its clients.  As FE 6 explained, there is just so much diversion you can do.  Accordingly, he quit Doximity.

87.    Doximity's customers increasingly became concerned with the level of engagement on the Doximity platform.  FE 1 offered a unique perspective on the issue given that, in 2022, FE 1 left Doximity to work for Novo Nordisk, a healthcare company focused on treating certain chronic diseases that, for example, produces half of the world's insulin supply.[56]  FE 1 stated that Novo Nordisk was a Doximity client that previously advertised on the Doximity platform.  During FE 1's discussions with Doximity (from the customer's end), Doximity refused to provide the information the Novo Nordisk team requested to run their own analytics to check on the level of engagement on the Doximity platform.  FE 1 explained that, as a result, his boss at Novo Nordisk questioned Defendant Tangney about user engagement rates on the Doximity platform over a dinner (also attended by FE 1), which resulted in Defendant Tangney leaving the dinner. After Tangney left, FE 1's boss told him that he merely wanted to know about Doximity's engagement numbers and how they got there, but Tangney told him to reach out to his Doximity sales representative and they could handle it, after which Tangney abruptly left.  As a result, as FE 1 explained, his team at Novo Nordisk decided to stop advertising with Doximity toward the end of 2022 because the numbers presented by Doximity were inflated, and Doximity refused to provide the requested information.  As FE 1 explained, his boss at Novo Nordisk thought that Doximity's engagement numbers were "complete BS."

88.    The lower-than-represented member engagement on the Doximity platform caused customers to reduce and, in some cases, stop purchasing "upsells" for ad space on the platform. FE 7 commented on this decline in upselling and confirmed that customers spent less money advertising with Doximity when the Company had no choice but to disclose its engagement

---

[56] *See What We Do*, NovoNordisk.com, https://www.novonordisk.com/about/what-we-do.html (last visited September 21, 2024).

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:24-cv-02281-EKL

metrics to customers for their advertisements.  FE 7 explained how, based on his experience, customers were not interested in upsells if their current ads were not performing consistent with how they thought they should.  FE 7 confirmed that there were customer concerns about user engagement and hesitancy with upsells his entire tenure from August 2022 through August 2023— which he knew based on conversations with both customers and Doximity salespeople.  After onboarding a new customer, FE 7 explained, he attended meetings between Doximity and those customers where they consistently reported that they were not going to spend as much with Doximity because of the results in the user engagement reports they received about their ads.

89.    In his Business Development role, FE 7 also attended weekly meetings with Doximity's sales department, where he learned that Doximity employees who were responsible for upsells were not hitting their numbers.  FE 7 explained that this was a common theme throughout his entire tenure (which ended in August 2023), but especially throughout the last couple of quarters that he was with the Company.  FE 7 explained that it was very clear that user engagement numbers and growth were declining, and there was a concern about how many pharmaceutical companies were investing in ads on Doximity and buying space on the platform. FE 7 confirmed that there was a general sentiment amongst the sales team that they could not complete as many advertising sales because of declining and low user engagement.

## V.    **THE TRUTH EMERGES**

90.    The relevant truth concealed by Defendants' Class Period misrepresentations and omissions emerged on August 8, 2023.  On that date, Doximity stunned investors by slashing its financial guidance for fiscal year 2024 that it previously provided to investors.  Doximity reduced its lower- and upper-end revenue guidance by, respectively, $32 million and $54 million, and reduced its lower- and upper-end EBITDA guidance by, respectively, $7 million and $29 million. Doximity also announced that, as a result, the Company would need to terminate 10% of its workforce.

91.    During Doximity's quarterly earnings call that day after market close, Doximity admitted to a substantial decline in its "upsell close rate"—i.e., a decline in the sale of one-time advertisements on the Newsfeed during the year.  Defendant Tangney further admitted that

"banner ads" on other social media platforms received its customers' "incremental spend"—in other words, Doximity lost out to its competitors.  Defendant Tangney further admitted that "smaller" social media companies "who are bidding up certain segments of physicians" were providing "a better, frankly, more normalized ROI than what we currently deliver."

92.    Analysts reacted sharply to these disclosures and the Company's results, which they described as "***shockingly short of expectations***."[57]    Analysts at Needham and Guggenheim Securities immediately downgraded Doximity's stock from "Buy" to "Hold" and "Neutral," respectively, while Piper Sandler, Bank of America Securities, and Morgan Stanley each substantially lowered their price targets for Doximity's stock in direct response to the revelations. Evercore ISI reported that investors "are likely to remain concerned that programmatic banner ads captured share from DOCS and will weigh further on the long-term growth of the core business."[58]

93.    During the August 8, 2023 earnings call, Defendant Tangney also sought to attribute much of the decline in the "close rate" of upsells to Doximity's sales tactics—and not less-than-represented engagement on the Doximity platform.  Analysts and investors, however, did not accept Defendants' stated explanations and recognized the singular, true cause for the decline in upsells: user engagement was not what Doximity had represented during the Class Period.  For example, in its August 9, 2023 report, analysts at Wells Fargo concluded that Doximity failed to level with investors, explaining "***we don't completely buy***" Defendants' "***explanation that a lack of a self-serve model [plus] market weakness fully explains the large miss to upsell expectations.***"  Rejecting the Company's stated explanation, Wells Fargo's analysts "***question[ed] whether [Doximity's] clients are seeing a high enough [return on investment] to warrant putting more ad dollars in later in the year.***"

94.    Analysts at Morgan Stanley also concluded that the decline in upsells was attributable to lower-than-represented engagement on the platform—and ***not*** to a flaw in any sales tactics.  In their August 9, 2023 report following the disclosures, Morgan Stanley's analysts told investors that a "stronger re-acceleration in the core newsfeed" was needed to get the Company

---

[57] August 8, 2023 Jefferies Report at 1.
[58] August 8, 2023 Evercore ISI Analyst Report.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:24-cv-02281-EKL

back to previously-reported revenue growth.  Morgan Stanley's analysts further explained how they conducted industry "checks" with Doximity's pharmaceutical and health system customers "to get a fresh pulse on current industry trends" and that, through these industry checks, they found that "company-specific" issues at Doximity resulted in lesser-than-expected upsells.  Chief among these issues, Doximity suffered from "***slowing growth in their … user engagement,***" which reduced upsells and forced Defendants to slash their revenue guidance.

95.    Other securities analysts and market commentators also recognized that the decline in Doximity's upsells, and the reduction in its revenue guidance, were attributable to the fact that there were lesser-than-represented active members on the platform.  For example, immediately following the Company's August 8, 2023 disclosures, Dr. Tarang Patel—a physician and securities analyst who focuses on healthcare companies—openly challenged the veracity of Doximity's representations, publicly stating to his followers that Defendants' representations about having "***4/5 of doctors***" as active members were "***hard to believe,***" adding "***I've never heard any colleagues say they use Doximity.***"[59]  Based on his outreach to doctors following the Company's August 8, 2023 disclosure, he concluded that the "major use" for the Doximity platform was ***not*** Newsfeed (i.e., the only meaningful money-making portion of the platform), but rather its "telehealth" tools that generated no revenue for the Company.  Indeed, the majority of doctors who responded to Dr. Patel's inquiry reported that they either did not use Doximity or only used it for its telehealth tools—i.e., not the Newsfeed—with many of the doctors questioning Doximity's representations to investors that "over 80%" of doctors were active members.[60]

96.    Over the next weeks, additional securities analysts confirmed the true reason why Doximity slashed its revenue guidance and was unable to complete upsells.  On April 1, 2024, an

---

[59] Dr. Patel runs a blog and podcast known as "Doctor Money Matters," which is a "resource for physicians, dentists, and other health professionals . . . to have a place to discuss financial topics."  *See* https://www.doctormoneymatters.com/ (last visited September 25, 2024).

[60] *See, e.g.*, Dr. Harry Giles ("I use the app's phone dialer feature only"); Dr. Smauel Brown ("I got a login because I was supposed to 'vote' in the US News rankings. I suspect there a lot of people like me who are nominally D users but who use it for nothing beyond the U.S News thing"), Dr. Ryan P. Daly ("It's nice to have a Rolodex of contact # and emails of physicians' colleagues. But its not much more than that"); Dr. Daniel J. Ritter ("Use or 'use?' I made a profile in medical school and have never logged in since").

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:24-cv-02281-EKL

analyst at the research firm Jehoshaphat issued a scathing 57-page report following an in-depth review of Doximity (the "Jehoshaphat Report").  The Jehoshaphat Report was based on, among other things, "interviews with former employees and digital marketing agencies, analysis of app activity," in addition to a "review of academic research about Doximity's misrepresentations in its profile network."

97.    The Jehoshaphat Report concluded that, contrary to Defendants' representations during the Class Period, "***Doximity Engagement Appears To Be Falling.***"  The Jehoshaphat Report's findings further undermined Doximity's Class Period representation that 80% of U.S. physicians were "active members" of the platform.  As the Jehoshaphat Report explained, "***[a]sk around (as we have), and we're confident that you'll find a great number of doctors who 'have' Doximity profiles but don't engage with the platform in any meaningful way***."  The Jehoshaphat Report found that Doximity's "active members" were not active at all; rather, the Company "signed up" many of their members through deceptive tactics, including by "using their NPI numbers and then inviting them to 'claim' their profiles."  As the Jehoshaphat Report noted, "[s]igning up doctors using their NPI numbers and then inviting them to 'claim' their profiles is a clever way to move towards hopeful engagement, ***but actual engagement it is not***."

