United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE DOXIMITY, INC. SECURITIES LITIGATION.

Case No. 24-cv-02281-NW

**ORDER DENYING MOTION TO DISMISS**

Re: ECF No. 65

On December 3, 2024, Defendants Doximity, Inc. ("Doximity") and its CEO Defendant Jeffrey Tangney ("Tangney") filed a motion to dismiss the consolidated class action complaint. ECF No. 65. Having considered the parties' briefs and the relevant legal authority, and concluding that oral argument is not required, *see* N.D. Cal. Civ. L.R. 7-1(b), the Court and DENIES the motion.

## I. REQUEST FOR JUDICIAL NOTICE OR INCORPORATION BY REFERENCE

Defendants ask the Court to either take judicial notice or incorporate by reference 32 separate exhibits, spanning over 400 pages. These exhibits fall into several categories (1) Doximity SEC forms (Exhibits 1-6, 16-24, and 32 at ECF Nos. 65-2 to 65-7, 65-17 to 65-25, and 65-33), (2) transcripts of earnings calls (Exhibits 7-15, and 25-29 at ECF Nos. 65-8 to 65-26, and 65-26 to 65-30), (3) a report on Doximity's stock price history (Exhibit 30 at ECF No. 65-31), and (4) a blog post relied upon in the complaint (Exhibit 31 at ECF No. 65-32).

When assessing the sufficiency of a complaint under Federal Rule of Civil Procedure 12(b)(6), district courts generally cannot consider material outside of the pleadings. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). However, this prohibition does not apply to the judicial notice doctrine under Federal Rule of Evidence 201 or the incorporation

United States District Court
Northern District of California

by reference doctrine. *Id.*

**A. Judicial Notice**

A court may take judicial notice of facts "not subject to reasonable dispute" because they are either (1) "generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. Accordingly, "[a] court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment." *Khoja*, 899 F.3d at 999 (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001)). But a court cannot take judicial notice of disputed facts contained in such public records. *Id.*

Defendants request that the Court take judicial notice of Exhibits 1-30 and 32. Request for Judicial Notice ISO Mot. to Dismiss ("RJN") at 4, ECF No. 65-34. These exhibits fall into three of the four categories: (1) Doximity SEC forms (Exhibits 1-6, 16-24, and 32 at ECF Nos. 65-2 to 65-7, 65-17 to 65-25, and 65-33); (2) transcripts of earnings calls (Exhibits 7-15, and 25-29 at ECF Nos. 65-8 to 65-26, and 65-26 to 65-30); and (3) a report on Doximity's stock price history (Exhibit 30 at ECF No. 65-31), RJN at 4-5. Defendants argue that all three categories of documents are properly subject to judicial notice because they are publicly available and are "capable of 'accurate[ ] and readily determined from sources whose accuracy cannot reasonably be questioned." RJN at 4 (quoting Fed. R. Evid. 201(b)(2). Plaintiffs object to judicial notice for two reasons. First, Plaintiffs assert Defendants' request is improper because Defendants fail to specify which facts within the documents are subject to notice. Opp'n to RJN at 5, ECF No. 67. Second, Plaintiffs argue that Defendants attempt to use their request to present their own version of the facts at the pleading stage, facts that are "subject to reasonable dispute." *Id.* at 6.

The Court agrees with Plaintiffs' second point and DENIES Defendants' request for judicial notice Exhibits 1-30 and 32. Defendants' request for judicial notice is an attempt to characterize the facts at the pleadings stage and put facts in dispute. For instance, Defendants argue in their motion that "Plaintiff does not adequately plead that investors understood Mr. Tangney's statements to be referring to 'quarterly active users' rather than simply a slightly different formulation of the Company's repeated (and unchallenged) disclosure that 80% of U.S.

United States District Court
Northern District of California

physicians are Doximity members." Mot. at 14 (citing RJN Exs. 4, 5, and 6). This is an attempt to argue, at the pleadings stage, the facts relating to what investors did (or not) understand Defendant Tangney's statements to mean. This is improper. *Khoja*, 899 F.3d at 1000 (finding judicial notice improper when the substance of the document is "subject to varying interpretations").

**B. Incorporation by Reference**

Unlike judicial notice, incorporation by reference is a "doctrine that treats certain documents as though they are part of the complaint itself." *Id.* at 1002. It "prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Id.* A document "may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). Once incorporated by reference, a district court "may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *Id.* However, "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Khoja*, 899 F.3d at 1003.

