**BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP**
Jonathan D. Uslaner (Bar No. 256898)
jonathanu@blbglaw.com
Lauren M. Cruz (Bar No. 299964)
lauren.cruz@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3481

*Counsel for Lead Plaintiff New York City District
Council of Carpenters Pension Fund and Lead
Counsel for the Class*

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| IN RE DOXIMITY, INC. SECURITIES LITIGATION | Case No. 5:24-cv-02281-NW<br><br>**NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL; LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Judge: Hon. Noël Wise<br>Date: November 19, 2025<br>Time: 9:00 a.m.<br>Courtroom: 3, Fifth Floor |

## NOTICE OF MOTION

To:    ALL PARTIES AND THEIR ATTORNEYS OF RECORD

PLEASE TAKE NOTICE that pursuant to the Court's Order of June 25, 2025 (ECF No. 83), on November 19, 2025 at 9:00 a.m. in the Courtroom of the Honorable Noël Wise, New York City District Council of Carpenters Pension Fund ("NYC Carpenters" or "Lead Plaintiff") shall and hereby does respectfully move this Court pursuant to Federal Rules of Civil Procedure 23(a), (b)(3), and (g) for entry of an order in the above-captioned action (the "Action"):

1.    Certifying a class of investors (the "Class") defined as:

> All persons or entities who purchased or otherwise acquired the common stock of Doximity, Inc. between June 24, 2021 and August 8, 2023, inclusive, and were damaged thereby.[1]

2.    Appointing Lead Plaintiff as Class Representative; and

3.    Approving Lead Plaintiff's selection of Lead Counsel Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz") as Class Counsel.

This motion is based on this Notice of Motion and Motion; the Memorandum of Points and Authorities in support thereof; the accompanying Declaration of Jonathan D. Uslaner (the "Uslaner Declaration" or "Uslaner Decl.") and all exhibits attached thereto; the papers and pleadings filed in this Action; and such further matters and argument as the Court may consider at the hearing on this motion.

---

[1] Exclusions from the Class are identified in footnote 3 to the motion.

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    PRELIMINARY STATEMENT ....................................................................1

II.   BACKGROUND AND PROCEDURAL HISTORY ....................................3

III.  ARGUMENT ...............................................................................................6

    A.    The Proposed Class Satisfies Rule 23(a) .........................................7

          1.    Numerosity Is Established ......................................7

          2.    Commonality Is Established ....................................8

          3.    Typicality Is Established ........................................8

          4.    Adequacy Is Established ........................................9

    B.    The Proposed Class Satisfies Rule 23(b)(3) .................................12

          1.    Common Questions of Law And Fact Predominate Over Individualized Issues .........................................................12

               a.    The Claims At Issue Will Be Established Using The Same Evidence ................................................12

               b.    The Fraud-on-the-Market Presumption Applies ...........................13

               c.    Damages Will Be Calculated Using a Common Methodology That Is Consistent With the Class-wide Theory of Liability ................................18

          2.    A Class Action Is Superior To Other Methods Of Resolving This Controversy. ..............................................19

    C.    Bernstein Litowitz Should Be Appointed Class Counsel ..............20

IV.   CONCLUSION ...........................................................................................21

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)...........................................................................................................12

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013)........................................................................................................7, 13

*In re Apple Inc. Sec. Litig.*,
    2022 WL 354785 (N.D. Cal. Feb. 4, 2022) ...........................................................................13

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988).........................................................................................................3, 13

*Blackie v. Barrack*,
    524 F.2d 891 (9th Cir. 1975) ...................................................................................................6

*In re BofI Holding, Inc. Sec. Litig.*,
    2021 WL 3742924 (S.D. Cal. Aug. 24, 2021) .............................................................7, 11, 19

*Booth v. Strategic Realty Tr., Inc.*,
    2015 WL 3957746 (N.D. Cal. June 28, 2015) .........................................................................6

*In re Bridgepoint Educ., Inc. Secs. Litig.*,
    2015 WL 224631 (S.D. Cal. Jan. 15, 2015)...........................................................................13

*Brown v. China Integrated Energy Inc.*,
    2015 WL 12720322 (C.D. Cal. Feb. 17, 2015).........................................................................8

*Cammer v. Bloom*,
    711 F. Supp. 1264 (D.N.J. 1989) ................................................................................ *passim*

*In re Celera Corp. Sec. Litig.*,
    2014 WL 722408 (N.D. Cal. Feb. 25, 2014) ...........................................................................9

*City of Miami Gen. Emps.' & Sanitation Emps' Ret. Trust v. RH, Inc.*,
    2018 WL 4931543 (N.D. Cal. Oct. 11, 2018)..............................................................1, 12, 18

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
    2022 WL 1459567 (N.D. Cal. May 9, 2022) .........................................................................11

*In re Cooper Cos. Inc. Sec. Litig.*,
    254 F.R.D. 628 (C.D. Cal. 2009) .........................................................................................1, 6

*In re Diamond Foods, Inc., Sec. Litig.*,
    295 F.R.D. 240 (N.D. Cal. 2013) ................................................................................ *passim*

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011)..................................................................................12, 13

*In re FibroGen Sec. Litig.*,
    2024 WL 1064665 (N.D. Cal. Mar. 11, 2024)........................................18

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014)........................................................................................13

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ..............................................9, 12, 20

*Harris v. Palm Springs Alpine Ests. Inc.*,
    329 F.2d 909 (9th Cir. 1964) ...............................................................12

*Hatamian v. Advanced Micro Devices, Inc.*,
    2016 WL 1042502 (N.D. Cal. Mar. 16, 2016)....................................7, 9

*Hayes v. MagnaChip Semiconductor Corp.*,
    2016 WL 7406418 (N.D. Cal. Dec. 22, 2016) ............................... *passim*

*Hefler v. Wells Fargo & Co.*,
    2018 WL 4207245 (N.D. Cal. Sept. 4, 2018) .....................................21

*In re Infineon Tech. AG Sec. Litig.*,
    266 F.R.D. 386 (N.D. Cal. 2009)..........................................................15

*In re Intuitive Surgical Sec. Litig.*,
    2016 WL 7425926 (N.D. Cal. Dec. 22, 2016).................................10, 14

*Junge v. Geron Corp.*,
    2022 WL 1002446 (N.D. Cal. Apr. 2, 2022) .......................................10

*In re Juniper Networks, Inc. Sec. Litig.*,
    264 F.R.D. 584 (N.D. Cal. 2009)..........................................................16

*Kanawi v. Bechtel Corp.*,
    254 F.R.D. 102 (N.D. Cal. 2008)............................................................9

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001) .........................................................14

*In re LDK Solar Sec. Litig.*,
    255 F.R.D. 519 (N.D. Cal. 2009)............................................................9

*In re Lendingclub Secs. Litig.*,
    282 F. Supp. 3d 1171 (N.D. Cal. Oct. 20, 2017) .................................19

*Malriat v. QuantumScape Corp.*,
    2022 WL 17974629 (N.D. Cal. Dec. 19, 2022) ...............................10, 17