98.    In addition to its own research, the Jehoshaphat Report brought to the fore the academic study discussed above (*see* ¶63), published by Dr. Smith in mid-August 2023 in the *Journal of Graduate Medical Education*. As the Jehoshaphat Report explained, Dr. Smith's study, titled "***Program Misrepresentation in the Doximity Residency Navigator,***" found that "a large majority of Doximity profiles of the program's residents and alumni had inaccuracies."[61]  The Jehoshaphat Report aptly concluded that it was "unfathomable" that "engaged" doctors would allow these kinds of errors to persist—indeed, "the higher the error rate in the profiles, the lower the percentage of profile 'owners' who have shown up to correct the errors in their profiles."

99.    The Jehoshaphat Report further explained that the analyst's "interviews with marketing agencies and former [Doximity] employees suggest" that Doximity provided

---

[61] Jehoshaphat Report at 42.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:24-cv-02281-EKL

"*misleading … ROI*" to drug companies that advertise on the Doximity platform, which, contrary to Defendants' representations, were "*declining.*"  Citing interviews with marketing executives, the Jehoshaphat Report explained that investors should take Doximity's representations about its customers' return-on-investment for their ads with a "*GIGANTIC* grain of salt."

100.    The Jehoshaphat Report further concluded that engagement at the Company was not only substantially lower than reported, but actively declining.  As the Jehoshaphat analyst explained, "*[u]ser engagement with the Doximity platform [] appears to be declining, which would explain declining customer ROIs.*"[62]  Because of these and other "fundamental issues" at Doximity, Jehoshaphat explained, the Company's "underlying sales" were also "declining at a negative -3-6% rate," a decline that Doximity disguised through accelerated revenue recognition— i.e., speeding up the timeframe in which Doximity recognized amounts billed for services to be performed as revenue.  In other words, Doximity had papered over the issues caused by customers no longer accepting its lofty engagement claims by "borrowing" money from future revenues to show growth in the current quarters.

101.    Investors were harmed by Defendants' misrepresentations about the number of "active members" and "increasing" engagement across the Doximity platform during the Class Period. Following the August 8, 2023 revelations, the price of Doximity's common stock plummeted by nearly *23%*— the largest single-day decline in Doximity's history—wiping out over *$900 million* in shareholder value in one day.

## VI.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

102.    Defendants made materially false and misleading statements during the Class Period in violation of Sections 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Among other things:

(i)    Defendants overstated *by more than 65%* the number of U.S. physicians who were "active members" on the Doximity platform during the Class Period;

(ii)    Defendants concealed that, of the U.S. physicians who used the platform, *more than*

---

[62] *See* https://x.com/JehoshaphatRsch/status/1774795208791581030.

*half of them* used Doximity's Newsfeed *less than quarterly* or *not at all* during the Class Period;

(iii)    Defendants represented that engagement across the platform was increasing when, in reality, engagement was *decreasing* across the platform; and

(iv)    Defendants represented that engagement on Doximity's Newsfeed was increasing and had "never been higher" when, in reality, engagement was *decreasing* on the Newsfeed.

103.    Defendants also omitted material facts when speaking to investors during the Class Period in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Once Defendants chose to tout that "over 80%" of U.S. doctors were "active members" on the Doximity platform and highlight the "record" and "increasing" level of engagement "across the entire platform," they were duty bound—but failed—to do so in a manner that did not mislead investors, including by disclosing, among other things, that:  (i) *more than half* of all U.S. physicians either *never* used Doximity or did so on a less-than-quarterly basis (¶60); (ii) *over one-third* of doctors who used the Doximity platform did so *less than quarterly* (¶60); (iii) *nearly half* of Doximity members that used the platform during the Class Period used Doximity's Newsfeed less than quarterly (¶61); (iv) approximately *one-fifth* of Doximity members that used the platform during the Class Period *never* used the Newsfeed during the Class Period (¶61); (v) the *majority* of member profiles contained basic errors and omissions, showing a lack of engagement with the profiles (¶¶63-64); and (vi) Doximity's own internal Dashboard showed that *less* than 80% of U.S. doctors were active members (¶¶70-71).

A.    **FALSE AND MISLEADING STATEMENTS IN 2021**

1.    **June 2021 Interview On CNBC's TechCheck**

104.    On the first day of the Class Period, Defendant Tangney appeared for an interview on CNBC's TechCheck, a broadcast that focuses on public companies in the technology sector. During the interview, the CNBC interviewer asked Defendant Tangney to introduce Doximity to investors and explain how it became the "Linked-In for doctors."  In response, Defendant Tangney stated that "*today we have over 80% of all U.S. physicians as active members on the platform.*" In the same interview, minutes later, Defendant Tangney represented "*again, we're over 80% of*

*all U.S. physicians as active members.*"

105.    The statements highlighted above in ¶104 were materially false and misleading when made.  In making these statements, Defendant Tangney overstated by *more than 65%* the number of U.S. physicians who were active members of the platform.  ¶¶58-62.  Additionally, it was materially misleading for Defendant Tangney to state that "we have over 80% of all U.S. physicians as active members" while omitting that (i) *more than half* of all U.S. physicians either *never* used Doximity or did so on a less-than-quarterly basis (¶60); (ii) *over one-third* of doctors who used the Doximity platform did so *less than quarterly* (¶60); (iii) *nearly half* of Doximity members that used the platform during the Class Period used Doximity's Newsfeed less than quarterly (¶61); (iv) approximately *one-fifth* of Doximity members who used the platform during the Class Period *never* used the Newsfeed during the Class Period (¶61); (v) the *majority* of member profiles contained basic errors and omissions, showing a lack of engagement with the profiles (¶¶63-64); and (vi) Doximity's own internal Dashboard showed that *less* than 80% of U.S. doctors were active members (¶¶70-71).  As a result of these materially misleading statements and omissions, investors were left with the false and misleading impression that Doximity's user engagement—particularly on its revenue-critical Newsfeed—was significantly higher than it actually was.  ¶¶56-79.

## 2.    August 2021 Quarterly Investor Conference

106.    On August 10, 2021, Defendant Tangney appeared and spoke on behalf of Doximity at the Company's first-ever earnings call as a public company. In his opening remarks, Defendant Tangney stated that "since this is our first earnings call, I do want to take a minute, step back and provide some broader context on our business and market opportunity."  Dr. Tangney then represented that "*today, over 80% of all U.S. physicians use our platform*."

107.    The statement highlighted above in ¶106 was materially false and misleading when made.  In making this statement, Defendant Tangney overstated by *more than 65%* the number of U.S. physicians who were active members of the platform.  ¶¶58-62.  Additionally, it was materially misleading for Defendant Tangney to state that "today, 80% of all U.S. physicians use our platform" while omitting that (i) *more than half* of all U.S. physicians either *never* used

Doximity or did so on a less-than-quarterly basis (¶60); (ii) *over one-third* of doctors who used the Doximity platform did so *less than quarterly* (¶60); (iii) *nearly half* of Doximity members who used the platform during the Class Period used Doximity's Newsfeed less than quarterly (¶61); (iv) approximately *one-fifth* of Doximity members who used the platform during the Class Period *never* used the Newsfeed during the Class Period (¶61); (v) the *majority* of member profiles contained basic errors and omissions, showing a lack of engagement with the profiles (¶¶63-64); and (vi) Doximity's own internal Dashboard showed that *less* than 80% of U.S. doctors were active members (¶¶56-71). As a result of these materially misleading statements and omissions, investors were left with the false and misleading impression that Doximity's user engagement—particularly on its revenue-critical Newsfeed—was significantly higher than it actually was. ¶¶56-79.

### 3. Doximity's Business Overview Website Video

108. On August 10, 2021, coinciding with Doximity's first earnings call as a public company, Doximity posted a video to its Investor webpage, described as a "Business Overview." The video featured Defendant Tangney and purported to describe Doximity's business to potential investors. In the video, Defendant Tangney represented that "*[t]oday, over 80% of all U.S. physicians use our platform*." The video remained posted to Doximity's investor page throughout the Class Period.

109. The statement highlighted above in ¶108 was materially false and misleading when made. In making this statement, Defendant Tangney overstated by *more than 65%* the number of U.S. physicians who were active members of the platform. ¶¶58-62. Additionally, it was materially misleading for Defendant Tangney to state that "[t]oday, over 80% of all U.S. physicians use our platform" while omitting that (i) *more than half* of all U.S. physicians either *never* used Doximity or did so on a less-than-quarterly basis (¶60); (ii) *over one-third* of doctors who used the Doximity platform did so *less than quarterly* (¶60); (iii) *nearly half* of Doximity members that used the platform during the Class Period used Doximity's Newsfeed less than quarterly (¶61); (iv) approximately *one-fifth* of Doximity members who used the platform during the Class Period *never* used the Newsfeed during the Class Period (¶61*)*; (v) the *majority* of member profiles contained basic errors and omissions, showing a lack of engagement with the

profiles (¶¶63-64); and (vi) Doximity's own internal Dashboard showed that *less* than 80% of U.S. doctors were active members (¶¶56-71). As a result of these materially misleading statements and omissions, investors were left with the false and misleading impression that Doximity's user engagement—particularly on its revenue-critical Newsfeed—was significantly higher than it actually was. ¶¶56-79.