Defendants also argue that Exhibits 4-5, 7-15, and 31 should be incorporated by reference because the complaint explicitly refers to them. RJN at 5-6. Plaintiffs assert that Defendants attempt to contravene *Khoja*, by using the incorporation by reference doctrine to dispute facts pleaded in the complaint. Opp'n to RJN at 8-9.

Here, Plaintiffs' complaint incorporates Exhibits 4-5, 7-15, and 31 by reference because they are explicitly and repeatedly referenced. *See* RJN at 6 (noting where each exhibit is cited in the CAC). Accordingly the Court GRANTS Defendants' motion and incorporates Exhibits 4-5, 7-15, and 31 by reference, subject to *Khoja*'s restrictions.

**II. BACKGROUND**

**A. The Parties**

Defendant Doximity is a social media platform for medical professionals. Consolidated Class Action Compl. ("CAC") ¶ 25, ECF No. 61. Referred to as the "LinkedIn for doctors,"

United States District Court
Northern District of California

Doximity encourages physicians to join its free platform for access to its "Newsfeed" and "telehealth" tools. *Id.* ¶ 1. "The Newsfeed, which is the 'foundation' of the platform, consists of curated medical articles, videos, and paid advertisements." *Id.* The telehealth tools help doctors conduct remote visits with patients. *Id.*

Lead Plaintiff New York City District Council of Carpenters Pension Fund ("Plaintiffs" or "NYC Carpenters") is a "pension fund responsible for managing assets for the benefit of around 30,000 working, inactive, and retired carpenters and their families." *Id.* ¶ 24. NYC Carpenters brings this suit on behalf of itself and other similarly situated persons or entities who purchased or otherwise acquired Doximity common stock between June 24, 2021, and August 8, 2023 (the "Class Period"). *See generally* CAC.

**B. Factual Allegations**

In addition to member profiles, Doximity's platform includes "(i) a Newsfeed, which contains medical news, sponsored content, and paid advertisements; and (ii) doctor telehealth tools, which include a 'scheduler' and 'dialer' for doctors to conduct virtual visits with patients." CAC ¶ 28.

Instead of charging members for access and use, Doximity earns money by "selling digital advertising space on the Newsfeed section of its platform." *Id.* Because Doximity is free, Doximity's revenue is dependent on advertising dollars from its customers, who are primarily large pharmaceutical companies, like Merck, GlaxoSmithKline, and Lilly. *Id.* ¶ 1. "These companies pay Doximity to host advertisements on its Newsfeed, which accounts for more than 90% of the Company's revenue." *Id.* Advertisers typically purchase year-long subscriptions for "ad space" (or a "marketing solution") on the Doximity platform. CAC ¶ 30. In addition to these year-long subscriptions, customers can also purchase advertising "upsells," a "term used to describe one-off purchases by existing customers of additional space for their advertisements during the year." *Id.* ¶¶ 16, 30.

Doximity competes for advertising dollars with various social media platforms, like LinkedIn and Facebook, health-related websites and apps, and niche platforms designed for medical professionals, like Sermo and Medscape. *Id.* ¶ 34. Doximity attracts and retains

customers when its customers' advertisements reach enough members on its platform. *Id.* ¶ 2. In short, the company's pitch is "that by choosing to advertise on Doximity, [the customers'] ads will reach more doctors than they would on other platforms." *Id.* ¶ 34. Thus, the size of Doximity's member base and its members' level of engagement is critical to its success. *Id.* ¶ 2. Doximity and industry analysts have recognized the importance of user engagement to the company. CAC ¶¶ 35-36.

In evaluating user engagement, social media companies typically "focus on the number of 'active members' on the platform, as opposed to one-off visitors. *Id.* ¶ 37. More active members "makes a social media platform more valuable for advertising customers and, thus, investors." *Id.* Consistent with the industry, Doximity defined "active members" during the Class Period as: "'also known as active users, members of a social media network that log in and click on internal links on a regular basis,' either 'weekly,' 'monthly' or, at minimum, 'quarterly.'" *Id.* ¶ 38 (citing https://tf-support.doximity.com/hc/en-us/articles/360039773833-44-Social-Recruiting-Terms-Every-Physician-Recruiter-Should-Know).