*In re Mattel, Inc. Sec. Litig.*,
   2021 WL 4704578 (C.D. Cal. Oct. 6, 2021) ....................................................... 1, 7

*Mauss v. NuVasive, Inc.*,
   2017 WL 1080654 (S.D. Cal. Mar. 22, 2017) ........................................................ 10

*Meyer v. Portfolio Recovery Assocs., LLC*,
   707 F.3d 1036 (9th Cir. 2012) ............................................................................... 8

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
   2016 WL 1598666 (N.D. Cal. Apr. 21, 2016) ........................................................ 14

*Parsons v. Ryan*,
   754 F.3d 657 (9th Cir. 2014) ................................................................................. 8

*In re Petrobras Sec.*,
   862 F.3d 250 (2d Cir. 2017) ................................................................................. 17

*Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*,
   2021 WL 229310 (N.D. Cal. Jan. 21, 2021) ..................................... 13, 14, 15, 19

*Purple Mountain Tr. v. Wells Fargo & Co.*,
   2022 WL 3357835 (N.D. Cal. Aug. 15, 2022) ...................................................... 14

*Quackenbush v. Am. Honda Motor Co.*,
   2021 WL 6116949 (N.D. Cal. Dec. 27, 2021), *aff'd*, 2025 WL 1009273 (9th Cir. Apr. 4, 2025) ............................................................................................................. 10

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017) ............................................................................. 13

*Roberts v. Heim*,
   42 F.3d 1401, 1994 WL 666043 (9th Cir. Nov. 25, 1994) ...................................... 6

*In re SanDisk LLC Secs. Litig.*,
   2018 WL 4293336 (N.D. Cal. Sept. 4, 2018) ....................................................... 19

*Schleicher v. Wendt*,
   618 F.3d 679 (7th Cir. 2010) ................................................................................. 6

*SEB Inv. Mgmt. AB v. Wells Fargo & Co.*,
   2025 WL 1243818 (N.D. Cal. Apr. 25, 2025) ...................................................... 14

*Siemers v. Wells Fargo & Co.*,
   243 F.R.D. 369 (N.D. Cal. 2007) ......................................................................... 20

*In re SiRF Tech. Holdings, Inc. Sec. Litig.*,
   2008 WL 2220601 (N.D. Cal. May 27, 2008) ...................................................... 11

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ..........................................................................................6

*Todd v. STARR Surgical Co.*,
    2017 WL 821662 (C.D. Cal. Jan. 5, 2017) .....................................................16

*In re Twitter Inc. Secs. Litig.*,
    326 F.R.D. 619 (N.D. Cal. 2018) ......................................................... *passim*

*In re UTStarcom, Inc. Sec. Litig.*,
    2010 WL 1945737 (N.D. Cal. May 12, 2010) .................................................12

*In re VeriSign, Inc. Secs. Litig.*,
    2005 WL 7877645 (N.D. Cal. Jan. 13, 2005) ...................................................7

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017) ..........................................................................14, 17

*Weston v. DocuSign, Inc.*,
    348 F.R.D. 354 (N.D. Cal. 2024) ...................................................................19

**STATUTES AND RULES**

15 U.S.C. §78j(b) ............................................................................... *passim*

15 U.S.C. §78t-1 .........................................................................1, 3, 4, 8

15 U.S.C. §78u-4 ................................................................................ *passim*

Fed. R. Civ. P. 23(a) .......................................................................... *passim*

Fed. R. Civ. P. 23(a)(1) ..................................................................................7

Fed. R. Civ. P. 23(a)(2) ..................................................................................8

Fed. R. Civ. P. 23(a)(3) ..................................................................................8

Fed. R. Civ. P. 23(a)(4) .............................................................................9, 10

Fed. R. Civ. P. 23(b) ........................................................................... *passim*

Fed. R. Civ. P. 23(g) ...........................................................................3, 20, 21

**OTHER AUTHORITIES**

H.R. Conf. Rep. No. 104-369, 104th Cong., 1st Sess. (1995), *reprinted in* 1995
    U.S.C.C.A.N. 730 .........................................................................................11

1    I.    **PRELIMINARY STATEMENT**

2        As courts in this District have aptly stated, "securities fraud cases fit Rule 23 like a

3    glove." *City of Miami Gen. Emps.' & Sanitation Emps' Ret. Trust v. RH, Inc.*, 2018 WL

4    4931543, at *3 (N.D. Cal. Oct. 11, 2018).[1] This case is no exception. This action asserts claims

5    under Sections 10(b) and 20(a) of the Exchange Act against Defendants Doximity, Inc.

6    ("Doximity") and its Chief Executive Officer, Jeffrey Tangney ("Tangney" and, with Doximity,

7    "Defendants"), arising from their false and misleading statements concerning the number of

8    active members and level of engagement on the Doximity platform. Throughout the Class

9    Period, Defendants repeatedly told investors that over 80% of U.S. doctors were "active

10   members" of the Doximity platform, and that engagement was reaching "record highs." In truth,

11   the percentage of doctors who actually used the platform was significantly lower, and

12   engagement with the platform declined even as Defendants claimed it hit "fresh highs." As a

13   result, the stock price for Doximity common stock was inflated, and investors suffered

14   substantial losses when, on August 8, 2023, Doximity sharply reduced its earnings guidance,

15   which Defendants attributed to a decline in the upsell close rate. Analysts did not accept

16   Doximity's explanations for the decline and instead connected it to the fact that user engagement

17   was not what Doximity had represented during the Class Period.

18       "Courts in this district have recognized the utility of the class action device in securities

19   cases." *In re Twitter Inc. Secs. Litig.*, 326 F.R.D. 619, 631 (N.D. Cal. 2018). Securities class

20   actions "are particularly effective in serving as private policing weapons against corporate

21   wrongdoing." *In re Cooper Cos. Inc. Sec. Litig.*, 254 F.R.D. 628, 642 (C.D. Cal. 2009). Such

22   actions are routinely certified, and "[t]he law in the Ninth Circuit is very well established that the

23   requirements of Rule 23 should be liberally construed in favor of class action cases brought

24   under the federal securities laws." *In re Mattel, Inc. Sec. Litig.*, 2021 WL 4704578, at *3 (C.D.

---

26   [1] Unless otherwise noted, (i) capitalized terms and abbreviations not defined herein have the
27   same meanings ascribed to them in the Consolidated Class Action Complaint for Violations of
     Federal Securities Laws (the "Complaint") (ECF No. 61); (ii) references to "¶__" refer to
28   paragraphs of the Complaint; (iii) all emphasis is added; and (iv) all internal citations and
     punctuation are omitted.

Cal. Oct. 6, 2021).

Certification under Rule 23 is granted if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Additionally, "common" issues of law or fact must "predominate over any questions affecting only individual members," and a class action must be "superior" to other methods of adjudication. Fed. R. Civ. P. 23(b)(3). The proposed Class satisfies these requirements.