### 4. August 2021 TechCheck Interview

110. On August 10, 2021, following Doximity's first earnings call, Defendant Tangney appeared and spoke on behalf of Doximity during an interview by CNBC's TechCheck. The CNBC interviewer asked Defendant Tangney to "tell us about what's driving" the Company's quarterly results. In response, Defendant Tangney again represented that "*we have over 80% of all U.S. physicians as active members on our platform.*"

111. The statement highlighted above in ¶110 was materially false and misleading when made. In making this statement, Defendant Tangney overstated by *more than 65%* the number of U.S. physicians who were active members of the platform. ¶¶58-62. Additionally, it was materially misleading for Defendant Tangney to state that "we have over 80% of all U.S. physicians as active members on our platform" while omitting that (i) *more than half* of all U.S. physicians either *never* used Doximity or did so on a less-than-quarterly basis (¶60); (ii) *over one-third* of doctors who used the Doximity platform did so *less than quarterly* (¶60); (iii) *nearly half* of Doximity members who used the platform during the Class Period used Doximity's Newsfeed less than quarterly (¶61); (iv) approximately *one-fifth* of Doximity members who used the platform during the Class Period *never* used the Newsfeed during the Class Period (¶61); (v) the *majority* of member profiles contained basic errors and omissions, showing a lack of engagement with the profiles (¶¶63-64); and (vi) Doximity's own internal Dashboard showed that *less* than 80% of U.S. doctors were active members (¶¶56-71). As a result of these materially misleading statements and omissions, investors were left with the false and misleading impression that Doximity's user engagement—particularly on its revenue-critical Newsfeed—was significantly higher than it actually was. ¶¶56-79.

### 5.    November 2021 Quarterly Investor Conference

112.    On November 9, 2021, Defendant Tangney appeared and spoke on behalf of Doximity during the Company's second quarterly earnings call.  On the earnings call, Defendant Tangney responded to an analyst report published by J.P. Morgan that questioned the engagement statistics provided by Doximity.  In particular, the J.P. Morgan analyst's report suggested that "of the 1.8M total members on the platform," only "~4.9%, have a session daily with 13.9% on a monthly basis for the month of September"—i.e., far less than the 80% of U.S. doctors than Defendants represented.  The J.P. Morgan analyst further questioned in his report whether the "active members" used the Newsfeed, with the analyst suggesting that Doximity members viewed the platform "more like a telehealth solution than a place where members spend time viewing the newsfeed—and thus ads."

113.    During the earnings call, in response to the J.P. Morgan report, Defendant Tangney stated that "***our engagement with our Newsfeed has never been higher***."  Additionally, in response to analyst questions about the number of active users on the platform, Defendant Tangney responded:

> ***And I could just hit that head on and say our users and usage is the way I mean, mid-double digit percentages up from our pre-pandemic levels and any third-party data that suggests otherwise is just wrong.***  And believe me, we've looked at this a bunch of different ways.  Internally, we split our three product teams across three different teams that we individually measure called news, network and comms or communications.

114.    The statements highlighted above in ¶113 were materially false and misleading when made.  Contrary to Defendants' statements that engagement across the platform was "up" and engagement on the Newsfeed had "never been higher," engagement across the platform and on the Newsfeed was ***declining*** throughout the Class Period.  ¶¶74-79.  Additionally, it was materially misleading for Defendant Tangney to tout engagement on Newsfeed as having "never been higher" and to refute all contrary evidence as "just wrong," without disclosing that (i) Defendants overstated by ***more than 65%*** the number of U.S. physicians who were active members of the platform (¶¶58-62); (ii) ***more than half*** of all U.S. physicians either ***never*** used Doximity or did so on a less-than-quarterly basis (¶60); (iii) ***over one-third*** of doctors who used

the Doximity platform did so *less than quarterly* (¶60); (iv) *nearly half* of Doximity members who used the platform during the Class Period used Doximity's Newsfeed less than quarterly (¶61); (v) approximately *one-fifth* of Doximity members who used the platform during the Class Period *never* used the Newsfeed during the Class Period (¶61); (vi) the *majority* of member profiles contained basic errors and omissions, showing a lack of engagement with the profiles (¶¶63-64); and (vii) Doximity's own internal Dashboard showed that *less* than 80% of U.S. doctors were active members (¶¶56-71). As a result of these materially misleading statements and omissions, investors were left with the false and misleading impression that Doximity's user engagement—particularly on its revenue-critical Newsfeed—was significantly higher than it actually was. ¶¶56-79.

### 6. November 2021 TechCheck Interview

115. On November 10, 2021, after denying analyst concerns about engagement on the Doximity platform during the prior day's quarterly investor call, Defendant Tangney appeared again on CNBC's TechCheck. At the start of the broadcast, Defendant Tangney offered a "quick reminder" about Doximity, during which he stated that "*today over 80% of all U.S. physicians are active members on our platform*."

116. The statement highlighted above in ¶115 was materially false and misleading when made. In making this statement, Defendant Tangney overstated by *more than 65%* the number of U.S. physicians who were active members of the platform. ¶¶58-62. Additionally, it was materially misleading for Defendant Tangney to tell investors that "today over 80% of all U.S. physicians are active members on our platform" while omitting that (i) *more than half* of all U.S. physicians either *never* used Doximity or did so on a less-than-quarterly basis (¶60); (ii) *over one-third* of doctors who used the Doximity platform did so *less than quarterly* (¶60); (iii) *nearly half* of Doximity members who used the platform during the Class Period used Doximity's Newsfeed less than quarterly (¶61); (iv) approximately *one-fifth* of Doximity members who used the platform during the Class Period *never* used the Newsfeed during the Class Period (¶61); (v) the *majority* of member profiles contained basic errors and omissions, showing a lack of engagement with the profiles (¶¶63-64); and (vi) Doximity's own internal Dashboard showed that *less* than

80% of U.S. doctors were active members (¶¶56-71).  As a result of these materially misleading statements and omissions, investors were left with the false and misleading impression that Doximity's user engagement—particularly on its revenue-critical Newsfeed—was significantly higher than it actually was.  ¶¶56-79.

**B.     FALSE AND MISLEADING STATEMENTS IN 2022**

**1.     February 2022 TechCheck Interview**

117.    On February 9, 2022, Defendant Tangney made yet another appearance on CNBC's TechCheck.  In providing what he termed a "quick reminder" of what Doximity did, Defendant Tangney again represented that "***Today, over 80% of all U.S. physicians use us*** to ***power millions of digital interactions each day***."

118.    The statements highlighted above in ¶117 were materially false and misleading when made.  In making these statements, Defendant Tangney overstated by ***more than 65%*** the number of U.S. physicians who were active members of the platform.  ¶¶58-62.  Additionally, it was materially misleading for Defendant Tangney to tell investors that "[t]oday, over 80% of all U.S. physicians" use Doximity to "power millions of digital interactions each day," while omitting that (i) ***more than half*** of all U.S. physicians either ***never*** used Doximity or did so on a less-than-quarterly basis (¶60); (ii) ***over one-third*** of doctors who used the Doximity platform did so ***less than quarterly*** (¶60); (iii) ***nearly half*** of Doximity members who used the platform during the Class Period used Doximity's Newsfeed less than quarterly (¶61); (iv) approximately ***one-fifth*** of Doximity members who used the platform during the Class Period ***never*** used the Newsfeed during the Class Period (¶61); (v) the ***majority*** of member profiles contained basic errors and omissions, showing a lack of engagement with the profiles (¶¶63-64); and (vi) Doximity's own internal Dashboard showed that ***less*** than 80% of U.S. doctors were active members (¶¶56-71).  As a result of these materially misleading statements and omissions, investors were left with the false and misleading impression that Doximity's user engagement—particularly on its revenue-critical Newsfeed—was significantly higher than it actually was.  ¶¶56-79.

**2.     March 2022 Morgan Stanley Investor Conference**

119.    On March 10, 2022, Defendant Tangney appeared and spoke on behalf of Doximity

during Morgan Stanley's Technology, Media and Telecom Investor Conference.  During Defendant  Tangney's prepared remarks, he represented that "*we have over 80% of all U.S. physicians as active members, and they're doing millions of interactions with us each day*."