### C. Challenged Statements

Plaintiffs allege that 14 statements were false and misleading when made. The challenged statements fall into two related categories: (1) statements from throughout the Class Period that over 80% of all U.S. doctors were active members of the Doximity platform (CAC ¶ 38) and (2) statements from throughout the Class Period that user engagement was increasing (CAC ¶ 55). The allegedly false and misleading statements are summarized below.[1]

#### 1. Over 80% of all U.S. doctors were active members of the Doximity platform

First, Plaintiffs allege that Defendants led investors to believe that 80% of all U.S. doctors were active members of the Doximity platform, *see* CAC ¶ 38, when in fact, Defendants overstated this number by more than 65%. *Id.* ¶ 102. Plaintiffs identify the following eight statements:

[1] For ease of analysis, the Court lists the statements thematically rather than chronologically.

- During a June 2021 interview on CNBC's TechCheck, Defendant Tangney stated that "***today we have over 80% of all U.S. physicians as active members on the platform***" and "***again, we're over 80% of all U.S. physicians as active members.***"[2] *Id.* ¶ 104.
- During an August 2021 quarterly investor conference, Defendant Tangney represented "***today, over 80% of all U.S. physicians use our platform***." *Id.* ¶ 106.
- In an August 2021 business overview video on Doximity's investor website, Defendant Tangney represented that "***[t]oday, over 80% of all U.S. physicians use our platform***." *Id.* ¶ 108.
- During an August 2021, interview on CNBC's TechCheck Defendant Tangney stated "***we have over 80% of all U.S. physicians as active members on our platform.***" *Id.* ¶ 110.
- During a November 2021, interview on CNBC's TechCheck Defendant Tangney stated "***today over 80% of all U.S. physicians are active members on our platform***." CAC ¶ 115.
- During a February 2022, interview on CNBC's TechCheck Defendant Tangney stated "***Today, over 80% of all U.S. physicians use us*** to ***power millions of digital interactions each day***." *Id.* ¶ 117.
- In March 2022, Defendant Tangney appeared and spoke on behalf of Doximity during Morgan Stanley's Technology, Media and Telecom Investor Conference and represented that "***we have over 80% of all U.S. physicians as active members, and they're doing millions of interactions with us each day***." *Id.* ¶ 119. Additionally, in response to an analyst's question, Tangney stated, "***[w]e have over 80% of U.S. physicians today as active members.***" *Id.* ¶ 120.
- On June 6, 2023, Doximity held an inaugural Investor Day Conference at which Defendant Tangney stated, "***over 80% of all physicians . . . use our platform***." CAC ¶ 133.

---

[2] Emphases in the bullets in Section II.C reflect the formatting in the complaint. In all other Sections, quotes from the complaint do not reflect that formatting unless otherwise indicated.

**2. User Engagement was Increasing**

Second, Plaintiffs allege that Defendants falsely represented that user engagement was increasing, when in fact, engagement was decreasing. *Id.* ¶ 55. Plaintiffs identify the following six statements:

- During a November 2021 quarterly investor conference, Defendant Tangney stated that "***our engagement with our Newsfeed has never been higher***" and "***I could just hit that head on and say our users and usage is the way I mean, mid-double digit percentages up from our pre-pandemic levels and any third-party data that suggests otherwise is just wrong***." CAC ¶ 113.
- During a May 2022 quarterly investor conference, Defendant Tangney stated "***[o]ur usage also hit fresh highs.***" *Id.* ¶ 122.
- During an August 2022 quarterly investor conference call, Defendant Tangney represented "our physician engagement ***also hit new record highs***." *Id.* ¶ 124. Additionally, in response to an analyst's question, Tangney stated, "So, hey listen, ***our engagement has never been higher as I said***, ***hundreds of thousands of doctors every week in our app. Five times what it was four years ago***." *Id.*
- During a November 2022 quarterly investor conference call, Defendant Tangney represented "that engagement on the Doximity platform achieved '***fresh highs in Q2.***'" *Id.* ¶ 127.
- During a February 2023 quarterly investor conference call, Defendant Tangney stated that "***our quarterly active users among physicians . . . hit an all-time high*** last quarter ***across our entire platform***" and that Doximity had "***all time high network usage in Q3***." *Id.* ¶ 129.
- During a May 2022 quarterly investor conference call, Defendant Tangney represented that "***[o]ur usage hit fresh high[s] in Q4. Across our entire platform, we achieved a record number of quarterly active users***." CAC ¶ 131.