**First,** the "numerosity" requirement is satisfied because there are many thousands of Class members. There was an average of 99.39 million shares of Doximity common stock outstanding during the Class Period, and an average weekly trading volume of over 11 million shares. Cain Rept. at ¶¶33-35, Exs. 2, 10. [2]

**Second,** the "commonality" requirement is satisfied because this Action involves many common issues of law and fact, including whether: (i) the challenged statements were false or misleading; (ii) Defendants acted with scienter; (iii) Defendants' misstatements and omissions caused investors' losses; and (iv) and to what extent Doximity's stock price was artificially inflated by Defendants' misstatements and omissions.

**Third,** the "typicality" requirement is satisfied because Lead Plaintiff and the other Class members were harmed by the same false and misleading statements and omissions, and suffered the same or similar monetary injury.

**Fourth,** Lead Plaintiff and Lead Counsel are "adequate" to represent the Class: Lead Plaintiff is a sophisticated institutional investor whose interests in prosecuting this Action are squarely aligned with the Class's interests, and Lead Counsel is one of the most experienced securities class action law firms in the country.

**Fifth,** this Action readily satisfies the "predominance" requirement of Rule 23(b)(3).

---

[2] References to the "Cain Report" or "Cain Rept." refer to the expert Report of Matthew D. Cain, attached as Exhibit B to the Uslaner Declaration.

Common issues of law and fact abound—including issues of falsity, materiality, scienter, and loss causation—and are subject to common proof. Moreover, class-wide reliance is presumed where, as here, the Company's stock trades on an efficient market. *See Basic Inc. v. Levinson,* 485 U.S. 224, 242 (1988) (adopting fraud-on-the-market presumption). The market for Doximity's common stock, which trades on the New York Stock Exchange ("NYSE"), is efficient and, accordingly, the class-wide presumption of reliance applies. The accompanying Cain Report establishes through empirical analysis that Doximity stock satisfies all of the factors that courts consider in evaluating market efficiency. Dr. Cain further explains how damages may be calculated based on a class-wide methodology that is consistent with Lead Plaintiff's theory of liability.

**Sixth,** the "superiority" factor under Rule 23(b)(3) is satisfied because (i) thousands of investors suffered damages as a result of Defendants' alleged misconduct; (ii) the typical claims are too small to warrant individual actions due to litigation costs; (iii) it is desirable to hear all such claims in one court; and (iv) there is no difficulty in maintaining this litigation as a class action.

**Finally,** pursuant to Rule 23(g), Lead Counsel should be appointed as Class Counsel because it is well qualified to prosecute this Action on behalf of Lead Plaintiff and the Class.

For these reasons, and as discussed further below, Lead Plaintiff respectfully requests that the Court certify the proposed Class, appoint Lead Plaintiff NYC Carpenters as Class Representative under Rules 23(a) and 23(b)(3), and appoint Bernstein Litowitz Berger & Grossmann ("Lead Counsel" or "Bernstein Litowitz") as Class Counsel under Rule 23(g).

## II.    BACKGROUND AND PROCEDURAL HISTORY

This is a securities class action brought under the federal securities laws, specifically Sections 10(b) and 20(a) of the Exchange Act, on behalf of all persons or entities who purchased or otherwise acquired Doximity common stock between June 24, 2021 and August 8, 2023, inclusive (the "Class Period"), and who were damaged thereby (the "Class").[3]

---

[3] Excluded from the Class are: (1) Defendants and their legal representatives, heirs, successors, and assigns; (2) any current or former officers or directors of Doximity; (3) the immediate family

Throughout the Class Period, Defendants repeatedly told investors that "over 80% of all U.S. physicians are active members" of Doximity. ¶40. Defendants further told investors that engagement on the Doximity platform and the Newsfeed had "never been higher" or was hitting "fresh highs." ¶¶51, 113-14, 122, 125, 127-28. These statements were important to investors: Doximity represented that its members' level of engagement was "critical to our success," and analysts reported that Doximity's "network" was "the key" to Doximity's profitability. ¶¶136, 139.

Unbeknownst to investors at the time, however, Defendants' statements were false and misleading. In truth, substantially fewer than 80% of U.S. physicians were "active members," *i.e.*, used Doximity at least quarterly, and, at times when Defendants claimed engagement was increasing, internal data showed engagement – including on Doximity's revenue-generating NewsFeed was actively declining. ¶¶38, 55, 75-79, 103.

Defendants' misrepresentations led to artificial inflation in Doximity's stock price and caused investor losses when the relevant truth concealed by those misrepresentations was revealed to the market, causing Doximity's stock price to decline. Specifically, on August 8, 2023, Doximity reduced its financial guidance, including by reducing its lower-and-upper end revenue guidance by $32 and $54 million, and terminated 10% of its workforce. ¶¶17, 90. Defendants announced a substantial decline in Doximity's "upsell close rate," *i.e.*, Doximity's sales of additional Newsfeed advertisements to existing customers. ¶166. Defendant Tangney admitted that "smaller companies who are bidding up certain segments of physicians" were able to provide "a better, frankly, more normalized ROI [Return on Investment] than what we currently deliver" to Doximity customers deciding where to place their ads. ¶¶91, 166.

Analysts reacted sharply, with several downgrading Doximity from "Buy" to "Neutral" or "Hold" or else lowering the price target. ¶92. Analysts directly connected the poor results to a lack of engagement on Doximity's platform. For example, Wells Fargo "*question[ed] whether*

members of any Defendant or any current or former officer or director of Doximity; and (4) any entity that any Defendant owns or controls, or owned or controlled during the Class Period. Excluded from the Class are purchases in the primary market (*i.e.*, prior to Doximity becoming publicly traded at the start of the Class Period).

*[Doximity's] clients are seeing a high enough [return on investment] to warrant putting more ad dollars in later in the year.*" ¶93. Morgan Stanley told investors at the time that "stronger re-acceleration in the core newsfeed" was needed to get back to previously reported revenue growth. ¶94. Moreover, later "checks" by Morgan Stanley identified "company-specific issues," such as "slowing growth in their . . . user engagement," which reduced upsells and forced Defendants to slash Doximity's revenue guidance. *Id.* Other analysts described Doximity's claim that 80% of U.S. physicians were active members as "hard to believe," reporting that engagement in Doximity was "[f]alling," and reporting: "[a]sk around (as we have, and . . . you'll find a great number of doctors who 'have' Doximity profiles but don't engage with the platform in any meaningful way." ¶¶95, 97.

Following the news, Doximity suffered the largest single-day decline in its history, plummeting nearly 23% and wiping out nearly $900 million in shareholder value. ¶101.

On July 3, 2024, the Court appointed NYC Carpenters to serve as the Lead Plaintiff in this Action and approved its selection of Bernstein Litowitz as Lead Counsel. ECF No. 41. NYC Carpenters oversees approximately $4.8 billion in assets under management. *See* ¶24. NYC Carpenters purchased nearly 200,000 shares of Doximity common stock on the open market during the Class Period, and suffered damages as a result of Defendants' alleged misrepresentations. ECF No. 17-3.