120.    Following Defendant Tangney's prepared remarks, an analyst asked Defendant Tangney "where are we at overall on the Doximity journey."  In response, Defendant Tangney again stated "*[w]e have over 80% of U.S. physicians today as active members.*"

121.    The statements highlighted above in ¶¶119-20 were materially false and misleading when made.  In making these statements, Defendant Tangney overstated by *more than 65%* the number of U.S. physicians who were active members of the platform.  ¶¶58-62.  Additionally, it was materially misleading for Defendant Tangney to tell investors that "we have over 80% of all U.S. physicians as active members" who were "doing millions of interactions with us each day" while omitting that (i) *more than half* of all U.S. physicians either *never* used Doximity or did so on a less-than-quarterly basis (¶60); (ii) *over one-third* of doctors who used the Doximity platform did so *less than quarterly* (¶60); (iii) *nearly half* of Doximity members who used the platform during the Class Period used Doximity's Newsfeed less than quarterly (¶61); (iv) approximately *one-fifth* of Doximity members who used the platform during the Class Period *never* used the Newsfeed during the Class Period (¶61); (v) the *majority* of member profiles contained basic errors and omissions, showing a lack of engagement with the profiles (¶¶63-64); and (vi) Doximity's own internal Dashboard showed that *less* than 80% of U.S. doctors were active members (¶¶56-71).  As a result of these materially misleading statements and omissions, investors were left with the false and misleading impression that Doximity's user engagement—particularly on its revenue-critical Newsfeed—was significantly higher than it actually was.  ¶¶56-79.

### 3.    May 2022 Quarterly Investor Conference

122.    On May 17, 2022, Defendant Tangney appeared and spoke on behalf of Doximity during the Company's quarterly earnings call.  During his introductory remarks describing the quarter's results, Defendant Tangney stated that "*[o]ur usage also hit fresh highs.*"

123.    The statement highlighted above in ¶122 was materially false and misleading when made.  Contrary to Defendants' statements that usage "hit fresh highs," engagement was *declining*

across the platform, including on Newsfeed. ¶¶74-79. Additionally, it was materially misleading for Defendant Tangney to tout "record" engagement across the platform and a "record number quarterly active users," without disclosing that (i) Defendants overstated by *more than 65%* the number of U.S. physicians who were active members of the platform (¶¶58-62); (ii) *more than half* of all U.S. physicians either *never* used Doximity or did so on a less-than-quarterly basis (¶60); (iii) *over one-third* of doctors who used the Doximity platform did so *less than quarterly* (¶60); (iv) *nearly half* of Doximity members who used the platform during the Class Period used Doximity's Newsfeed less than quarterly (¶61); (v) approximately *one-fifth* of Doximity members who used the platform during the Class Period *never* used the Newsfeed during the Class Period (¶61); (vi) the *majority* of member profiles contained basic errors and omissions, showing a lack of engagement with the profiles (¶¶63-64); and (vii) Doximity's own internal Dashboard showed that *less* than 80% of U.S. doctors were active members (¶¶56-71). As a result of these materially misleading statements and omissions, investors were left with the false and misleading impression that Doximity's user engagement—particularly on its revenue-critical Newsfeed—was significantly higher than it actually was. ¶¶56-79.

### 4.    August 2022 Quarterly Investor Conference

124.    On August 4, 2022, Defendant Tangney appeared and spoke on behalf of Doximity during the Company's August 2022 quarterly investor conference call. During the quarterly call, Defendant Tangney represented during his prepared remarks that "our physician engagement *also hit new record highs*."

125.    Following Defendant Tangney's prepared remarks, an analyst questioned him about the state of the business. In response, Defendant Tangney stated "So, hey listen, *our engagement has never been higher as I said*, *hundreds of thousands of doctors every week in our app. Five times what it was four years ago*."

126.    The statements highlighted above in ¶¶124-45 were materially false and misleading when made. Contrary to Defendants' statements that engagement "hit new record highs" and that "our engagement has never been higher," engagement and deep engagement on the platform were *declining*, including on Newsfeed. ¶¶74-79. Additionally, it was materially misleading for

Defendant Tangney to tout "record" engagement across the platform, without disclosing that (i) Defendants overstated by ***more than 65%*** the number of U.S. physicians who were active members of the platform (¶¶58-62); (ii) ***more than half*** of all U.S. physicians either ***never*** used Doximity or did so on a less-than-quarterly basis (¶60); (iii) ***over one-third*** of doctors who used the Doximity platform did so ***less than quarterly*** (¶60); (iv) ***nearly half*** of Doximity members who used the platform during the Class Period used the Newsfeed less than quarterly (¶61); (v) approximately ***one-fifth*** of Doximity members who used the platform during the Class Period ***never*** used Doximity's Newsfeed during the Class Period (¶61); (vi) the ***majority*** of member profiles contained basic errors and omissions, showing a lack of engagement with the profiles (¶¶63-64); and (vii) Doximity's own internal Dashboard showed that ***less*** than 80% of U.S. doctors were active members (¶¶56-71).  As a result of these materially misleading statements and omissions, investors were left with the false and misleading impression that Doximity's user engagement—particularly on its revenue-critical Newsfeed—was significantly higher than it actually was.  ¶¶56-79.

### 5.     November 2022 Quarterly Investor Conference

127.    On November 10, 2022, Defendant Tangney appeared and spoke on behalf of Doximity during the Company's November 2022 quarterly investor conference call.  During the quarterly call, Defendant Tangney stated that engagement on the Doximity platform achieved "***fresh highs in Q2.***"

128.    The statement highlighted above in ¶127 was materially false and misleading when made.  Contrary to Defendants' statements that engagement achieved "fresh highs in Q2," engagement and deep engagement were ***declining***, including on Newsfeed.   ¶¶74-79.  Additionally, it was materially misleading for Defendant Tangney to tout "fresh highs" in engagement on the Doximity platform, without disclosing that (i) Defendants overstated by ***more than 65%*** the number of U.S. physicians who were active members of the platform (¶58-62); (ii) ***more than half*** of all U.S. physicians either ***never*** used Doximity or did so on a less-than-quarterly basis (¶60); (iii) ***over one-third*** of doctors who used the Doximity platform did so ***less than quarterly*** (¶60); (iv) ***nearly half*** of Doximity members who used the platform during the

1     Class Period used the Newsfeed less than quarterly (¶61); (v) approximately ***one-fifth*** of Doximity

2     members who used the platform during the Class Period ***never*** used Doximity's Newsfeed during

3     the Class Period (¶61); (vi) the ***majority*** of member profiles contained basic errors and omissions,

4     showing a lack of engagement with the profiles (¶¶63-64); and (vii) Doximity's own internal

5     Dashboard showed that ***less*** than 80% of U.S. doctors were active members (¶¶56-71).  As a result

6     of these materially misleading statements and omissions, investors were left with the false and

7     misleading impression that Doximity's user engagement—particularly on its revenue-critical

8     Newsfeed—was significantly higher than it actually was.  ¶¶56-79.

9         **C.**      **FALSE AND MISLEADING STATEMENTS IN 2023**

10          **1.**      **February 2023 Quarterly Investor Conference**

11        129.    On February 9, 2023, Defendant Tangney appeared and spoke on behalf of

12     Doximity during the Company's February 2023 quarterly investor conference call.  In his

13     introductory remarks, while discussing Doximity's "network growth," Defendant Tangney stated

14     that "***our quarterly active users among physicians … hit an all-time high*** last quarter ***across our***

15     ***entire platform***" and later repeated that the Company had "***all time high network usage in Q3***."

16        130.    The statements highlighted in ¶129 were materially false and misleading when

17     made.  Contrary to Defendants' statements that engagement on the Doximity platform "hit an all-

18     time high" across the "entire platform," engagement and deep engagement were ***declining***,

19     including on the Newsfeed.  ¶¶74-79. Additionally, it was materially misleading for Defendant

20     Tangney to tout an "all-time high" in engagement on the Doximity platform, without disclosing

21     that: (i) Defendants overstated by ***more than 65%*** the number of U.S. physicians who were active

22     members of the platform (¶¶58-62); (ii) ***more than half*** of all U.S. physicians either ***never*** used

23     Doximity or did so on a less-than-quarterly basis (¶60); (iii) ***over one-third*** of doctors who used

24     the Doximity platform did so ***less than quarterly*** (¶60); (iv) ***nearly half*** of Doximity members

25     who used the platform during the Class Period used the Newsfeed less than quarterly (¶61);

26     (v) approximately ***one-fifth*** of Doximity members who used the platform during the Class Period

27     ***never*** used Doximity's Newsfeed during the Class Period (¶61); (vi) the ***majority*** of member

28     profiles contained basic errors and omissions, showing a lack of engagement with the profiles

(¶¶63-64); (vii) Doximity's own internal Dashboard showed that *less* than 80% of U.S. doctors were active members, with engagement on the platform decreasing (¶¶70-71); and (viii) Doximity refused to provide and deliberately hid from customers its engagement metrics, including on the Newsfeed, precisely because they were lower than its customers understood (¶¶80-89). As a result of these materially misleading statements and omissions, investors were left with the false and misleading impression that Doximity's user engagement—particularly on its revenue-critical Newsfeed—was significantly higher than it actually was. ¶¶56-79.

### 2.    May 2023 Quarterly Investor Conference

131.    On May 16, 2023, Defendant Tangney appeared and spoke on behalf of Doximity during the Doximity's earnings May 2023 quarterly investor call. In his opening remarks, Defendant Tangney again stated that "*[o]ur usage hit fresh high[s] in Q4. Across our entire platform, we achieved a record number of quarterly active users*."