**D. Events in August 2023**

On August 8, 2023, Doximity announced two things: first, that it was reducing its financial



United States District Court
Northern District of California

United States District Court
Northern District of California

guidance, including reducing "its lower- and upper-end revenue guidance by, respectively, $32 million and $54 million," and second, that Doximity planned to terminate 10% of its workforce. *Id.* ¶ 90. Following these announcements, Doximity's common stock dropped by nearly 23%—the largest single-day decline in Doximity's history, which reduced shareholder value by $900 million. *Id.* ¶ 101.

### E. Procedural History

On April 17, 2024, Peter Kissler filed a class action complaint alleging claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("the Exchange Act") against Doximity, Jeffery Tangney, and Anna Bryson. Compl., ECF No. 1. On the same day, Kissler caused a notice of pendency of the action to be published on *Business Wire*. ECF No. 5. In response to the published notice, the Court received several motions for the appointment of lead plaintiff and lead counsel. ECF Nos. 17, 24, 31. The Court granted NYC Carpenters' motion to be lead plaintiff and appointed Bernstein Litowitz Berger & Grossmann LLP as lead counsel. Order, ECF No. 41.

In October 2024, Plaintiffs filed a consolidated class action complaint on behalf of itself and other similarly situated persons or entities who purchased or otherwise acquired Doximity common stock during the Class Period. *See* CAC. Defendants moved to dismiss on December 3, 2024.

## III. LEGAL STANDARD

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the [plaintiff]." *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). However, the tenet that a court must accept a complaint's allegations as true "is inapplicable to . . . [t]hreadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"Securities fraud class actions must [also] meet the higher, exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (PSLRA)."

*Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014). Under Rule 9(b) and the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to the alleged false statements or omissions, and a party must "state with particularity the circumstances constituting fraud or mistake." 15 U.S.C. § 78u–4(b)(2)(A); Fed. R. Civ. P. 9(b). If the complaint does not satisfy the PSLRA's pleading requirements, the Court must grant a motion to dismiss the complaint. 15 U.S.C. § 78u–4(b)(3)(A).

## IV. DISCUSSION

Section 10(b) prohibits any act or omission resulting in fraud or deceit in connection with the purchase or sale of any security. "To plead a claim under [S]ection 10(b) and Rule 10b-5, the Plaintiff[ ] must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 613 (9th Cir. 2017) (quoting *Oregon Pub. Emps. Ret. Fund*, 774 F.3d at 603).

### A. False or Misleading Statements

Under the PSLRA, "plaintiffs must allege a misrepresentation or a misleading omission with particularity and explain why it is misleading." *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1274 (9th Cir. 2017). A statement is false if it "directly contradict[s] what the defendant knew at that time." *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022). "Even if a statement is not false, it may be misleading if it omits material information." *Khoja*, 899 F.3d at 1008–09. Put another way, "a statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Retail Wholesale & Department Store Union Local 338 Retirement Fund*, 845 F.3d at 1275.

Defendants contend that Plaintiffs fail to adequately plead falsity. Mot. at 1. The Court turns to this argument first, analyzing Defendants' statements by category.

United States District Court
Northern District of California

### 1. Defendants' Statements that 80% of U.S. Physicians were "Active Members" of Doximity

Plaintiffs adequately allege that Defendants' statements to investors that 80% of all U.S. doctors were active members of the Doximity platform were false or misleading. Plaintiffs support these allegations by citing to evidence in its complaint, including a survey of U.S. doctors (CAC ¶¶ 58-62), former employee accounts (CAC ¶¶ 66-73), and other corroborating facts (CAC ¶¶ 63-65).

To start, Defendants argue that "Plaintiff fails to adequately plead that Mr. Tangney's statements misled investors to believe that 80% of U.S. physicians were 'quarterly active users' of the Doximity platform" because Plaintiffs conflate the phrase "active members" with "quarterly active users." Mot. at 13. Plaintiffs respond by asserting that this ignores the complaint's well-pled allegations and is an argument more appropriate for summary judgment. Opp'n at 10.

The Court agrees with Plaintiffs. The complaint alleges that Doximity defined "active members" on is website during the Class Period as "active users . . . that log in and click on internal links on a regular basis," or at least "quarterly." CAC ¶ 38. Additionally, internally at Doximity, "active members" and "active users" were used interchangeably to refer "to the number of members who used the platform on, at minimum, a quarterly basis." *Id.* Doximity's CEO also interchangeably stated that "over 80% of all U.S. physicians use our platform," *id.* ¶¶ 106, 108, 117, 133, and "over 80% of all U.S. physicians are active members." *Id.* ¶¶ 115, 104, 110, 119, 120. Further, analysts repeated the "active member" metric because it demonstrated regular use of Doximity's platform. *Id.* ¶ 44 (noting (1) Canaccord Genuity justifying its valuation of Doximity because of the "unique asset with 80% of U.S. physicians as active members on the platform;" (2) J.P. Morgan highlighting that "over 80% of U.S. physicians [are] using the platform;" and (3) William Blair explaining Doximity is unique because its platform was "used daily" by over 80% of physicians). At the pleadings stage, this is sufficient.