On October 4, 2024, Lead Plaintiff filed the Amended Consolidated Class Action Complaint, which sets forth Defendants' violations of the Exchange Act and how those violations damaged investors. ECF No. 61.

On December 3, 2024, Defendants moved to dismiss the claims asserted in the Complaint. ECF No. 65. Defendants made a series of arguments common to all Class members, including that they purportedly made no actionable misstatements or omissions. *Id.* at 10-17. The Court carefully considered each of Defendants' arguments and denied in full Defendants' motion to dismiss in its May 13, 2025 Order. ECF No. 75.

Discovery has recently commenced. Lead Plaintiff and Defendants have each served and responded to document requests, and the deadline for fact discovery is January 16, 2026. ECF

No. 83.

In accordance with the case schedule, Lead Plaintiff now moves for class certification under Rule 23.

## III.    <u>ARGUMENT</u>

The Supreme Court "has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the Securities and Exchange Commission (SEC)." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007). "The availability of the class action to redress such frauds has been consistently upheld, . . . in large part because of the substantial role that the deterrent effect of class actions plays in accomplishing the objectives of the securities laws." *Blackie v. Barrack*, 524 F.2d 891, 903 (9th Cir. 1975). "District courts have consistently recognized that the common liability issues involved in securities fraud cases are ideally suited for resolution by way of a class action." *Cooper Cos.*, 254 F.R.D. at 641.

"[A]ctions involving alleged fraud in connection with the sale of securities are particularly suitable for class certification." *Roberts v. Heim*, 42 F.3d 1401, 1994 WL 666043, at *1 (9th Cir. Nov. 25, 1994); *see also Booth v. Strategic Realty Tr., Inc.*, 2015 WL 3957746, at *9 (N.D. Cal. June 28, 2015) (same). "Courts in this district have recognized the utility of the class action device in securities cases." *Twitter,* 326 F.R.D. at 631; *see also Cooper Cos.*, 254 F.R.D. at 641 ("District courts have consistently recognized that the common liability issues involved in securities fraud cases are ideally suited for resolution by way of a class action."). Indeed, "class certification is routine" in cases alleging securities fraud. *Schleicher v. Wendt*, 618 F.3d 679, 682 (7th Cir. 2010).

To be certified, a proposed class must satisfy Rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements, and it also must meet the requirements of at least one of Rule 23(b)'s subsections. *See, e.g., Twitter,* 326 F.R.D. at 624. In determining whether a class should be certified, the question is not whether plaintiffs will prevail on the merits, but rather whether the requirements of Rule 23 have been met. *Blackie,* 524 F.2d at 901. As the Supreme

Court has explained, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds,* 568 U.S. 455, 465-66 (2013). Courts in this Circuit have stated, in certifying securities class actions, that Rule 23's requirements should be liberally construed in favor of class action cases brought under the federal securities laws. *See Mattel,* 2021 WL 4704578, at *3 ("[T]he law in the Ninth Circuit is very well established that the requirements of Rule 23 should be liberally construed in favor of class action cases brought under the federal securities laws."); *see also In re VeriSign, Inc. Secs. Litig.,* 2005 WL 7877645, at *9 (N.D. Cal. Jan. 13, 2005) (same).

Each Rule 23 requirement is satisfied here.

## A.    The Proposed Class Satisfies Rule 23(a)

### 1.    Numerosity Is Established

The "numerosity" requirement is satisfied if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "While no specific minimum number of potential class members exists, a proposed class of at least forty members presumptively satisfies the numerosity requirement." *Hatamian v. Advanced Micro Devices, Inc.*, 2016 WL 1042502, at *4 (N.D. Cal. Mar. 16, 2016). Thus, this requirement is readily satisfied in securities cases, where often millions of shares are impacted by the alleged fraud. *See Twitter*, 326 F.R.D. at 626 ("The Court certainly may infer that, when a corporation has millions of shares trading on a national exchange, the numerosity requirement is met."); *VeriSign*, 2005 WL 7877645, at *4 ("[C]ourts are quite willing to accept common sense assumptions in order to support a finding of numerosity.").

Doximity averaged more than 99.39 million shares of common stock outstanding during the Class Period, with average weekly trading of more than 11 million shares on the NYSE. Cain Rept. ¶35, Ex. 10. Accordingly, the numerosity requirement is satisfied. *See, e.g.*, *Hayes v. MagnaChip Semiconductor Corp.*, 2016 WL 7406418, at *3 (N.D. Cal. Dec. 22, 2016) (numerosity met where company had 34.1 million to 37.1 million shares outstanding during the class period); *In re BofI Holding, Inc. Sec. Litig.*, 2021 WL 3742924, at *2 (S.D. Cal. Aug 24, 2021) (numerosity established where "BofI had millions of shares trading on NASDAQ during

the class period.").

### 2. Commonality Is Established

The "commonality" requirement is satisfied when "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The Ninth Circuit has held that the commonality requirement is "construed permissively," and "[a]ll questions of fact and law need not be common to satisfy the rule." *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1041 (9th Cir. 2012). It is well-established that "[s]o long as there is even a single common question, a would-be class can satisfy the commonality requirement of Rule 23(a)(2)." *Parsons v. Ryan,* 754 F.3d 657, 675 (9th Cir. 2014); *see also In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 246 (N.D. Cal. 2013) ("The existence of shared legal issues with divergent factual predicates is sufficient" to satisfy commonality). Accordingly, plaintiffs in securities fraud litigation generally satisfy the commonality prerequisite "very easily." *Brown v. China Integrated Energy Inc.,* 2015 WL 12720322, at *14 (C.D. Cal. Feb. 17, 2015).

The common questions of law and fact in this case are numerous and include: (i) whether Defendants made false or misleading statements or omissions; (ii) whether Defendants acted with scienter; (iii) whether the price of Doximity's common stock was artificially inflated or maintained during the Class Period and, if so, by how much; (iv) whether Defendants' misrepresentations and omissions caused Class members to suffer economic losses; (v) the proper methodology for measuring damages per share; and (vi) whether Defendant Tangney was a "control person" of Doximity. These common questions readily satisfy the "commonality" requirement. *See Twitter*, 326 F.R.D. at 629 (commonality established when common questions included whether "Defendants' statements to the investing public mispresented material facts," and "Defendants acted with the requisite state of mind"); *Hayes*, 2016 WL 7406418, at *6 (same).

### 3. Typicality Is Established

The "typicality" requirement of Rule 23(a)(3) is satisfied when the "claims or defenses of the representative parties are typical of the claims or defenses of the class." "[T]he typicality requirement is met" where all "claims are based upon the same course of events as the claims of

all class members, and all claims are based on the same theories and will be proven by the same evidence." *In re Celera Corp. Sec. Litig*., 2014 WL 722408, at *3 (N.D. Cal. Feb. 25, 2014). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). In assessing typicality, a court's "focus should be on the *defendants'* conduct. . . ." *Hatamian*, 2016 WL 1042502, at *5; *Kanawi v. Bechtel Corp.*, 254 F.R.D. 102, 110 (N.D. Cal. 2008) ("[F]ocus should be on the defendants' conduct and plaintiff's legal theory, not the injury caused to the plaintiff[.]"). Accordingly, "potential complications regarding the computation of damages do not" defeat class certification. *In re LDK Solar Sec. Litig.,* 255 F.R.D. 519, 530 (N.D. Cal. 2009).