132.    The statement highlighted above in ¶131 was materially false and misleading when made. Contrary to Defendants' statements that engagement on the Doximity platform "hit fresh highs" across the "entire platform," engagement and deep engagement were *declining*, including on the Newsfeed. ¶¶74-79. Additionally, it was materially misleading for Defendant Tangney to tout an "all-time high" in engagement on the Doximity platform, without disclosing that: (i) Defendants overstated by *more than 65%* the number of U.S. physicians who were active members of the platform (¶¶58-62); (ii) *more than half* of all U.S. physicians either *never* used Doximity or did so on a less-than-quarterly basis (¶60); (iii) *over one-third* of doctors who used the Doximity platform did so *less than quarterly* (¶60); (iv) *nearly half* of Doximity members who used the platform during the Class Period used the Newsfeed less than quarterly (¶61); (v) approximately *one-fifth* of Doximity members who used the platform during the Class Period *never* used Doximity's Newsfeed during the Class Period (¶61); (vi) the *majority* of member profiles contained basic errors and omissions, showing a lack of engagement with the profiles (¶¶63-64); (vii) Doximity's own internal Dashboard showed that *less* than 80% of U.S. doctors were active members, with engagement on the platform decreasing (¶¶70-71); and (viii) Doximity refused to provide and deliberately hid from customers its engagement metrics, including on the

Newsfeed, precisely because they were lower than its customers understood (¶¶80-89).  As a result of these materially misleading statements and omissions, investors were left with the false and misleading impression that Doximity's user engagement—particularly on its revenue-critical Newsfeed—was significantly higher than it actually was.  ¶¶56-79.

### 3.    June 2023 Investor Day Conference

133.    On June 6, 2023, Doximity held its inaugural Investor Day in which Defendant Tangney, among other Doximity executives and selected panelists, pitched the Company to investors.  In his introductory remarks Defendant Tangney set the stage by claiming once again that "***over 80% of all physicians . . . use our platform***."

134.    The statement highlighted above in ¶133 was materially false and misleading when made.  In making this statement, Defendant Tangney overstated by ***more than 65%*** the number of U.S. physicians who were active members of the platform.  ¶58-62. Additionally, it was materially misleading for Defendant Tangney to tell investors that "over 80% of all physicians . . .  use our platform" while omitting that (i) ***more than half*** of all U.S. physicians either ***never*** used Doximity or did so on a less-than-quarterly basis (¶60); (ii) ***over one-third*** of doctors who used the Doximity platform did so ***less than quarterly*** (¶60); (iii) ***nearly half*** of Doximity members who used the platform during the Class Period used Doximity's Newsfeed less than quarterly (¶61); (iv) approximately ***one-fifth*** of Doximity members who used the platform during the Class Period ***never*** used the Newsfeed during the Class Period (¶61); (v) the ***majority*** of member profiles contained basic errors and omissions, showing a lack of engagement with the profiles (¶¶63-64); (vi) Doximity's own internal Dashboard showed that ***less*** than 80% of U.S. doctors were active members (¶¶70-71); and (vii) Doximity refused to provide and deliberately hid from customers its engagement metrics, including on the Newsfeed, precisely because they were lower than its customers understood (¶¶80-89).  As a result of these materially misleading statements and omissions, investors were left with the false and misleading impression that Doximity's user engagement—particularly on its revenue-critical Newsfeed—was significantly higher than it actually was.  ¶¶56-79.

1

2

**VII.    DEFENDANTS' MISREPRESENTATIONS AND OMISSIONS WERE MATERIAL TO INVESTORS**

3    135.    A host of additional facts, in addition to those discussed above, demonstrate that

4    Defendants' false and misleading statements were material to investors.

5    136.    *First*, member engagement was essential to maintaining Doximity's core business.

6    By Doximity's own account, 93% of its revenue came from its advertisement subscription revenue,

7    and analysts such as Piper Sandler, in a June 2023 report, attributed ***more than 90% of its revenue***

8    to the Newsfeed. As Doximity acknowledged in its annual and quarterly SEC filings throughout

9    the Class Period, "[t]he size of our member base and our members' level of engagement are ***critical***

10    ***to our success***." Doximity additionally acknowledged that a decrease in user engagement would

11    render the Company "less attractive to our pharmaceutical manufacturer and health system

12    customers" and that, if Doximity were unable to "maintain and increase [its] member engagement,

13    [its] revenue, operating results, financial condition, business, and future growth potential may be

14    adversely affected."

15    137.    *Second*, the false and misleading statements overstated Doximity's member

16    engagement by a significant amount. Specifically, Doximity overstated the number of U.S.

17    physicians who were active members by over ***65%***. *See* ¶¶58-62. And while Defendants touted

18    ever-higher engagement figures "across the platform," they failed to disclose that ***more than half***

19    of the physicians who used Doximity during the Class Period utilized the Newsfeed ***less than*** once

20    a quarter or ***not at all***. *See id.*

21    138.    *Third*, the level of engagement on the platform was a matter of internal concern,

22    demonstrating its importance to the Company. As FE 6 explained, the prospect of having to tell

23    Doximity's customers the true state of engagement was a source of "panic" at the Company. For

24    example, when it seemed like Merck, a major customer, would demand to see engagement on

25    Doximity's Newsfeed, the "panic" reached such a level that Doximity's CEO was brought into the

26    loop. Additionally, as FE 7 reported, internal emails submitted on a monthly basis confirmed that

27    engagement was declining and that members of the Product team were concerned that engagement

28    was dropping and that revenue was going to drop as a result. FE 6 reported being specifically

concerned about how Doximity reported the figures to its customers.  FE 6 raised the issue numerous times both to the Sales Department and to Jeff Gambino, the head of business analytics who checked-in with Defendant Tangney regularly.  Specifically, FE 6 raised concerns that the Company was not providing key metrics of engagement on the Newsfeed to customers with Gambino at least five times, and ultimately quit because he could not stomach concealing the truth from Doximity's customers.  FE 6 reported that Defendant Tangney knew of the concern that they were not providing customers with newsfeed engagement numbers because they were poor, and that such concerns were raised to Defendant Tangney in April or May of 2023.

139.    ***Fourth***, engagement was an area of analyst and investor focus during the Class Period.  From the very start of the Class Period, analysts zeroed in on Doximity's purportedly high engagement as what made the Company "unique."  For example, analysts at Canaccord Genuity credited and highlighted Defendants' representations that 80% of physicians were "active members" and found access to that base was "highly valuable" to Doximity, while analysts at William Blair reported that "[t]he network is the key" before telling investors that Doximity was purportedly "used daily by nearly all" of the more than 80% of physicians Doximity claimed as active members.  Analysts also asked direct questions about user engagement to Defendant Tangney and others, and Piper Sandler, in its November 9, 2021 report, confirmed that the market had been "concerned" that user engagement rates were falling at the Company, although it was also pleased to report that Defendants had "put those concerns to rest" through their representations.

140.    ***Fifth***, Defendant Tangney repeated the same false and misleading engagement statistics over and over again.  *See* ¶¶38-48.  On nearly every possible occasion, he told investors that "more than 80% of physicians [were] active members" of the platform, and repeated claims of "growing" and "record" engagement virtually every quarter.  *Id*.  Defendants' repeated emphasis of these metrics—often using the same language—shows that Defendants thought it was important that investors heard, and believed, this information.

141.    ***Finally***, as a result of the lower-than-represented engagement, Doximity was unable to sell advertisements to customers, including upsells, which forced the Company to cut its

1  revenue guidance for the upcoming fiscal year by $54 million. Doximity's eventual disclosure of

2  lowered revenue guidance and lower-than-expected upsells led to a major drop in the Company's

3  stock price—the largest single-day stock price decline in the Company's history. That declining

4  engagement had such a significant impact on the Company's overall health and stock price

5  demonstrates that Defendants' misstatements and omissions were material.

6  **VIII.  ADDITIONAL SCIENTER ALLEGATIONS**

7       142.  A host of additional facts, in addition to those discussed above, support a strong

8  inference that Defendants knew, or at minimum was severely reckless in not knowing, the true

9  facts about the number of active members and level of user engagement on the Doximity platform.

10      143.  ***User engagement was key to Doximity's business, and therefore it was essential***

11  ***for its highest-ranking executives to track it.***  The number of members actively using Doximity's

12  platform—including, most importantly, the Newsfeed—was critical to the Company's ability to

13  sell advertisements, which accounted for 93% of Doximity's revenue. Doximity repeatedly

14  acknowledged the importance of user engagement to Doximity's bottom-line. For example, in its

15  annual SEC filings, Doximity acknowledged that "***[o]ur members' level of engagement [is]***

16  ***critical to our success***" and that "[o]ur financial performance has been and will continue to be

17  significantly determined by our success in adding, retaining, and engaging members." In those

18  same filings, Defendants further acknowledged that "[a] decrease in member retention, growth, or

19  engagement could render [the Company] less attractive" to its customers, which could "have a

20  material and adverse impact on [the Company's] revenue, business, financial condition, and results

21  of operations."