Turning to Plaintiffs' evidence in support of its allegations, Lead Counsel conducted a survey of randomly-selected U.S. doctors that asked each to confirm (1) if the respondent was U.S. licensed physician during the Class Period, (2) which of several social media platforms,

including Doximity, each respondent used during the Class Period, (3) of those that used Doximity, how many used the platform less than once every three months, and (4) of those that used Doximity, whether the respondent had used the Newsfeed feature, and if so, if the respondent used it at least quarterly. *Id.* ¶¶ 59-61. "[T]he survey results can be stated with a 95% confidence level." *Id.* ¶ 62. The survey results identified in the complaint indicate that of the doctors that used the Doximity platform during the Class Period, over one-third reported using it less than once a quarter. *Id.* ¶ 60. The complaint also included results that indicate that slightly more than half of all U.S. physicians either never used Doximity or used it less than once a quarter. *Id.* This provides a particularized showing that less than 80% of all U.S. doctors were active members of the Doximity platform during the Class Period.

Defendants assert that Plaintiffs' survey "fail[s] to provide contemporaneous evidence" and is a non-actionable fraud-by-hindsight claim. Mot. at 16 (citing *City of Roseville Employees' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1119 (E.D. Wash. 2013), *aff'd*, 691 F. App'x 393 (9th Cir. 2017)). "Inherent in the concept of falsity is the requirement of contemporaneousness. To viably plead a false or misleading statement, Plaintiff must 'set forth, as part of the circumstances constituting fraud, an explanation as to why the disputed statement was untrue or misleading *when made.*'" *City of Roseville Employees' Ret. Sys.*, 963 F. Supp. 2d at 1109 (citations omitted and emphasis in original). Defendants' argument misconstrues the data reported by the survey. The survey specifically asked respondents to only report their use during the Class Period, not afterward. CAC ¶¶ 60-61. Thus, the survey reflects Class Period data, not present-day knowledge. Data regarding the number of regular users on the Doximity platform would have been available to the company on its Dashboard. *Id.* ¶ 13. At the pleadings stage, this is sufficient.[3]

[3] Defendants further argue, without meaningful support, that Plaintiff's survey "suffers from methodological flaws," *see* Reply at 8, and thus should be disregarded. Mot. at 16. While this may be true (the Court draws no conclusion), further discovery will allow for a larger sample size and more robust statistical analysis. Additionally, Defendants overstate the falsity standard. Plaintiffs present compelling survey data that demonstrate Defendants' 80% figures were inflated. This analysis is sufficient to meet both the PSLRA's particularity requirement and *Twombly* and *Iqbal*'s reasonable inference plausibility standard on a Rule 12(b)(6) motion to dismiss.



United States District Court
Northern District of California

Second, Plaintiffs rely on former employee (FE) accounts to support its allegations of falsity. For example, "FE 5, who regularly used Doximity's Dashboard," throughout the Class Period, "confirmed that Defendants' 80% figure was not true. *Id.* ¶ 71. FE 6 stated that the number of active members on the platform was "a topic of conversation and a concern at [Doximity and] that the number of active members using the Newsfeed was significantly below 80% of the U.S. physician population." *Id.* ¶ 73. Collectively these allegations support Plaintiffs' contentions that Defendant's statements to investors (that 80% of all U.S. doctors were active members of the Doximity platform) were false or misleading.

Defendants respond that the statements of its former employees are inconsistent and neither reliable nor contemporaneous. Mot. at 15. Specifically, Defendants assert that the FEs were not "personally knowledgeable of reliable facts that contradict" Doximity's statements and they "do not offer information contemporaneous to Mr. Tangney's statements, but rather offer retroactive observations." *Id.* But this belies the actual allegations in the complaint. As to the FEs' personal knowledge, the complaint alleges that several FEs had access to the Doximity Dashboard, *see* CAC ¶¶ 57, 67-68, 71, and others had access to metrics about member use, including click-through rates and profile error rates. *Id.* ¶¶ 57, 64-65. This is sufficient to allege that Doximity's FEs had personal knowledge of reliable facts.