Here, Lead Plaintiff alleges that Defendants violated Sections 10(b) and 20(a) of the Exchange Act by making materially false and misleading public statements and omissions. Lead Plaintiff, like all other Class members, purchased Doximity common stock at prices that were artificially inflated due to Defendants' material misrepresentations and omissions. Lead Plaintiff, along with the Class, was damaged when artificial inflation was removed from Doximity's stock price. Accordingly, Lead Plaintiff's claims arise from the same alleged course of conduct that gives rise to claims of other Class members, are based on the same legal theory, and will be proven by the same set of operative facts. *See Twitter*, 326 F.R.D. at 629 (typicality requirement satisfied where alleged artificial inflation and market correction that caused lead plaintiff's harm arose from the same misstatements, events, and conduct that gave rise to other class members' claims).

### 4.    Adequacy Is Established

A class representative is "adequate" if it "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon,* 150 F.3d at 1020. "[I]n the Ninth Circuit, as long as the class representative understands his duties and is represented by competent counsel, the class

representative and class counsel are considered competent for purposes of Rule 23(a)(4)." *Mauss v. NuVasive, Inc.*, 2017 WL 1080654, at *2 (S.D. Cal. Mar. 22, 2017); *see also Quackenbush v. Am. Honda Motor Co.*, 2021 WL 6116949, at *9 (N.D. Cal. Dec. 27, 2021), *aff'd*, 2025 WL 1009273 (9th Cir. Apr. 4, 2025) (same). Lead Plaintiff satisfies both prongs of the adequacy inquiry.

*First*, Lead Plaintiff's interests are aligned with Class members' interests. Like the other Class members, Lead Plaintiff sustained losses as a result of Defendants' material misrepresentations and omissions and shares the Class's interest in obtaining the best possible recovery. *See Junge v. Geron Corp.*, 2022 WL 1002446, at *3 (N.D. Cal. Apr. 2, 2022) ("no differences appear in [Lead Plaintiff's] interests or circumstances that would derail competent class representation" where they all purchased "stock during the class period and were damaged thereby"); *Malriat v. QuantumScape Corp.*, 2022 WL 17974629, at *5 (N.D. Cal. Dec. 19, 2022) (no conflict where the plaintiffs' "individual claims [were] identical to those they bring on behalf of the class").

*Second*, Lead Plaintiff has vigorously prosecuted this litigation on behalf of the Class and will continue to do so. Lead Plaintiff fully understands its duties and responsibilities as a class representative. Saraceni Decl. ¶¶3-5.[4] Lead Plaintiff has demonstrated its commitment to leading this action by, among other things, retaining and overseeing experienced counsel; filing a detailed complaint; defeating Defendants' motion to dismiss in its entirety; propounding discovery requests; and responding to discovery requests propounded by Defendants. *Id.* ¶4. It will vigorously continue to represent those interests, and fulfills the "adequacy" requirement. *See Twitter,* 326 F.R.D. at 626 (finding that class representatives were adequate "will vigorously represent the class"); *In re Intuitive Surgical Sec. Litig.,* 2016 WL 7425926, at *7 (N.D. Cal. Dec. 22, 2016) ("To establish adequacy, class representatives generally need only to be 'familiar with the basis for the suit and their responsibilities as lead plaintiffs' such that they can uphold their obligations to other class members.").

---

[4] Citations to "Saraceni Decl." refer to the Declaration of Walter Saraceni in Support of Lead Plaintiff's Motion for Class Certification, attached as Exhibit A to the Uslaner Declaration.

Moreover, NYC Carpenters—a large institutional investor—is precisely the "type of plaintiff typically favored under the PSLRA to be the lead plaintiff in securities litigation." *BofI Holding,* 2021 WL 3742924, at *3; *see also City of Sunrise Firefighters' Pension Fund v. Oracle Corp.,* 2022 WL 1459567, at *5 (N.D. Cal. May 9, 2022) ("[T]he fact that [lead plaintiff] is a large institutional investor and BLB&G is experienced with securities class actions provides further support that they will adequately represent the Class."); *In re SiRF Tech. Holdings, Inc. Sec. Litig.,* 2008 WL 2220601, at *3 (N.D. Cal. May 27, 2008) ("[B]y enacting the PSLRA, Congress sought to increase the participation of institutional investors in securities class actions," because "increasing the role of institutional investors in class actions will ultimately benefit shareholders and assist courts by improving the quality of representation in securities class actions"); H.R. Conf. Rep. No. 104-369, 104th Cong., 1st Sess. (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 733 ("Institutional investors and other class members with large amounts at stake will represent the interests of the plaintiff class more effectively than class members with small amounts at stake").

*Finally*, "[t]he [PSLRA's] lead plaintiff provisions were designed to encourage greater institutional investor participation in class action litigation by giving the lead plaintiff the power to control the course of the action, including the selection of lead counsel." *Twitter,* 326 F.R.D. at 627. Here, Lead Plaintiff has selected Lead Counsel Bernstein Litowitz, which has extensive experience in securities litigation. *See* Uslaner Decl. Ex. C (Firm Resumé); *see also Oracle*, 2022 WL 1459567, at *5 ("[Bernstein Litowitz] is experienced with securities class actions"). Lead Counsel has a proven track record of success in complex cases such as this one, and has successfully prosecuted high-profile securities fraud class actions, including in this District, recovering billions of dollars on behalf of injured investors across the country. *See id.;* Uslaner Decl. ¶¶5-6. Consistent with its track record, Bernstein Litowitz has vigorously prosecuted the Class's claims to date. *See* Uslaner Decl. ¶7; *see also Twitter,* 326 F.R.D. at 628 (finding class representative adequate and class counsel appropriate where class counsel had "vigorous[ly] prosecut[ed] this case by investigating claims, preparing the complaint, defending the complaint against dismissal, conducting discovery, and pursuing class certification").

**B.    The Proposed Class Satisfies Rule 23(b)(3)**

In addition to meeting the prerequisites of Rule 23(a), the proposed Class also satisfies Rule 23(b)(3), which requires that (i) "the questions of law or fact common to class members predominate over any questions affecting only individual members," and (ii) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

As the Ninth Circuit observed:

[Rule 23] does not require that all the members of the class be identically situated, if there are substantial questions either of law or fact common to all. [Rule 23] is based on the assumption that the economy of time, effort, and expense which will result from a common trial of substantial common issues exceeds the additional burden which may be imposed upon the court and the parties by the necessity of also determining in the common litigation those issues which may be several.

*Harris v. Palm Springs Alpine Ests. Inc.*, 329 F.2d 909, 914-15 (9th Cir. 1964).