22      144.  Given the "critical" significance of user engagement to Doximity's "success" and

23  "financial performance," it would be absurd for Defendants not to be aware of the actual

24  percentage of active members and user engagement on the platform.

25      145.  ***Defendant Tangney repeatedly told investors that over 80% of U.S. doctors were***

26  ***active members of the Doximity platform, purporting to know what he was talking about***. During

27  the Class Period, Defendant Tangney represented numerous times that over 80% of American

28  doctors were "active members" of Doximity's platform. For example, on the first day of the Class

Period, during his first interview following Doximity's IPO, Defendant Tangney told investors "***today we have over 80% of all U.S. physicians as active members on the platform***." On that same call, Defendant Tangney reiterated his message on engagement, "***again, we're over 80% of all U.S. physicians as active members***." He then made this identical representation in prepared introductory remarks during Doximity's first two quarterly investor conferences, as well in subsequent interviews and investor conferences.

146.    That Defendant Tangney repeatedly—and falsely—told investors that over 80% of U.S. physicians were "active members" of the platform strengthens the scienter inference. Either Defendant Tangney knew the representation he provided so often was false and misleading or, at minimum, he was severely reckless in not finding out the truth.

147.    ***Analysts were particularly focused on user engagement on the Doximity platform.*** During the Class Period, analysts were acutely focused on Doximity's user engagement. Analysts asked specific questions about the subject on numerous occasions throughout the Class Period, and Defendant Tangney was called upon to speak about engagement on numerous occasions. *See* ¶¶38-54. Knowing that analysts and investors were acutely focused on the question of user engagement from having fielded questions on the subject continuously throughout the Class Period, it would be severely reckless, at minimum, for Defendant Tangney to speak about user engagement repeatedly—often in response to direct analyst questions—without reviewing the relevant data.

148.    ***Defendant Tangney specifically denied analyst concerns that Doximity overstated user engagement.*** On October 14, 2021, an analyst at J.P. Morgan issued an analyst report that called into question Doximity's purported engagement levels. *See* ¶¶52, 112. Analyzing third-party "app traffic" data, the analyst raised questions about whether, in truth, less than 80% of all U.S. doctors were active members and also, based on the data and conversations with physicians, questioned whether most Doximity users were "viewing the Newsfeed—and thus ads." At Doximity's November 9, 2021, earnings call, Defendant Tangney assured investors that the J.P. Morgan analyst report was "***just wrong***." Defendant Tangney's personal attention to engagement levels and doubling down on his representations regarding Doximity's engagement levels further

1  strengthens the inference that he knew—or was severely reckless in not knowing—that the

2  engagement statistics he repeatedly touted were false.

3       149.    ***Defendants' misrepresentations were crucial to Doximity's launch as a public***

4  ***company and raising a half-billion dollars.***  Defendants' campaign to convince investors that

5  over 80% of U.S. doctors were "active members" commenced on the most important day of

6  Doximity's existence: the day of its IPO.  Indeed, Doximity had not raised outside capital since

7  2014.  As Defendant Tangney has acknowledged, the IPO was a "huge milestone" for Doximity.

8  By making misrepresentations about Doximity's user engagement, Defendants ensured a

9  successful and profitable IPO.  Indeed, within an hour of Doximity's IPO, Tangney gave an

10 interview on CNBC, during which he assured investors that "today we have over 80% of all U.S.

11 physicians as active members on the platform."  Defendant Tangney then repeated that same

12 representation in response to a question minutes later, stating "again we're over 80% of all U.S.

13 physicians as active members." These representations had their intended effect.  Doximity raised

14 $500 million through its IPO, with the newly-issued shares soaring 69% on its first trading day.

15      150.    That Defendant Tangney made, and repeated, the false and misleading

16 representation that "over 80% of all U.S. physicians are active members on the platform" during

17 such a critical period for the Company further supports the scienter inference.  Either Defendant

18 Tangney knew that the figure he used was false and misleading, or he was, at minimum, severely

19 reckless in not knowing the truth.

20      151.    ***The magnitude and significance of Defendant Tangney's misstatements and***

21 ***omissions supports scienter.***  For two years, Defendants overstated by ***over 65%*** the percentage

22 of U.S. doctors who were "active members" on the Platform.  For two years, Defendants also kept

23 hidden from investors the fact that ***nearly 50%*** of doctors who Doximity claimed as "active

24 members" were not active on Newsfeed—the source of virtually all of the Company's revenues.

25 Indeed, multiple former employees confirmed that the active member figure that Defendants touted

26 to investors was not accurate.  FE 5 confirmed that the Dashboard reflected that the percentage of

27 quarterly active doctors was ***always*** below 80% for ***all*** of physician types he reviewed.   In fact,

28 Doximity's concealment of its Newsfeed engagement from customers was so troubling to FE 6

1  that it ultimately caused him to quit his job.

2      152.    Misstatements and omissions of this magnitude do not occur by happenstance or in

3  the dark: they are the product of intentional or, at minimum severely reckless conduct.    The

4  magnitude and duration of the overstatements and concealed facts further strengthens the scienter

5  inference.

6      153.    ***Defendant Tangney had access to, and did access, a user engagement Dashboard***

7  ***showing the actual number of active members and level of engagement on the Doximity***

8  ***platform, including the Newsfeed***.    Doximity maintained an internal dashboard that tracked the

9  number of active members.    As Dr. Bushra Anjum explained, the engagement dashboard allowed

10  Doximity to "track user engagement," including "by users, by products, by specialty and by dates,"

11  enabling Doximity executives to "aggregate [users] by any of these dimensions or more."    Dr.

12  Anjum specifically noted that the dashboard enables Doximity executives to view engagement by

13  "product," with the Newsfeed classified as a "product," while also confirming that Doximity

14  "calculate[d] advance metrics such as daily active users, weekly active users, monthly active users,

15  and quarterly active users using this data."    Additionally, Dr. Anjum identified "senior

16  management," and specifically Doximity's CEO, as a party "interested in overall user

17  engagement" who had access to the engagement dashboard.    FE 6 corroborated Dr. Anjum's

18  account, explaining that Doximity, indeed, kept track of engagement data using the Dashboard.

19      154.    FE 6 further confirmed that the dashboard showed both the percentage of Doximity

20  users who were "active" on a quarterly basis and the number of quarterly active users.    From the

21  time the dashboard was created, FE 6 confirmed that Defendant Tangney and Jeff Gambino had

22  access to this dashboard.    In fact, as FE 6 explained, the request for the creation of the dashboard

23  came directly from Defendant Tangney.    Additionally, as Doximity former employees have

24  explained, the Dashboard that Defendant Tangney had access to and did access showed the true

25  number of active members, which was always below 80%, as well as the low and declining level

26  of engagement, particularly on the Newsfeed.

27      155.    Through their access to the Doximity engagement dashboard, Defendants knew—

28  or, at minimum, were severely reckless in not knowing—the actual number of "active" doctors on

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:24-cv-02281-EKL

the Doximity platform, as well as its Newsfeed, and that engagement was declining across the platform and throughout the Class Period.

156. ***Defendant Tangney received regular information about Doximity's user engagement.*** Defendant Tangney provided updates to the entire Company at offsite events three to four times a year, during which he would discuss metrics including quarterly active users. FE 6 recalled no discrepancy between the numbers provided by Defendant Tangney at the offsite meetings and the numbers available on Doximity's Dashboard—i.e., the actual, undisclosed, number of active members and engagement. Accordingly, Defendant Tangney knew or, at minimum, was severely reckless in not knowing, the actual percentage of U.S. doctors that were active members on the platform, which was reflected in the Dashboard and inconsistent with his statements to investors.

157. ***Defendant Tangney publicly acknowledged that he and Doximity had access to its user engagement metrics.*** Throughout the Class Period, Defendant Tangney publicly confirmed to investors that he and Doximity had ready access to and personally reviewed user engagement data. For example, on November 9, 2021, Defendant Tangney assured investors that, on the subject of user engagement, "***we've looked at this a bunch of different ways.***" Again, during a February 8, 2022 earnings call, when an analyst asked whether voting for U.S. News & World Report Rankings increased general engagement with the Newsfeed, Defendant Tangney responded that he "***could wander down the hall here and ask some of our Newsfeed team.***"

158. That Defendant Tangney, by his own admission, had easy access to engagement data and personally reviewed that data further strengthens the inference that he knew or was, at a minimum, severely reckless in grossly misrepresenting Doximity's engagement levels.

159. ***Doximity deliberately avoided disclosing basic engagement metrics, including metrics specifically pertaining to the platform's Newsfeed.*** During the Class Period, Defendants did not provide the precise number of daily, monthly, or quarterly active users on the Doximity platform, instead stating that "over 80%" of U.S. doctors were active members and that engagement was increasing "across the platform." Additionally, Defendants deliberately avoided disclosing the percentage of members on the Newsfeed during the Class Period, instead telling

1    investors only that it was a "record" number each quarter.  Defendants' refusal to provide basic

2    user engagement statistics during the Class Period stands in stark contrast to other social media

3    platforms.  Indeed, during the Class Period, other major social media companies—including

4    Facebook, Snap, and Twitter—provided the precise number of daily, monthly, and/or quarterly

5    active users on their platform.