Defendants' argument that the FEs do not "provide contradictory information as of the time of Mr. Tangney's statements in 2021 and early 2022" also misreads the complaint. Mot. at 15. First, as to the contradictory information, both FE 5, whose tenure encompassed the entire Class Period (CAC ¶ 71), and FE 6, the Business Analytics Manager at Doximity from March 2021 to November 2023 (CAC ¶ 67), reported the falsity of Defendants' 80% figure. CAC ¶¶ 71, 73. Second, as to the time the misleading statements were made, Plaintiffs allege a false and misleading statement about the 80% figure was made after early 2022, on June 6, 2023. *Id.* ¶ 133 (alleging that on June 6, 2023, Doximity held an inaugural Investor Day Conference at which Defendant Tangney stated, "over 80% of all physicians . . . use our platform."). Thus, the Court finds the complaint adequately alleges contemporaneous contradictory statements sufficient to support falsity.

United States District Court
Northern District of California

Finally, Plaintiffs allege other corroborating facts to support their claim of falsity. For example, the complaint refers to a mid-August 2023 independent study that demonstrated many of the user profiles of Doximity platform members contained basic errors, indicating that they were not actively engaged on the platform. *Id.* ¶ 63. FE 2's account, explaining that basic information about Doximity's active members was wrong or outdated, supports the data from the study. *Id.* ¶ 64. Finally, FE 3 explains that the "click-through-rate was consistently low throughout his tenure," from July 2022 until after the end of the Class Period. *Id.* ¶ 65. These further corroborating factual allegations, together with survey data and former employee testimony, plausibly allege that Defendants' statements to investors (that 80% of all U.S. doctors were active members of the Doximity platform) were false or misleading.

**2. Defendants' Statements About Increasing User Engagement**

Plaintiffs also plausibly allege that Defendants falsely represented that user engagement was increasing, when in fact, engagement was decreasing. *Id.* ¶ 55. Again, Plaintiffs support these allegations by citing to evidence in their complaint, including a survey of U.S. doctors (CAC ¶¶ 58-62), former employee accounts (CAC ¶¶ 66-73), and other corroborating facts (CAC ¶¶ 63-65).

Defendants again argue for dismissal by challenging the sufficiency of Plaintiffs' support. Defendants argue that Plaintiffs fail to identify specific internal data that shows declining user engagement, *see* Mot. at 10, and that Plaintiffs' reliance on three former employees, who are not alleged to have roles with access to platform-wide user engagement data, is misplaced. Mot. at 11. For all the same reasons discussed above, Defendants arguments fail.

First, in addition to the allegations noted above regarding Defendants' 80% figure, Plaintiffs allege that "[n]umerous former Doximity employees have reported that user engagement on the platform was decreasing throughout the Class Period." CAC ¶¶ 75, 77-78. Additionally, "[f]ormer Doximity employees also confirmed that the Company internally recognized and specifically discussed the decline in engagement across the platform." *Id.* ¶ 76. Finally, the complaint states "[t]he decline in user engagement was widely discussed among concerned Doximity employees." *Id.* ¶ 79. This evidence provides a particularized showing of declining

user engagement across the platform throughout the Class Period.

Moreover, Defendants assertions about these FEs lacking access are unavailing. As noted above, several FEs had access to the Doximity Dashboard, *see* CAC ¶¶ 57, 67-68, 71, and others had access to metrics about member use, including click-through rates and profile error rates. *Id.* ¶¶ 57, 64-65. This is sufficient.

Similarly, Defendants' argument that Plaintiffs fail to identify specific internal data showing declining user engagement is without substance. At the pleading stage, Plaintiffs need not show data demonstrating declining engagement; they need only demonstrate with particularly that there was a decline. Plaintiffs met this burden.

**B. Scienter**

"[A] securities fraud complaint must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011) (quoting 15 U.S.C. § 78u–4(b)(2)(A)). "A complaint can plead scienter by raising a strong inference that the defendant possessed actual knowledge or acted with deliberate recklessness." *Id.* The Court first determines whether any allegations, standing alone, "are sufficient to create a strong inference of scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 992 (9th Cir. 2009), *as amended* (Feb. 10, 2009). If no individual allegations are sufficient, the Court "conduct[s] a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Id.* In reviewing the sufficiency of the complaint, the Court must "take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323 (2007). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

"As a general matter, 'corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud' or other allegations supporting scienter." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784–85 (9th Cir.