**1.    Common Questions of Law And Fact Predominate Over Individualized Issues**

The Supreme Court has recognized that "[p]redominance is a test readily met" in securities fraud cases like this one. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *see also In re UTStarcom, Inc. Sec. Litig.,* 2010 WL 1945737, at *9 (N.D. Cal. May 12, 2010) ("the predominance requirement is readily met in securities fraud cases"). When, as here, "common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon,* 150 F.3d at 1022. As discussed further below, there are numerous common questions of law and fact that predominate over any individual questions.

**a.    The Claims At Issue Will Be Established Using The Same Evidence**

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *RH*, 2018 WL 4931543, at *2 (*quoting Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) ("*Halliburton I*") (quoting Fed. R. Civ. P. 23(b)(3))). "To recover damages for violations of section 10(b) and Rule 10b-5, a plaintiff must prove (1) a material misrepresentation or omission

by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140-41 (9th Cir. 2017); *see also In re Bridgepoint Educ., Inc. Secs. Litig.*, 2015 WL 224631, at *6 (S.D. Cal. Jan. 15, 2015) ("In the typical securities-fraud case, as in this case, the factual and legal issues related to most of these elements are common to the class, so the requirements for class certification are usually 'readily met.").

The elements of "falsity," "materiality," "scienter," and "loss causation" all raise common questions of law and fact and, accordingly, support class certification. *Amgen,* 568 U.S. at 461-62, 474-75; *Halliburton I,* 563 U.S. at 811-12. Each of these elements of Lead Plaintiff's claims "are clearly susceptible to classwide proof" and will be resolved uniformly among all class members. *In re Apple Inc. Sec. Litig.,* 2022 WL 354785, at *6 (N.D. Cal. Feb. 4, 2022).

### b.    The Fraud-on-the-Market Presumption Applies

The element of "reliance" also raises "common questions" in this case and supports class certification. As in most securities class actions involving a security traded on a national exchange, the "fraud-on-the-market" presumption of reliance applies in this case. *See Levinson*, 485 U.S. at 224. That presumption is based on the well-founded principle, adopted by the Supreme Court, that "a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014). When the presumption applies, investors do not need to demonstrate individual reliance. *Halliburton I*, 563 U.S. at 811; see also *Levinson*, 485 U.S. at 241-47.

In this case, all of the factors that courts consider demonstrate that the market for Doximity's stock was efficient. To start, courts consider whether the security at issue trades on a major national exchange. Here, Doximity's common stock actively traded on the NYSE, which is the "quintessentially efficient market." *Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*, 2021 WL 229310, at *6 (N.D. Cal. Jan. 21, 2021); *SEB Inv. Mgmt. AB v. Wells Fargo & Co.*,

2025 WL 1243818, at *6 (N.D. Cal. Apr. 25, 2025) ("Courts have found the New York Stock Exchange to be a presumptively efficient market"); *Purple Mountain Tr. v. Wells Fargo & Co.*, 2022 WL 3357835, at *5 (N.D. Cal. Aug. 15, 2022) ("the fact that Wells Fargo stock is listed on the NYSE, a highly regarded and well-regulated exchange, strongly indicates that it trades in an efficient market").

Next, courts consider the five so-called "*Cammer* factors," set forth in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286 (D.N.J. 1989). *See, e.g., Intuitive Surgical,* 2016 WL 7425926, at *11 n.12; *Granite Constr.,* 2021 WL 229310, at *6; *In re Montage Tech. Grp. Ltd. Sec. Litig.,* 2016 WL 1598666, at *8 (N.D. Cal. Apr. 21, 2016). The *Cammer* factors include: (1) whether the stock trades at a high weekly volume; (2) whether securities analysts follow and report on the stock; (3) whether the stock has market makers and arbitrageurs; (4) whether the company is eligible to file SEC registration Form S-3, as opposed to Form S-1 or S-2; and (5) whether there are empirical facts showing a cause-and-effect relationship between unexpected corporate events or financial releases and a contemporaneous response in a stock price. *See, e.g., Granite Constr.*, 2021 WL 229310, at *6. A plaintiff need not demonstrate that all of the *Cammer* factors are satisfied to demonstrate market efficiency because, as numerous Circuits have explained, these factors are an "analytical tool," not a "checklist." *Waggoner v. Barclays PLC*, 875 F.3d 79, 98-99 n.30 (2d Cir. 2017) (collecting cases).

As set forth in the expert report of financial economist Dr. Matthew Cain, analysis of the *Cammer* factors shows that Doximity common stock traded in an efficient market during the Class Period. Dr. Cain received a Ph.D. in finance, served as a Financial Economist at the SEC, and is a Senior Fellow at New York University School of Law. *See, e.g.*, Cain Rept. ¶¶5-10. Dr. Cain thoroughly analyzed each *Cammer* factor (as well as several other factors cited by courts) for the entire Class Period, including the period directly following Doximity's IPO, and determined that the market for Doximity's common stock was efficient beginning on the first day of trading and remained efficient throughout the Class Period. *See id*. ¶¶26-102[5]; *see also In re*

---

[5] As set forth in his Report, Dr. Cain also analyzed additional indicators of efficiency, including the three factors set forth in *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001):

*Infineon Tech. AG Sec. Litig.*, 266 F.R.D. 386, 396-97 (N.D. Cal. 2009) (certifying a class period beginning on the day of the IPO).

**High Weekly Trading Volume (*Cammer* Factor 1):** High trading volume indicates substantial investor interest in the security, and thus increases the likelihood that newly available public and private information will be rapidly incorporated into the security price through trading. *See* Cain Rept. ¶32; *Diamond Foods*, 295 F.R.D. at 247; *Cammer*, 711 F. Supp. at 1293. The relatively high trading volume for Doximity common stock supports efficiency.

"Turnover measured by average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one." *Cammer*, 711 F. Supp. at 1286. During the Class Period, Doximity had an average weekly trading volume of 11 million shares, or 14.21% of shares outstanding—***more than 7 times*** the "two percent" threshold that *Cammer* held "would justify a strong presumption that the market for the security is an efficient one." Cain Rept. ¶33.

**Significant Analyst Coverage (*Cammer* Factor 2):** Securities analyst coverage of a company supports efficiency because analysts facilitate the dissemination of information, increasing the likelihood that the price of the security reflected, and investors therefore relied upon, information released by a company. *See* Cain Rept. ¶¶36-37; *Diamond Foods*, 295 F.R.D. at 247; *Cammer*, 711 F. Supp. at 1286.