6        160.    That Defendants did not provide metrics that similar companies, including those

7    identified as Doximity's competitors, regularly provided further strengthens the scienter inference,

8    as it shows that Defendants sought to conceal hard numbers and therefore obfuscate the true facts

9    about the true number of active U.S. doctors and decline in user engagement on the platform.

10       161.    ***Defendant Tangney was the CEO of Doximity and responsible for measuring the***

11   ***Company's performance.***  As the CEO of Doximity, Defendant Tangney was the "chief operating

12   decision maker for the Company" and charged with "review[ing] financial information on a

13   consolidated basis to make decisions about how to allocate resources and how to measure the

14   Company's performance."  In making these decisions and measuring the Company's performance,

15   Defendant Tangney reviewed—or was severely reckless in not reviewing—the basic engagement

16   statistics for the Doximity platform, including the actual percentage of U.S. doctors who were

17   active members of the Doximity platform.

18       162.    ***Defendant Tangney was financially motivated to misrepresent user engagement***

19   ***due to Doximity's unique compensation structure.***  The vast majority of Defendant Tangney's

20   compensation was in the form of stock grants, with a significant extra sum tied directly to the level

21   of represented "member engagement" on the platform.  Specifically, in May of 2021, shortly

22   before the start of the Class Period, Doximity's Board granted Defendant Tangney the option for

23   50,000 shares of stock in connection with meeting certain benchmarks, including "member

24   engagement" benchmarks.  These and Defendant Tangney's other stock grants—which, at the end

25   of fiscal year 2021, totaled nearly $21 million—were contingent on his continued employment at

26   the Company for five years and vested monthly, meaning every month he remained that the

27   Company more options would vest into stock.  However, if he did not remain at the Company, he

28   would forfeit any stock that had not yet vested.  As a result, Defendant Tangney was financially

motivated to falsely represent the level of engagement on the platform (to collect the additional stock at the start of the Class Period) and then conceal the actual level of engagement on the platform (to preserve his employment as CEO and collect the full $21 million in stock).

*    *    *

163.    The foregoing facts, particularly when considered collectively (as they must be), support a strong inference of Doximity and Defendant Tangney's scienter.

## IX.    ADDITIONAL LOSS CAUSATION ALLEGATIONS

164.    The misrepresentations alleged herein were the proximate cause of the economic loss suffered by Lead Plaintiff and the Class.  There was a causal connection between the alleged misrepresentations and omissions and the losses (i.e., stock price declines) described herein.  *See*, *e.g.*, *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750 (9th Cir. 2018).

165.    During the Class Period, Lead Plaintiff and Class members purchased or otherwise acquired Doximity common stock at artificially inflated prices, and were damaged thereby when the price of Doximity common stock declined in response to the August 8, 2023 disclosures. Throughout the Class Period, the price of Doximity's common stock was artificially inflated and/or maintained as a result of Defendants' materially false and misleading statements and omissions. The price of Doximity's common stock significantly declined, causing investors to suffer losses, in response to the disclosures concerning or connected to the facts misrepresented or concealed by Defendants, which are described more fully above in Section V.

166.    Because the number of active members and user engagement was lower than Defendants represented during the Class Period, Doximity had to slash its revenue guidance and admit to a substantial decline in "upsell close rate"—i.e., the sales of advertisements on Newsfeed to its customers.  Defendant Tangney, on a call with investors and analysts that began after markets closed that day, admitted that "banner ads or programmatic" ads received "the incremental spend in the summer."  Defendant Tangney further admitted that "smaller companies who are bidding up certain segments of physicians" were able to provide "a better, frankly, more normalized ROI than what we currently deliver" to customers.

167.    Analysts connected the August 8, 2023 disclosures with less-than-represented user

engagement on the Doximity platform, and rejected Doximity's additional explanation that its customers preferred a self-service platform. For example, analysts at Wells Fargo stated that it was "odd that ad agencies would recommend moving away from a highly performing ad buy merely because there is friction in the work to make the ad buy happen." Rejecting the Company's stated explanation for the decline in upsells, Wells Fargo "question[ed] whether [Doximity's] clients are seeing a high enough [return on investment] to warrant putting more ad dollars in later in the year." The analysts explained that if "ad dollars still moved to lower friction platforms, it may suggest"—contrary to Defendants' repeated representations throughout the Class Period— that "Doximity's [return on investment] isn't materially superior" to its competitors.

168.    Analysts at Morgan Stanley also concluded that Doximity's decline in upsells was attributable to less-than-represented engagement on the Doximity platform—and not a flaw in any of its sales tactics. In its August 9, 2023 report following Doximity's disclosures, Morgan Stanley's analysts explained that a "stronger re-acceleration in the core newsfeed" was needed in order to get the Company back to previously-reported revenue growth. Subsequently, Morgan Stanley's analysts conducted industry "checks" with Doximity's pharmaceutical and health system customers "to get a fresh pulse on current industry trends." Through these industry checks, Morgan Stanley found that—contrary to Defendants' stated explanations for the decline in upsells—"company-specific" issues reduced Doximity's up-sell rate and forced the Company to slash its revenue guidance. Chief among these issues, Doximity suffered from "***slowing growth in their . . . user engagement,***" which adversely impacted their digital advertisement upsells on the platform.

169.    Other securities analysts and market commentators also recognized that the decline in Doximity's upsells, and the reduction in its revenue guidance, was attributable to the fact that there were lesser-than-represented active members on the platform. For example, immediately following the Company's August 8, 2023 disclosures, Dr. Tarang Patel—a securities analyst and physician who focuses on healthcare companies—openly challenged the veracity of Doximity's representations, publicly stating to his followers that Defendants' representations about having "***4/5 of doctors***" as active members were "***hard to believe,***" adding "***I've never heard any***

*colleagues say they use Doximity.*"  Based on his outreach to doctors following the Company's August 8, 2023 disclosure, he concluded that the "major use" for the Doximity was **not** the Newsfeed, but rather the platform's "telehealth" tools that generated no revenue for the Company.

170.    As a result of the disclosures described herein, Doximity's stock price declined from $32.79 per share on August 8 to a closing price of $25.30 on August 9, 2023, a decline of 23% on high volume, representing a total decline of more than $900 million in market capitalization.  A total of more than 11 million shares of Doximity common stock traded hands that day, an increase of **357%** above the prior trading session, as shown below:



171.    The timing and magnitude of the decline in Doximity's share price on August 9, 2023 negate any inference that Lead Plaintiff's losses were caused by changed market conditions, macroeconomic or industry factors unrelated to Defendants' misrepresentations and omissions. The following chart demonstrates the clear divergence of the prices of Doximity's common stock from the relevant index (the S&P information Technology Index), following the August 8, 2023 disclosures:

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:24-cv-02281-EKL

1
2
3
4
5
6
7
8
9
10
11



DOCS Share Price versus S&P 500 Information Technology Index, August 2-9, 2023

12    172.    It was entirely foreseeable that Defendants' materially false and misleading

13  statements and omissions discussed herein would artificially inflate or maintain the price of

14  Doximity's stock.  It was also foreseeable to Defendants that the disclosures described above

15  would cause the price of Doximity stock to fall as the artificial inflation caused or maintained by

16  Defendants' misstatements and omissions was removed.  Thus, the stock price decline described

17  above was directly and proximately caused by Defendants' materially false and misleading

18  statements.

19  **X.    THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND
    BESPEAKS CAUTION DOCTRINE**
20

21    173.    The statutory safe harbor applicable to forward-looking statements under certain

22  circumstances does not apply to any of the false or misleading statements pleaded in this

23  Complaint.  The statements complained of herein were: (i) historical statements or statements of

24  purportedly current facts and conditions at the time the statements were made; (ii) mixed

25  statements of present and/or historical facts and future intent; and/or (iii) omitted to state material

26  current or historical facts necessary to make the statements not misleading.

27    174.    Further, to the extent that any of the false or misleading statements alleged herein

28  could be construed as forward-looking, the statements were not accompanied by any meaningful

cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by the Defendants were not sufficient to insulate them from liability for their materially false and misleading statements.

175.    Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, the Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speaker knew the statement was false or misleading, did not actually believe the statements, had no reasonable basis for the statements, and/or was aware of undisclosed facts tending to seriously undermine the statements' accuracy.

## XI.    THE PRESUMPTION OF RELIANCE

176.    The Class is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for Doximity's common stock was efficient for the following reasons, among others:

    a.    Doximity's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

    b.    Doximity's common stock traded at high weekly volumes;

    c.    As a regulated issuer, Doximity filed periodic reports with the SEC;

    d.    Doximity was eligible to and did file registration statements with the SEC on Form S-3;

    e.    Doximity regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:24-cv-02281-EKL

1          f.       Doximity was followed by numerous securities analysts employed by major

2               brokerage firm(s) who wrote reports which were distributed to those

3               brokerage firm(s)' sales force and certain customers.  Each of these reports

4               was publicly available and entered the public marketplace; and

5          g.      There was a cause-and-effect relationship between unexpected corporate

6               events or financial releases and movements in Doximity's stock price.