United States District Court
Northern District of California

2008) (quoting *Metzler Inv. GmbH v. Corinthian Colleges, Inc.*, 534 F.3d 1068, 1087 (9th Cir.2008)). However, "allegations regarding management's role in a company may be relevant and help to satisfy the PSLRA scienter requirement in three circumstances." *S. Ferry LP, No. 2*, 542 F.3d at 785. First, "allegations regarding management's role in a corporate structure may be considered as part of the *Tellabs* holistic analysis." *Lamartina v. VMware, Inc.*, No. 20-CV-02182-EJD, 2023 WL 2763541, at *15 (N.D. Cal. Mar. 31, 2023). "Second, such allegations may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information." *S. Ferry LP, No. 2*, 542 F.3d at 785-86. "Finally, such allegations may conceivably satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be 'absurd to suggest that management was without knowledge of the matter." *Id.* (citations omitted)

Considered holistically, the allegations in the CAC give rise to a strong inference of scienter. Plaintiffs allege that Defendant Tangney was personally aware of Doximity's "user engagement Dashboard showing the actual number of active members and level of engagement on the Doximity platform, including the Newsfeed," CAC ¶ 153, and knew, or were reckless in not knowing, "that engagement was declining across the platform and throughout the Class Period." *Id.* ¶ 155. A former employee confirmed that Defendant Tangney not only had access to the Dashboard showing the true number of active members, "which was always below 80%, as well as the low and declining level of engagement," but Tangney requested its creation. *Id.* ¶ 154. As CEO of a social media company dependent on advertisers for 90% of its revenue, *see id.* ¶ 1, it is implausible, particularly when taking the allegations in the complaint in the light most favorable to Plaintiffs, as the Court must, that Defendant Tangney would not have been aware of user engagement metrics, particularly on the NewsFeed.

It is similarly implausible, given the whole of the allegations, that Defendants would not have known that they were misleading investors by deliberately avoiding disclosing basic engagement metrics that were "crucial to Doximity's launch as a public company and raising a half-billion dollars." *Id.* ¶¶ 149, 159. Doximity publicly acknowledged that "'[o]ur members'

level of engagement [is] critical to our success' and that '[o]ur financial performance has been and will continue to be significantly determined by our success in adding, retaining, and engaging members.'" CAC ¶ 143 (quoting Doximity's annual SEC filing). "Defendant Tangney repeatedly told investors that over 80% of U.S. doctors were active members of the Doximity platform." *Id.* ¶ 145.

Considered as a whole, these allegations raise a strong inference of deliberate recklessness that is "at least as compelling" as any "opposing innocent inference." *Zucco Partners LLC*, 552 F.3d at 991. Defendants argue that "[v]iewed under the rubric of *Tellabs*, the more plausible inference is that . . . Doximity's growth rate slowed post-COVID." Mot. at 21. Plaintiffs respond that this ignores the allegations and the inferences that can be drawn from them. Opp'n at 24. Assuming the factual allegations in the complaint to be true, the Court finds, the balance of inferences favors finding scienter. *Telelabs, Inc.*, 551 U.S. at 324 (holding that "[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.")

The Court finds scienter under a holistic, *Telelabs* analysis; as such the Court does not address whether the complaint's allegations regarding management's role in a company independently satisfy the PSLRA because they are particular and "suggest that defendants had actual access to the disputed information" or because they are "of such prominence that it would be 'absurd to suggest that management was without knowledge of the matter.'" *S. Ferry LP, No. 2*, 542 F.3d at 785-86.

**C. Loss Causation**

The PSLRA requires the plaintiff to prove "that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). "Loss causation" refers to the "causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). "To prove loss causation, plaintiffs need only show a 'causal connection' between the fraud and the loss . . . by tracing the loss back to 'the very facts about which the defendant lied.'" *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (internal citations omitted). Stated another way "[t]o establish

loss causation in a fraud-on-the-market case, the plaintiff must show that after purchasing her shares and before selling, the following occurred: (1) 'the truth became known,' and (2) the revelation caused the fraud-induced inflation in the stock's price to be reduced or eliminated." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 789 (9th Cir. 2020).

"So long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). The requirement "'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of' loss causation." *Id.* (quoting *Twombly*, 550 U.S. at 555).