Here, Dr. Cain found that analysts from 26 firms published 320 reports concerning Doximity during the Class Period, including J.P. Morgan, Wells Fargo, and Canaccord Genuity. Cain Rept. ¶¶38-39. In addition, Dr. Cain identified a substantial volume of news coverage—at least 397 articles—regarding Doximity during the Class Period, including articles published by *Dow Jones Institutional News*, *The New York Times*, *Reuter's News*, *Business Wire*, and numerous other outlets. *Id.* ¶40. As Dr. Cain explains, the significant number of analysts and

---

(i) Doximity's market capitalization; (ii) the size of the float of Doximity's common stock; and (iii) the size of the bid-ask spread for Doximity's common stock. *See* Cain Rept. ¶¶76-88; *see also Granite Constr.*, 2021 WL 229310, at *6 (considering *Krogman* factors). As detailed in Dr. Cain's Report, each of these factors further supports the conclusion that Doximity common stock traded in an efficient market throughout the Class Period. Cain Rept. ¶¶76-88.

news reports covering Doximity indicates a greater likelihood that investors relied on information provided about the Company and, therefore, supports a finding that the market for Doximity shares during the Class Period was efficient. *Id.*; *see also, e.g.*, *Todd v. STARR Surgical Co.*, 2017 WL 821662, at *7 (C.D. Cal. Jan. 5, 2017) (coverage by six analysts supports efficiency); *In re Juniper Networks, Inc. Sec. Litig.*, 264 F.R.D. 584, 591 (N.D. Cal. 2009) (coverage by four analysts supports efficiency).

**Substantial Market Maker/Arbitrage Activity (*Cammer* Factor 3):** Courts find that the existence of numerous market makers supports market efficiency. The existence of numerous market makers ensures that investors "react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Cammer,* 711 F. Supp. at 1286-87; *see also Diamond Foods,* 295 F.R.D. at 248 ("The existence of market makers and arbitrageurs would further provide a mechanism through which the market could be expected to receive information and fully incorporate it into the stock price of a security, as these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level.").

During the Class Period, there were at least 114 market makers that traded Doximity's stock on the NYSE. Cain Rept. ¶46. In addition, as Dr. Cain explains, 707 institutional investors traded Doximity stock during the Class Period, owning an average of 91.43% of Doximity's outstanding common stock. *Id.* ¶48. This activity supports the conclusion that investors were able to, and did, "react swiftly" to public information by trading in Doximity stock, driving price changes. *Cammer,* 711 F. Supp. at 1286-87.

**S-3 Registration Eligibility (*Cammer* Factor 4):** Courts find that a corporation's eligibility to use SEC Form S-3 "is an important factor weighing in favor of a finding that [the] market is efficient." *Id.* at 1285. This factor "is predicated on the [SEC's] belief that the market operates efficiently for [eligible] companies, i.e., [all public information] has already been disseminated and accounted for by the market place." *Id.* at 1284. More specifically, "it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency." *Id.* at 1286-87; *see also Diamond Foods*, 295 F.R.D. at 248 ("That a company's

1  public offerings met the threshold requirements for filing a Form S–3 tends to support a finding

2  of efficiency").

3      Throughout the Class Period, Doximity met the necessary requirements to file a Form S-

4  3; in fact, Doximity's average float during the Class Period of $3.8 billion exceeded the SEC's

5  required market capitalization of $75 million by more than *50 times*. Cain Rept. ¶51-52.

6  Doximity's Form S-3 eligibility supports market efficiency.

7      **Strong Cause-And-Effect Relationship (*Cammer* Factor 5):** The fifth and final

8  *Cammer* factor asks whether during the Class Period, Doximity's common stock price quickly

9  responded to the release of new Company-specific "unexpected" news. *Cammer*, 711 F. Supp. at

10  1287. As the *Cammer* court explained, empirical facts "showing a cause-and-effect relationship

11  between unexpected corporate events or financial releases and an immediate response in the

12  stock price" would be helpful to the efficiency analysis. *Id.*; *see also Hayes*, 2016 WL 7406418,

13  at *6 (this factor requires "empirical facts showing a cause and effect relationship between

14  unexpected corporate events or financial releases and an immediate response in the stock

15  price."). While not required to demonstrate market efficiency,[6] the fifth *Cammer* factor supports

16  such a finding.

17      Dr. Cain has shown through empirical analyses based on the results of an event study that

18  Doximity's stock price reacted in an efficient manner to new information about the Company.

19  *See* Cain Rept. ¶¶56-75. "Courts regularly accept experts' event studies to support market

20  efficiency analyses at the class certification stage." *QuantumScape Corp.*, 2022 WL 17974629,

21  at *12*; Diamond Foods*, 295 F.R.D. at 248 (stating that the "most common empirical test for a

22  causal connection is an event study"). Dr. Cain performed empirical analyses based on the

23  generally-accepted and commonly-utilized event study methodology to determine whether

24  Doximity common stock had a greater frequency of statistically significant price movements on

25  "Earnings Announcement Days"—days on which Doximity-specific information entered the

26  market through Doximity's quarter earnings announcements—than on more typical "Non-

---

27  [6] *See, e.g.*, *Waggoner*, 875 F.3d at 96-97 ("We conclude that direct evidence of price impact

28  under *Cammer* 5 is not always necessary to establish market efficiency and invoke

the *Basic* presumption[.]"); *In re Petrobras Sec.*, 862 F.3d 250, 277-278 (2d Cir. 2017).

---

Earnings Announcement Days," an approach to analyzing *Cammer*'s fifth factor which courts routinely accept. Cain Rept. ¶¶54-75; *see In re FibroGen Sec. Litig.*, 2024 WL 1064665, at *10 (N.D. Cal. Mar. 11, 2024) (finding that "an event study and a series of statistical analyses to determine whether [defendant's] securities reacted to company-specific, new information" was "consistent with the analysis accepted by courts in this district").

Dr. Cain found a pattern of more frequent statistically significant stock price movement on "Earnings Announcement Days" than "Non-Earnings Announcement Days," which provides further evidence that the market for Doximity common stock was informationally efficient during the Class Period. Cain Rept. ¶¶54-75 Indeed, Dr. Cain found that Doximity stock was ***36 times more likely*** to have Company-specific price movements on "Earnings Announcement Days" than "Non-Earnings Announcement Days"—a difference that is highly statistically significant at a level of greater than 99%. *Id.* ¶73. As Dr. Cain explains, the results of these empirical analyses further support a finding of market efficiency. *Id.* ¶¶73-75; *see Diamond Foods*, 295 F.R.D. at 248 (relying on the same event study methodology used here to conclude that a security's reaction to new information supported finding market efficiency); *Hayes*, 2016 WL 7406418, at *10 (same).

In sum, Dr. Cain found that each of the *Cammer* factors, as well as the additional factors analyzed, supports a finding of market efficiency. Lead Plaintiff and the Class may rely on the "fraud-on-the-market" presumption to establish reliance.

### c. Damages Will Be Calculated Using a Common Methodology That Is Consistent With the Class-wide Theory of Liability

The "out of pocket" damages model Dr. Cain proposes to use to measure damages in this case (*see* Cain Rept. ¶¶103-120) is the universally-accepted method for calculating damages arising from claims under Section 10(b), and is used to calculate damages in securities class actions across the country. *See, e.g.*, *RH.*, 2018 WL 4931543, at *3 ("Courts regularly reaffirm that the out-of-pocket, or event study, method matches plaintiffs' theory of liability under Section 10(b) of the Securities Exchange Act, making it the standard method for calculating damages in virtually every Section 10(b) class action," and collecting cases).