7       177.     As a result of the foregoing, the market for Doximity's common stock reasonably

8 promptly digested current information regarding Doximity from all publicly available sources and

9 reflected such information in the price of Doximity's common stock during the Class Period.

10 Under these circumstances, all purchasers of Doximity common stock during the Class Period

11 suffered similar injury through their purchase of Doximity common stock at artificially inflated

12 prices, and a presumption of reliance applies.

13       178.     A Class-wide presumption of reliance is also appropriate in this action under the

14 United States Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406

15 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions.

16 Because this action involves Defendants' failure to disclose material adverse information

17 regarding Doximity's business—information that Defendants were obligated to disclose in order

18 to make statements made not materially false or misleading—positive proof of reliance is not a

19 prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense

20 that a reasonable investor might have considered them important in making investment decisions.

21 **XII.**   **CLASS ACTION ALLEGATIONS**

22       179.     Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil

23 Procedure 23(a) and 23(b)(3) on behalf of all persons who purchased or otherwise acquired the

24 common stock of Doximity during the Class Period, and who were damaged thereby (the "Class").

25 Excluded from the Class are Defendants and their immediate families, the officers and directors

26 of the Company at all relevant times, members of their immediate families, and Defendants' legal

27 representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a

28 controlling interest.

180.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Doximity shares were actively traded on the NYSE. As of July 5, 2024, there were approximately 185 million shares of Doximity common stock outstanding.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least thousands of members of the Class.  Class members who purchased common stock may be identified from records maintained by Doximity or its transfer agent(s) and may be notified of this class action using a form of notice similar to that customarily used in securities class actions. Disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

181.    Lead Plaintiff's claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

182.    Lead Plaintiff will fairly and adequately protect Class members' interests and has retained competent counsel experienced in class actions and securities litigation.  Lead Plaintiff has no interest that conflicts with the interests of the Class.

183.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of fact and law common to the Class are:

a.    whether Defendants' misrepresentations and omissions as alleged herein violated the federal securities laws;

b.    whether Defendants made false or misleading statements or omissions during the Class Period;

c.    whether Defendants' alleged false and misleading statements and omissions were material;

d.    whether Defendants made their alleged false and misleading statements and omissions with scienter;

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:24-cv-02281-EKL

1       e.     whether Defendant Tangney is personally liable for the alleged

2       misrepresentations and omissions described herein;

3       f.     whether Defendant Tangney was a controlling person of Doximity;

4       g.     whether Defendants' misrepresentations and omissions as alleged herein

5       caused the Class members to suffer a compensable loss; and

6       h.     whether the members of the Class have sustained damages, and the proper

7       measure of damages.

8  184.     A class action is superior to all other available methods for the fair and efficient

9  adjudication of this action.  Joinder of all Class members is impracticable.  Additionally, the

10  damage suffered by some individual Class members may be relatively small so that the burden and

11  expense of individual litigation make it practically impossible for such members to individually

12  redress the wrongs done to them.  There will be no difficulty in the management of this action as

13  a class action.

14  **XIII.**   **CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT**

15  **COUNT I**
   **For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5**

16  **(Against All Defendants)**

17  185.     This Count is asserted on behalf of all members of the Class against all Defendants

18  for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5

19  promulgated thereunder, 17 C.F.R. § 240.l0b-5.

20  186.     During the Class Period, Defendants disseminated, furnished information for

21  inclusion in, or approved the false statements specified above, which they knew, or were severely

22  reckless in not knowing, were false or misleading in that they contained misrepresentations and/or

23  omitted material facts necessary in order to make the statements made, in light of the circumstances

24  under which they were made, not misleading.

25  187.     During the Class Period, Defendants carried out a plan, scheme, and course of

26  conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

27  public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) cause Lead

28  Plaintiff and other members of the Class to purchase Doximity common stock at artificially

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:24-cv-02281-EKL

1    inflated prices.

2        188.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

3    (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material

4    fact and/or omitted to state material facts necessary to make the statements not misleading; and

5    (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon

6    the purchasers of the Company's common stock in an effort to maintain artificially high market

7    prices for Doximity common stock.

8        189.    Defendants, individually and in concert, directly and indirectly, by the use, means

9    or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

10   continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the Class;

11   made various untrue and/or misleading statements of material facts and omitted to state material

12   facts necessary in order to make the statements made, in light of the circumstances under which

13   they were made, not misleading; made the above statements intentionally or with severe

14   recklessness; and employed devices and artifices to defraud in connection with the purchase and

15   sale of Doximity common stock, which were intended to, and did:  (a) deceive the investing public,

16   including Lead Plaintiff and the Class, regarding, among other things, the percentage of physicians

17   who were active members of Doximity and engagement across the platform, including on the

18   Newsfeed; (b) artificially inflate and maintain the market price of Doximity common stock; and

19   (c) cause Lead Plaintiff and other members of the Class to purchase Doximity common stock at

20   artificially inflated prices and suffer losses when the true facts became known and/or the risks

21   materialized.

22       190.    Defendants are liable for all materially false and misleading statements made during

23   the Class Period, as alleged above.

24       191.    As described above, Defendants acted with scienter throughout the Class Period, in

25   that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.

26   The misrepresentations and omissions of material facts set forth herein, which presented a danger

27   of misleading buyers or sellers of Doximity stock, were either known to the Defendants or were

28   so obvious that the Defendants should have been aware of them.

---

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:24-cv-02281-EKL

192.    Lead Plaintiff and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Doximity common stock, which inflation was removed from its price when the relevant truth concealed by Defendants' misrepresentations and omissions became known.

193.    Defendants' wrongful conduct, as alleged above, directly and proximately caused the damages suffered by Lead Plaintiff and other Class members.  Had Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Lead Plaintiff and other Class members would not have purchased or otherwise acquired these securities at the artificially inflated prices that they paid.  It was also foreseeable to Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of Doximity securities and that the ultimate disclosure of relevant truth concealed by Defendants' misrepresentations and omissions, or the materialization of the risks concealed by Defendants' material misstatements and omissions, would cause the price of Doximity securities to decline.

194.    Accordingly, as a result of their purchases of Doximity common stock during the Class Period, Lead Plaintiff and the Class suffered economic loss and damages under the federal securities laws.

195.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule l0b-5, promulgated thereunder.

196.    This claim is brought within the applicable statute of limitations.

### COUNT II
### For Violations of Section 20(a) of the Exchange Act
### (Against Defendant Tangney)

197.    Lead Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

198.    Defendant Tangney acted as a controlling person of Doximity within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

199.    By reason of his high-level position of control and authority as the Company's most senior officer, Defendant Tangney had the authority to influence and control, and did influence

and control, the decision-making and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.  Defendant Tangney was able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Doximity during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein.  Indeed, Defendant Tangney was the Doximity officer who communicated with investors on earnings calls and at investor conferences on the Company's behalf.  Defendant Tangney was provided with, or had unlimited access to, copies of the Company's press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were made and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

200.    Defendant Tangney spoke to investors on behalf of the Company during the Class Period.  Therefore, Defendant Tangney was able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Doximity during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein.

201.    As set forth above, Doximity violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

202.    By virtue of his position as a controlling person of Doximity and as a result of his own aforementioned conduct, Defendant Tangney was liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiff and the other members of the Class who purchased or otherwise acquired Doximity securities.

203.    As a direct and proximate result of Defendant Tangney's conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Doximity common stock.

204.    This claim is brought within the applicable statute of limitations.

**XIV.   <u>PRAYER FOR RELIEF</u>**

205.    WHEREFORE, Lead Plaintiff prays for judgment as follows:

      a.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

      b.    Awarding compensatory damages in favor of Lead Plaintiff and other Class members against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

      c.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

      d.    Awarding such equitable, injunctive or other further relief as the Court may deem just and proper.

**XV.   <u>JURY DEMAND</u>**

206.    Lead Plaintiff hereby demands a trial by jury.


DATED: October 4, 2024

                    **BERNSTEIN LITOWITZ BERGER**
                      **& GROSSMANN LLP**

                    */s/ Jonathan D. Uslaner*
                    Jonathan D. Uslaner (Bar No. 256898)
                    (jonathanu@blbglaw.com)
                    2121 Avenue of the Stars, Suite 2575
                    Los Angeles, CA  90067
                    Tel: (310) 819-3481

                    -and-

                    Timothy G. Fleming
                    (timothy.fleming@blbglaw.com)
                    Sarah Schmidt
                    (sarah.schmidt@blbglaw.com)
                    1251 Avenue of the Americas
                    New York, New York 10020
                    Tel: (212) 554-1400

                    *Lead Counsel for Lead Plaintiff New York City District Council of Carpenters Pension Fund*

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:24-cv-02281-EKL

1

2

**KESSLER TOPAZ MELTZER
& CHECK, LLP**

3

4

Jennifer L. Joost (Bar No. 296164)
(jjoost@ktmc.com)
Stacey M. Kaplan (Bar No. 241989)
(skaplan@ktmc.com)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel: (415) 400-3000
Fax: (415) 400-3001

5

6

7

8

*Local Counsel for Lead Plaintiff New York City
District Council of Carpenters Pension Fund*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:24-cv-02281-EKL