Defendants argue that Plaintiffs fail to adequately plead loss causation for two reasons. Mot. at 22-24; Reply at 13-15. First, Defendants assert that Plaintiffs have not alleged any "corrective disclosure." Mot. at 22. While identifying one or more corrective disclosures may be a common way to allege loss causation, *see In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020), it is not the only way. *See Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016); *see also Leventhal v. Chegg, Inc.*, No. 21-CV-09953-PCP, 2024 WL 3447516, at *2 (N.D. Cal. July 17, 2024) (citation omitted). Indeed, "loss causation is simply a variant of proximate cause," *Lloyd*, 811 F.3d at 1210 (citing *Dura Pharms., Inc.*, 544 U.S. at 343-46), and there are an "'infinite variety' of causation theories a plaintiff might allege to satisfy proximate cause." *Mineworkers' Pension Scheme*, 881 F.3d at 754 (citing *Lloyd*, 811 F.3d at 1210). One way "[a] plaintiff may also prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss." *Mineworkers' Pension Scheme*, 881 F.3d at 754 (citations omitted).

Here, Plaintiffs seek to recover losses from a significant stock drop—the largest single-day decline in Doximity's history—that occurred on August 8, 2023. CAC ¶ 101. The drop came the same day Doximity reduced its financial guidance for fiscal year 2024 and announced that it would terminate 10% of its workforce. *Id.* ¶ 90. Defendants argue this August 8, 2023, disclosure did not reveal a decline in user engagement or Doximity's membership. Mot. at 22. Plaintiffs counter that the 23% stock drop was connected to Doximity's misrepresentations about user

engagement (or rather lack thereof) with its platform, which led to declining upsell close rates and "lost ground to competitors." Opp'n at 24 (citing CAC ¶¶ 91, 166). Specifically, Plaintiffs allege that Doximity's misrepresentations artificially inflated the price of the company's stock and when Doximity announced the reduction in revenue guidance and workforce, the price of Doximity's stock declined in response. CAC ¶¶ 165-166.

Additionally, Plaintiffs allege that "[a]nalysts connected the August 8, 2023 disclosures with less-than-represented user engagement on the Doximity platform." *Id.* ¶ 167. As Plaintiffs note, not only did Wells Fargo question whether Doximity's customers saw a high enough return on investment "to warrant putting more ad dollars in later in the year," but "Morgan Stanley also concluded that Doximity's decline in upsells was attributable to less-than-represented engagement on the Doximity platform." CAC ¶ 167-68. Morgan Stanley also stated in subsequent industry checks that "Doximity suffered from 'slowing growth in their . . . user engagement,' which adversely impacted their digital advertisement upsells on the platform." *Id.* (emphasis omitted). Other analysts and market commentators, "recognized that the decline in Doximity's upsells, and the reduction in its revenue guidance, was attributable to the fact that there were lesser-than-represented active members on the platform." *Id.* ¶ 169.

The Ninth Circuit has held that when "analysts note[ ] the probable relationship between" alleged misstatements and a stock price decline, plaintiffs have adequately pleaded loss causation. *Lloyd*, 811 F.3d at 1202. Here, Plaintiffs have met the burden to plead loss causation. *In re WageWorks, Inc., Sec. Litig.*, No. 18-CV-01523-JSW, 2020 WL 2896547, at *8 (N.D. Cal. June 1, 2020) (noting a "low bar of pleading proximate cause for purposes of loss causation").

**D. Section 20(a)**

Plaintiffs also allege that Defendant Tangney is liable under section 20(a) of the Exchange Act. CAC ¶¶ 197-204. To state a prima facie section 20(a) claim, a plaintiff must plead: (1) "a primary violation of federal securities laws"; and (2) "that the defendant exercised actual power or control over the primary violator." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). Because Plaintiffs have properly pleaded a Section 10(b) violation, the Section 20(a) claim against Defendant Tangney will not be dismissed. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046,

1052 (9th Cir. 2014) (requiring "a primary violation of underlying federal securities laws, such as Section 10(b) or Rule 10b-5" to establish a cause of action under Section 20(a)).

## V. CONCLUSION

The Court DENIES Defendants motion to dismiss. Defendants shall file an answer to the operative complaint in three weeks, on June 3, 2025.

The Court will hold an initial case management conference on Tuesday, July 1, 2025, at 9:00 a.m. via Zoom video. A joint case management conference statement is due two weeks prior on Tuesday, June 17, 2025.

**IT IS SO ORDERED.**

Dated: May 13, 2025

Noël Wise
United States District Judge

United States District Court
Northern District of California