As Dr. Cain explains, per-share damages for all Class members are readily calculable using the standard "out-of-pocket" methodology. Cain Rept. ¶103. Damages will be measured as the difference between the amount of stock price inflation at purchase and the amount of inflation in the stock price at sale. *Id.* ¶105. Further, Lead Plaintiff's proposed model will calculate class-wide damages by using an event study to measure the amount of artificial inflation in Doximity stock on each day of the Class Period. Cain Rept. ¶¶104-110. Under this well-established event study methodology, an expert estimates company-specific price movement while removing price movement caused by other factors such as overall market conditions or dissemination of other material but non-fraudulent information relayed by the subject company. *Id.* ¶¶115-20.

Dr. Cain's methodology is the same methodology that is employed in nearly every securities fraud class action, and has been widely endorsed by courts in this District and throughout the Ninth Circuit. *See, e.g., Weston v. DocuSign, Inc.*, 348 F.R.D. 354, 368 (N.D. Cal. 2024) ("[t]he out-of-pocket method of damages calculation is common for § 10(b) actions like this one"); *Granite Constr.*, 2021 WL 229310, at *6; *In re Lendingclub Secs. Litig.,* 282 F. Supp. 3d 1171, 1184 (N.D. Cal. Oct. 20, 2017) (plaintiffs' "proposed method—using an event study— is widely accepted for calculating damages of a class of stockholders"); *In re SanDisk LLC Secs. Litig.*, 2018 WL 4293336, at *2 (N.D. Cal. Sept. 4, 2018) ("[T]his damages methodology, coupled with its general acceptance, suffices to show for class certification purposes that classwide damages can be determined without excessive difficulty and attributed to the plaintiffs' theory of liability").

### 2.    A Class Action Is Superior To Other Methods Of Resolving This Controversy.

Rule 23(b)(3) also requires that class resolution be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "Courts in this district have recognized the utility of the class action device in securities cases." *MagnaChip*, 2016 WL 7406418, at *10; *Twitter*, 326 F.R.D. at 631 (same). "Concentrating potential plaintiffs' claims into a single action will promote judicial efficiency." *BofI Holding,* 2021 WL

1    3742924, at *10. As the Ninth Circuit has explained, "[a] fair examination of alternatives can

2    only result in the apodictic conclusion that a class action is the clearly preferred procedure."

3    *Hanlon*, 150 F.3d at 1023; *see also Siemers v. Wells Fargo & Co.*, 243 F.R.D. 369, 376 (N.D.

4    Cal. 2007) ("The amounts involved are modest per investor. No single investor could hope to

5    recover more than it would cost to prosecute an individual suit.").

6         The superiority inquiry considers four factors: "(1) the class members' interests in

7    individually controlling a separate action; (2) the extent and nature of litigation concerning the

8    controversy already begun by or against class members; (3) the desirability of concentrating the

9    litigation in the particular forum; and (4) the manageability of a class action." *Twitter*, 326

10   F.R.D. at 630-31; *see also* Fed. R. Civ. P. 23(b)(3).

11        Each of these factors is satisfied here: (1) the number of Class members is far too

12   numerous, and the typical claim is generally too small, for each individual Class member to have

13   an interest in maintaining a separate action; (2) Lead Plaintiff is aware of no individual actions

14   brought on behalf of Doximity common stock investors seeking recovery under the federal

15   securities laws for damages caused by Defendants' fraud; (3) the broad geographical dispersion

16   of the Class members makes it desirable to litigate Lead Plaintiff's claims in this forum; and (4)

17   there are no management difficulties that would preclude this action from being maintained as a

18   class action.

19        **C.    Bernstein Litowitz Should Be Appointed Class Counsel**

20        Lead Plaintiff also respectfully requests that the Court appoint Bernstein Litowitz as

21   Class Counsel. In appointing Class Counsel, Rule 23(g) provides that the Court must consider:

22   (i) the work counsel has done; (ii) counsel's experience in handling, among other things, class

23   actions and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable

24   law; and (iv) the resources that counsel will commit to representing the class. Fed. R. Civ. P.

25   23(g)(1)(A)(i)-(iv).

26        Bernstein Litowitz amply satisfies the Rule 23(g) criteria. Under Lead Plaintiff's

27   supervision and direction, Bernstein Litowitz has undertaken a vigorous prosecution of this case,

28   including by, among other things: thoroughly analyzing, researching and investigating the

securities law claims at issue; drafting the detailed Complaint; successfully opposing Defendants' motion to dismiss; conducting ongoing fact discovery; retaining experts; and assembling a dedicated and highly skilled team to prosecute the Action. *See* Uslaner Decl. ¶7.

Bernstein Litowitz has significant experience prosecuting complex securities class actions, deep knowledge of the applicable securities laws, and an exemplary record of success. *See* Uslaner Decl. Ex. C (Firm Résumé). Working as lead counsel or co-lead counsel on behalf of lead plaintiffs in other cases, the firm has recovered over $37 billion for investors. *Id.* Bernstein Litowitz has devoted and will continue to devote the resources necessary to represent the Class throughout the course of this litigation. Bernstein Litowitz has thus demonstrated that it is fully qualified for appointment as Class Counsel under Rule 23(g). *See Hefler v. Wells Fargo & Co.,* 2018 WL 4207245, at *4 (N.D. Cal. Sept. 4, 2018) (appointing Bernstein Litowitz as Class Counsel under Rule 23(g) because it "obtained a good understanding of the issues and vigorously prosecuted this action by litigating this case through dispositive motions, the initial stages of formal discovery, and formal mediation" and "has significant prior experience in litigating securities fraud cases").

## IV.    **CONCLUSION**

For the foregoing reasons, Lead Plaintiff respectfully requests that the Court: (i) certify this action as a class action pursuant to Federal Rules of Civil Procedures 23(a) and 23(b)(3); (ii) appoint Lead Plaintiff as a representative of the proposed Class; and (iii) appoint Lead Counsel as Class Counsel.

DATED:  August 12, 2025

BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP


*/s/ Jonathan D. Uslaner*
Jonathan D. Uslaner (Bar No. 256898)
jonathanu@blbglaw.com
Lauren M. Cruz (Bar No. 299964)
lauren.cruz@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, California 90067
Tel: (310) 819-3470

*-and-*

John Rizio-Hamilton (admitted *pro hac vice*)
johnr@blbglaw.com
Timothy G. Fleming (admitted *pro hac vice*)
timothy.fleming@blbglaw.com
Matthew Arrow (admitted *pro hac vice*)
matthew.arrow@blbglaw.com
1251 Avenue of the Americas
New York, New York 10020
Tel: (212) 554-1400
Fax: (212) 554-1444

*Counsel for Lead Plaintiff New York City
District Council of Carpenters Pension Fund
and Lead Counsel for the Class*

KESSLER TOPAZ MELTZER
  & CHECK, LLP

Stacey M. Kaplan (Bar No. 241989)
skaplan@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel:   (415) 400-3000
Fax:  (415) 400-3001

*Local Counsel for Lead Plaintiff New York City
District Council of Carpenters Pension Fund
and the Class*