STEPHEN BLAKE (SBN 260069)
sblake@stblaw.com
HILARY WONG (SBN 336544)
hilary.wong@stblaw.com
CAMILLE VICTORIA BOLER
(SBN 353906)
camille.boler@stblaw.com
SIMPSON THACHER & BARTLETT LLP
2475 Hanover Street
Palo Alto, California 94304
Telephone: (650) 251-5000
Facsimile: (650) 251-5002

BATOUL HUSAIN
batoul.husain@stblaw.com
SIMPSON THACHER & BARTLETT LLP
900 G Street, N.W.
Washington, D.C. 20001
Telephone: (202) 636-5500
Facsimile: (202) 636-5502

JONATHAN K. YOUNGWOOD
(SBN 350373)
jyoungwood@stblaw.com
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
Facsimile: (212) 455-2502

*Attorneys for Defendants Doximity, Inc., and
Jeffrey Tangney*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| IN RE DOXIMITY, INC. SECURITIES LITIGATION | Case No. 5:24-cv-02281-NW<br><br>**DEFENDANTS' OPPOSITION TO LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Judge: The Honorable Noël Wise<br><br>Date:          November 19, 2025<br>Time:          9:00 a.m.<br>Courtroom:   3, Fifth Floor |

# TABLE OF CONTENTS

STATEMENT OF THE ISSUE TO BE DECIDED .................................................................... 1

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ......................................................................................................... 3

    A.    Doximity Regularly Discloses That Over 80% Of U.S. Physicians Are Its Members .................................................................................................... 3

    B.    Lead Plaintiff Alleges That Defendants Misled Investors To Believe That 80% Of U.S. Physicians Were *Quarterly Active Users* ............................ 4

    C.    Lead Plaintiff Alleges That Defendants Misled Investors To Believe That Engagement On The Platform Reached Record Highs ............................ 5

    D.    There Is No Evidence That Investors Believed That Over 80% Of U.S. Physicians Were *Quarterly Active Users* ............................................................ 5

    E.    Market Analysts Recognized That Doximity Did Not Report Active User Metrics .................................................................................................... 5

    F.    Market Commentary Did Not Distinguish Between The SEC 80% Member Disclosures And The Alleged 80% Misstatements ............................ 7

    G.    The Alleged 80% Misstatements Did Not Increase Doximity's Stock Price ................................................................................................................ 8

    H.    Doximity Gave Initial Full Fiscal Year 2024 Guidance On May 16, 2023 ................................................................................................................ 9

    I.    Doximity Gave Revised Full Fiscal Year 2024 Guidance On August 8, 2023 ................................................................................................................ 9

    J.    Market Commentary Did Not Connect the August 8 Disclosure to the Alleged 80% Misstatements ........................................................................ 10

    K.    Market Commentary Has Consistently Reported On The 80% Figure Before And Long After the August 8 Disclosure .......................................... 11

ARGUMENT ........................................................................................................................... 12

    I.    The *Basic* Presumption Is Rebutted Because There Is Direct Evidence Showing That the Alleged 80% Misstatements Did Not Have Front-End Price Impact ........... 14

    A.    Market Commentary Demonstrates That the Alleged 80% Misstatements Were Not Relevant to Stock Value ........................................ 15

    B.    The Alleged 80% Misstatements Did Not Cause a Stock Price Increase ....... 17

    II.    The *Basic* Presumption Is Rebutted Because Indirect Evidence Demonstrates That the Alleged 80% Misstatements Had No Back-End Price Impact ...................... 19

DEFS.' OPP. TO MOTION FOR CLASS CERTIFICATION    CASE NO. 5:24-cv-02281-NW

A.    The August 8 Disclosure Did Not "Correct" Any Portion of the Alleged 80% Misstatements.............................................................................. 20

B.    Market Commentary Did Not Connect the August 8 Disclosure to the Alleged 80% Misstatements.............................................................................. 23

CONCLUSION ....................................................................................................................... 25

DEFS.' OPP. TO MOTION FOR CLASS CERTIFICATION            CASE NO. 5:24-cv-02281-NW

# TABLE OF AUTHORITIES

## CASES

*Affiliated Ute Citizens of Utah v. United States*,
406 U.S. 128 (1972) ........................................................................................................ 13

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ........................................................................................................ 12

*Amgen Inc. v. Conn.t Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013). ....................................................................................................... 13

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
77 F.4th 74 (2d Cir. 2023)........................................................................................ passim

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) .......................................................................................................... 1

*Bonanno v. Cellular Biomedicine Grp., Inc.*,
2016 WL 4585753 (N.D. Cal. Sept. 2, 2016)................................................................. 21

*Bratya SPRL v. Bed Bath & Beyond Corp.*,
2025 WL 721770 (D.D.C. Mar. 6, 2025) ....................................................................... 18

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) .......................................................................................................... 12

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
594 U.S. 113 (2021) ................................................................................................. passim

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) ............................................................................................. 1, 12, 13

*IBEW Loc. 98 Pension Fund v. Best Buy Co.*,
818 F.3d 775 (8th Cir. 2016)..................................................................................... 14, 18

*In re Apache Corp. Sec. Litig.*,
2024 WL 532315 (S.D. Tex. Feb. 9, 2024)............................................................... passim

*In re Apple Inc. Sec. Litig.*,
2022 WL 354785 (N.D. Cal. Feb. 4, 2022)..................................................................... 13

*In re BofI Holding, Inc. Secs. Litig.*,
977 F.3d 781 (9th Cir. 2020)........................................................................................... 20

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) ................................................................ 14

*In re Concho Res., Inc. Secs. Litig.*,
2025 WL 1040379 (S.D. Tex. Apr. 7, 2025) .................................................................. 22

*In re FibroGen Sec. Litig.*,
2024 WL 1064665 (N.D. Cal. Oct. 3, 2023) ............................................................. 15, 20

DEFS.' OPP. TO MOTION FOR CLASS CERTIFICATION          CASE NO. 5:24-cv-02281-NW

*In re Intuitive Surgical Secs. Litig.*,
2016 WL 7425926 (N.D. Cal. Dec. 22, 2016) .......................................................................... 21

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024) ........................................................................ 16

*In re Nektar Therapeutics*,
2020 WL 3962004 (N.D. Cal. July 13, 2020) ......................................................................... 24

*In re Nio, Inc. Sec. Litig.*,
2023 WL 5048615 (E.D.N.Y. Aug. 8, 2023) .......................................................................... 14

*In re Novatel Wireless Secs. Litig.*,
830 F. Supp. 2d 996 (S.D. Cal. 2011) .................................................................................... 20

*In re Qualcomm Inc. Secs. Litig.*,
2023 WL 2583306 (S.D. Cal. Mar. 20, 2023)..................................................................... 21, 22

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
2 F.4th 1199 (9th Cir. 2021).................................................................................................... 13

*Luna v. Carbonite, Inc.*,
2023 WL 4539855 (D. Mass. July 14, 2023) .......................................................................... 17

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008).................................................................................................. 24

*Pardi v. Tricida, Inc.*,
2024 WL 4336627 (N.D. Cal. Sept. 27, 2024)....................................................................... 19

*Ramirez v. Exxon Mobil Corp.*,
2023 WL 5415315 (N.D. Tex. Aug. 21, 2023) ....................................................... 16, 17, 22, 23

*Shupe v. Rocket Cos., Inc.*,
752 F. Supp. 3d 735 (E.D. Mich. Sept. 30, 2024)................................................... 14, 15, 16, 23

*Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*,
2025 WL 2554474 (S.D.N.Y. Sept. 4, 2025)...................................................................... 20, 22

*Teamsters Local 617 Pension & Funds v. Apollo Grp., Inc.*,
633 F. Supp. 2d 763 (D. Ariz. 2009)....................................................................................... 23

DEFS.' OPP. TO MOTION FOR CLASS CERTIFICATION                    CASE NO. 5:24-cv-02281-NW

## STATEMENT OF THE ISSUE TO BE DECIDED

1.      **Failure to Demonstrate a Certifiable Class:** Whether Lead Plaintiff has satisfied its burden under Federal Rule of Civil Procedure 23(b) to show that alleged common questions of law and fact of the proposed class predominate over any questions affecting individual members.

## PRELIMINARY STATEMENT

Lead Plaintiff seeks to certify a class of persons who purchased or acquired Doximity Inc. ("Doximity" or the "Company") common stock between June 24, 2021 and August 8, 2023 (the "Putative Class Period") and who were allegedly damaged by a stock drop on August 8, 2023, when Doximity reported its earnings for the first quarter of its 2024 fiscal year (the "August 8 Disclosure").  Lead Plaintiff contends that Doximity misled investors to believe that: (i) over 80% of all U.S. doctors were "active members" of the Doximity platform, when only approximately half allegedly used the platform quarterly (the "Alleged 80% Misstatements"); and (ii) user engagement achieved record highs, when it was allegedly declining (the "Alleged Record Engagement Misstatements").  This opposition focuses on only the Alleged 80% Misstatements, which are in no way connected to investor losses on August 8, 2023.

At class certification, it is Lead Plaintiff's burden to demonstrate strict compliance with all requirements under Federal Rule of Civil Procedure 23, including Rule 23(b)(3)'s predominance requirement.  Here, reliance on an alleged misstatement is a necessary element of Lead Plaintiff's claim for securities fraud and Lead Plaintiff must invoke a presumption of class-wide reliance to avoid the need for individualized proof of reliance.  Lead Plaintiff invokes the fraud-on-the-market presumption from *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), which assumes that investors purchase securities in reliance on the market price, and, in an efficient market, material misrepresentations are incorporated into the market price.  The Supreme Court has held, however, that defendants can rebut applicability of the *Basic* presumption at class certification by showing that alleged misrepresentations "did not actually affect the market price[.]"  *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 284 (2014) ("*Halliburton II*").  In considering whether an alleged misrepresentation had so-called "price impact," the Supreme Court instructs that district courts must consider "*all* probative evidence" and apply "a good dose of common sense."

1

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 122 (2021) ("*Goldman 2021*"). Stated plainly, pleading-stage inferences and legal presumptions now give way to evidence.

Defendants here overwhelmingly show that there was no price impact from the Alleged 80% Misstatements.  There is no market evidence that Doximity investors were led to believe that 80% of U.S. doctors used the platform quarterly, as Lead Plaintiff contends; nor is there any connection between the stock drop following the purportedly corrective August 8 Disclosure and the alleged revelation of the supposed falsity of Defendants' statements.  As analysts recognized, Doximity's stock price dropped in August 2023 based on circumstances in the summer of 2023: when the Company revised earnings guidance it had given in May 2023, announced layoffs, and disclosed that upsells in June and July 2023 lagged behind its own May 2023 expectations.  There is no connection between these events and the Alleged 80% Misstatements.  In these circumstances, the *Basic* presumption is rebutted, and a class cannot be certified with respect to the Alleged 80% Misstatements because individual reliance predominates.

Defendants demonstrate a lack of price impact in two ways.  **First**, Defendants point to direct evidence showing no "front-end" price impact when the Alleged 80% Misstatements were made, thus demonstrating that Doximity's stock price was not artificially inflated.  Defendants' expert, Professor Yael Hochberg, conducted an extensive review of over 480 analyst reports and news stories and concluded that the Alleged 80% Misstatements were not value relevant to Doximity's stock price.  Professor Hochberg's review demonstrates that no market commentators interpreted the Alleged 80% Misstatements as suggesting that 80% of U.S. doctors used Doximity quarterly, as Lead Plaintiff contends.  Indeed, no market commentary reflects Lead Plaintiff's theory, which was raised publicly for the first time in the Amended Complaint in this action.  Rather, the market interpreted the Alleged 80% Misstatements as consistent with Doximity's unchallenged disclosures in its periodic SEC filings before, during, and after the Putative Class Period that its members include more than 80% of U.S. doctors.  Moreover, on the seven days when Alleged 80% Misstatements were made, there was either no statistically significant positive stock price increase, or market commentary clearly demonstrates that the price increase was explained by unrelated positive Company news, thus foreclosing front-end price impact.

2

*Second*, Defendants point to indirect evidence showing no "back end" price impact, *i.e.*, that the August 8 Disclosure triggered a dissipation of misstatement-related artificial price inflation. Lead Plaintiff cannot credibly claim that the August 8 Disclosure corrected any portion of the Alleged 80% Misstatements.  The August 8 Disclosure revised Doximity's earnings guidance and announced layoffs.  None of the statements in the August 8 Disclosure made any reference to, nor did they disclose, revise, or retract any information about the number of U.S. doctors using Doximity's platform, actively or otherwise.  Professor Hochberg's extensive review of market commentary reveals that none of the 88 analyst and media reports on the August 8 Disclosure connected that disclosure to the Alleged 80% Misstatements.  To the contrary, analysts cited other reasons for the stock drop and *continued* to describe Doximity's physician use and membership levels consistent with the Alleged 80% Misstatements long after the August 8 Disclosure.

In sum, overwhelming evidence demonstrates that the Alleged 80% Misstatements did not impact Doximity's stock price, nor did the August 8 Disclosure cause investor losses by revealing any falsity of the Alleged 80% Misstatements.  Because Lead Plaintiff cannot rely on the *Basic* presumption, individual questions of reliance predominate.  Accordingly, this Court should deny class certification with respect to persons who purchased or acquired Doximity common stock between June 24, 2021 and November 9, 2021 from the Putative Class.[1]

## STATEMENT OF FACTS

Doximity is a "leading digital platform for U.S. medical professionals."  Ex. 1[2] (Registration Statement) at 2.  The Company conducted its initial public offering ("IPO") on June 24, 2021 and trades under the symbol "DOCS."  Ex. 2 (Stock Info); Dkt. 85-3 ¶¶ 15, 91.

### A.    Doximity Regularly Discloses That Over 80% Of U.S. Physicians Are Its Members

Doximity has consistently disclosed in periodic SEC filings, beginning with its March 31, 2021 Registration Statement and continuing through its most recent 2025 Forms 10-K and 10-Qs—

---

[1] Defendants challenge certification of the class from June 24, 2021, the date of the first Alleged 80% Misstatement, through November 9, 2021, the date before the first Alleged Record Engagement Misstatement.

[2] "Ex. X" refers to exhibits attached to the Declaration of Stephen Blake ("Blake Decl.").

DEFS.' OPP. TO MOTION FOR CLASS CERTIFICATION                    CASE NO. 5:24-cv-02281-NW

filed *after* the Putative Class Period—that its members include more than 80% of U.S. physicians (the "SEC 80% Member Disclosures").  *See, e.g.*, Ex. 1 (Registration Statement) at 2, 68, 99 ("Our members include more than 80% of U.S. physicians."); Ex. 3 (May 23, 2024 Form 10-K) at 3 ("Our members include more than 80% of U.S. physicians, spanning all 50 states and every medical specialty[.]"); Ex. 4 (August 7, 2025 Form 10-Q) at 23 (same).  Lead Plaintiff does not allege that the SEC 80% Member Disclosures are false or misleading.

**B.** **Lead Plaintiff Alleges That Defendants Misled Investors To Believe That 80% Of U.S. Physicians Were *Quarterly Active Users***

Lead Plaintiff cherry-picks a few oral, public relations statements by Mr. Tangney—not the Company in SEC disclosures or investor earnings calls—which it claims misled Doximity's investors to believe that over 80% of U.S. physicians "used Doximity at least quarterly."  Dkt. 85 at 4.  The Court at Motion to Dismiss identified eight statements as Alleged 80% Misstatements, including four statements along the lines of "we have over 80% of all U.S. physicians as active members on the platform" and four statements providing that "over 80% of all U.S. physicians use our platform," without specifying the frequency or intensity of use.  Dkt. 75 at 6.

While the eight alleged misstatements differ, Lead Plaintiff appears to interpret all as suggesting that the "over 80% of U.S. physicians" figure (the "80% Figure") used in the SEC 80% Member Disclosures reflects "active members" who were "us[ing] Doximity at least quarterly." *See* Dkt. 85 at 4.  Of course, the word "quarterly" does not appear in any of the Alleged 80% Misstatements, nor do any of the statements purport to report on user engagement metrics.  Dkt. 75 at 6.  Defendants deny that the Alleged 80% Misstatements are actionable and will further challenge them at summary judgment should a class be certified.[3]

---

[3] As Defendants explained in their Motion to Dismiss, Lead Plaintiff does not credibly explain that "active members" or "using" Doximity must mean "using Doximity at least quarterly."  Lead Plaintiff's sole citation is to a post on Doximity's blog to claim that Doximity defined "active users" as members who logged into Doximity and clicked on internal links on at least a quarterly basis."  *See* Compl. ¶¶ 2, 38 n.17; *see also* Ex. 5 (Social Recruiting Blog Post).  This blog post was not discussing Doximity's public disclosures; it was commenting on engagement metrics on social media platforms generally, which is not Doximity's business.  In any case, the post refers to "active members" as those who use a platform "regular[ly]," and indicates that there could be multiple definitions for "regular[ly]."  *Id.*

DEFS.' OPP. TO MOTION FOR CLASS CERTIFICATION                    CASE NO. 5:24-cv-02281-NW

**C.    <u>Lead Plaintiff Alleges That Defendants Misled Investors To Believe That Engagement On The Platform Reached Record Highs</u>**

Lead Plaintiff claims that Defendants repeatedly told investors during the Putative Class Period that "engagement on the Doximity platform and the Newsfeed had "never been higher" or was hitting "fresh highs" when "internal data showed engagement – including on Doximity's . . . NewsFeed as actively declining." Dkt. 85 at 4.[4]  The Court at Motion to Dismiss categorized this theory separately from the Alleged 80% Misstatements.  Dkt. 75 at 7.  The Alleged Record Engagement Misstatements described user engagement trends relative to prior periods (*e.g.*, "our quarterly active users among physicians . . . hit an all-time high last quarter across our entire platform"), without making claims about the absolute number of Doximity's active users or share of U.S. physicians that used the platform.  *See id.*

**D.    <u>There Is No Evidence That Investors Believed That Over 80% Of U.S. Physicians Were *Quarterly Active Users*</u>**

There is no credible evidence that the Alleged 80% Misstatements inflated Doximity's stock price.  In connection with her expert opinion, Professor Hochberg analyzed over 470 Doximity-specific analyst and news reports published during the Putative Class Period.  Ex. 38 (Rpt.) ¶¶ 35-36.[5]  None pointed to the Alleged 80% Misstatements as meaning that at least 80% of U.S. physicians used the Doximity platform *at least quarterly* or identified the 80% Figure as revealing an active user metric.  Ex. 38 (Rpt.) ¶ 26.

**E.    <u>Analysts Recognized That Doximity Did Not Report Active User Metrics</u>**

Rather than relying on the Alleged 80% Misstatements for information about Doximity's active user levels, analysts treated active user levels as undisclosed and uncertain.  Ex. 38 (Rpt.) ¶ 42.  Indeed, market analysts repeatedly (i) recognized that not all Doximity members would be actively using the platform and (ii) explicitly called out that Doximity did <u>not</u> provide active user

---

[4] Defendants deny that the Alleged Record Engagement Misstatements are actionable, and will challenge them at summary judgment.  Lead Plaintiff's allegation that the Alleged Record Engagement Misstatements are false is based almost entirely on convoluted statements of so-called "confidential witnesses"—former employees, most of which worked for Curative Talent, LLC, a separate business from Doximity—and will be disproven.

[5] "Rpt." refers to the September 26, 2025 Rebuttal Expert Report of Yael V. Hochberg, Ph.D.

DEFS.' OPP. TO MOTION FOR CLASS CERTIFICATION                CASE NO. 5:24-cv-02281-NW

metrics often disclosed by social media or platforms businesses—thus directly undermining Lead Plaintiff's theory.  Ex. 38 (Rpt.) ¶ 41.  For example:

- Leerink (July 19, 2021): "***DOCS will not be providing industry-specific metrics*** seen across its social media/internet peers[.]." Ex. 6 (July 19, 2021 SVB Leerink Report) at 7 (emphasis added).

- J.P. Morgan (November 10, 2021): "It was clear the company did not care for our attempt last month at ***sourcing Apptopia data to see what the membership usage and engagement has looked like the last couple years***."  Ex. 7 (November 10, 2021 J.P. Morgan Report) at 3 (emphasis added).

- William Blair (July 12, 2022): "Doximity currently has more than 80% of physicians on the platform[]. ***Some bears also question how actively providers actually use the platform*** . . ." Ex. 8 (July 12, 2022 William Blair Report) at  3 (emphasis added).

- Raymond James (July 19, 2021): "Doximity ha[s] 1.8+ million physicians on its network exiting C1Q21. ***While time spent on the platform likely varies by the individual physician***, we believe this network of targeted physicians will be quite difficult for others to replicate . . ." Ex. 9 (July 19, 2021 Raymond James Report) at 1 (emphasis added).

- Evercore ISI (October 23, 2022): "***DOCS userbase may not be very active*** daily if they are merely registering to vote . . . annually." Ex. 10 (October 23, 2022 Evercore ISI Report) at 32 (emphasis added)

- Piper Sandler (July 19, 2021): Reporting quarterly active users as a separate metric from platform member numbers.  Ex. 11 (July 19, 2021 Piper Sandler Report) at 7, Exhibit 5.

Recognizing that Doximity did not disclose active user statistics, certain analysts instead relied on third-party data or their own independent assessments for information on Doximity's active user levels.  Ex. 38 (Rpt.) ¶ 43; *see* Ex. 12 (July 28, 2022 Berenberg Report) at 12 ("In our survey of 50 U.S. physicians . . . more than 25% use Doximity daily, more than 65% use Doximity at least weekly, and more than 86% use Doximity at least once a month."); Ex. 11 (July 19, 2021 Piper Sandler Report) at 7, Exhibit 5 (citing PSC Equity Research and CMS as data sources for a chart including Doximity's quarterly active users).  Analysts used these alternative sources for Doximity's active user data throughout the entire Putative Class Period, beginning as early as July 2021 and continuing through May 2023.  Ex. 38 (Rpt.) ¶ 43, Table 2.  Such evidence demonstrates that the market looked to independent sources—not the Alleged 80% Misstatements—for information on Doximity's active user levels.

6

**F.      Market Commentary Did Not Distinguish Between The SEC 80% Member Disclosures And The Alleged 80% Misstatements**

Market participants reported on Doximity's physician membership and the 80% Figure consistent with the SEC 80% Member Disclosures, which is not alleged to be false or misleading, before and during the Putative Class Period.  Ex. 38 (Rpt.) ¶ 46.  In fact, on June 15, 2021, a market commentator reported that "[t]he company wrote in its S-1 that more than ***80% of U.S. physicians used the platform*** as of March 31."  Ex. 13 (June 15, 2021 Seeking Alpha Article) (emphasis added).  This reporting predated the Alleged 80% Misstatements and was based solely on the SEC 80% Member Disclosures as reported in the Registration Statement.

Throughout the Putative Class Period, market commentators alternated between phrasing such as "used," "utilize," and "members" in analyst and media reports, frequently referencing information from the SEC 80% Member Disclosures.  Ex. 38 (Rpt.) ¶¶ 45-48.

- Doximity's "***network members include over 80% of U.S. physicians*** across all specialties and practice areas."  Ex. 14 (June 23, 2021 Factiva Article) (emphasis added).

- "Doximity's network is now ***used by*** 1.8 million medical professionals in the U.S., ***including over 80% of physicians***."  Ex. 15 (June 24, 2021 CNBC Article) (emphasis added).

- Doximity has "1.8 million active medical professional ***members who utilize the platform***, including ***more than 80% of U.S. physicians*** as of March 31, 2021."  Ex. 16 (July 19, 2021 Canaccord Genuity Report) at 2 (emphasis added).

- "We see Doximity uniquely positioned to introduce AI workflow tools . . . ***considering that 80% of US physicians are members on its network***."  Ex. 17 (March 30, 2023 Canaccord Genuity Report) at 2 (emphasis added).

Such evidence demonstrates that analysts and news outlets considered the Alleged 80% Misstatements as synonymous with the SEC 80% Member Disclosures, which are not alleged to be false or misleading, in determining that 80% of physicians "used" the Doximity Platform.  *See* Ex. 38 (Rpt.) ¶ 46.

Over the course of the three-year Putative Class Period, only .56% of all analyst reports—just two of the 356 reports—included terms remotely resembling "active members," but neither report supports that analysts considered the Alleged 80% Misstatements as relevant to stock value.  *See* Ex. 38 (Rpt.) ¶¶ 26, 30.  A report published by Canaccord on July 19, 2021 referenced "active" and "engaged" members, but did not define those terms—let alone suggest that the terms refer to

7

members who use the platform at least quarterly—and the terms were never repeated in any of Canaccord's subsequent coverage in the remaining two years of the Putative Class Period.  Ex. 16 (July 19, 2021 Canaccord Genuity Report) at 1-2, 20; Ex. 38 (Rpt.) ¶ 30.  Moreover, the July 19 Canaccord report repeatedly references the SEC 80% Member Disclosure, including that "members who utilize the platform" include "more than 80% of U.S. physicians as of March 31, 2021," which was likely based on the Registration Statement published on May 28, 2021 before the Putative Class Period.  Ex. 16 (July 19, 2021 Canaccord Genuity Report) at 2.

A William Blair supplemental deck published on July 19, 2021 noted that Doximity was "used daily by nearly all of" its members, including 80% of all U.S. physicians, but the "used daily" reference was never repeated in later coverage, nor could the language be premised on the Alleged 80% Misstatements that did not reference "daily" use.  Ex. 18 (July 19, 2021 William Blair Supplemental Deck) at 6; Ex. 38 (Rpt.) ¶ 30.  Just as with the July 19 Canaccord report, the July 19 Blair report and supplemental deck repeatedly referenced the 80% Figure consistent with the SEC 80% Member Disclosure—including that more than 80% of U.S. physicians are "members of its platform as of March 2021," have "signed up" for, or are part of Doximity's "network of users"— further supporting that references to the 80% Figure in the Blair commentary were based on the SEC 80% Member Disclosure, not the Alleged 80% Misstatements.  *See* Ex. 19 (July 19, 2021 William Blair Report ) at 4, 6; Ex. 18 (July 19, 2021 William Blair Supplemental Deck) at 3.

### G.     The Alleged 80% Misstatements Did Not Increase Doximity's Stock Price

In determining whether the Alleged 80% Misstatements caused an increase in Doximity's stock price, Professor Hochberg analyzed whether there was a statistically significant increase in Doximity's stock price when the Alleged 80% Misstatements were made and, if so, whether market commentary supported that the price increase was attributable to the Alleged 80% Misstatements or other factors.  Ex. 38 (Rpt.) ¶¶ 55-74.  As summarized in the chart below, Professor Hochberg determined that (i) on four out of the seven days when the Alleged 80% Misstatements were made, there was no statistically significant stock price increase; and (ii) on the three remaining days where Doximity's stock price increased, market commentary shows that the price increases were

8
DEFS.' OPP. TO MOTION FOR CLASS CERTIFICATION                    CASE NO. 5:24-cv-02281-NW

attributable to positive confounding company-specific news disclosed concurrently, not the Alleged 80% Misstatements. Ex. 38 (Rpt.) ¶¶ 55-74.

| Date | Price Increase | Reason(s) for Price Increase |
|---|---|---|
| 6/24/2021 | Yes | Price increase driven by Doximity's IPO. Ex. 38 (Rpt.) ¶¶ 63-66. |
| 8/10/2021 | No | N/A. Ex. 38 (Rpt.) ¶ 61. |
| 8/11/2021 | Yes | Price increase driven by the Company's 8/10/2021 quarterly earnings call reporting strong past and projected future revenue growth and an adjusted EBITDA margin. Ex. 38 (Rpt.) ¶¶ 67-69. |
| 11/10/2021 | No | N/A. Ex. 38 (Rpt.) ¶ 61. |
| 2/9/2022 | Yes | Price increase driven by the Company's 2/8/2022 earnings call reporting strong quarterly earnings results and the acquisition of Amion, a healthcare scheduling platform. Ex. 38 (Rpt.) ¶¶ 70-74. |
| 3/11/2022 | No | N/A. Ex. 38 (Rpt.) ¶ 61. |
| 6/6/2023 | No | N/A. Ex. 38 (Rpt.) ¶ 61. |

Such evidence demonstrates that the Alleged 80% Misstatements did not cause an increase in Doximity's stock price.

### H.    Doximity Gave Initial Full Fiscal Year 2024 Guidance On May 16, 2023

Doximity first issued guidance for its fiscal year 2024 on May 16, 2023 (the "May 16 Guidance"). Ex. 20 (May 16, 2023 Release) at 2 (Doximity's fiscal year ends March 31.).[6] At that time, Doximity projected revenue growth between $500 million and $506 million and adjusted EBITDA[7] between $216 million and $222 million for fiscal year 2024. *Id.* Lead Plaintiff does not allege that the May 16 Guidance was false or misleading.

### I.    Doximity Gave Revised Full Fiscal Year 2024 Guidance On August 8, 2023

On August 8, 2023, Doximity announced that it was adjusting downward its annual estimate from the May 16 Guidance, but still projecting ***growth*** compared to the prior year, decreasing projected revenue to between $452 million and $468 million and adjusting EBITDA to between $193 million and $209 million. Ex. 22 (August 8, 2023 Earnings Call Tr.) at 5. Doximity also announced that it was reducing its workforce by 10%. *Id.* at 4.

During the August 8 earnings call, Doximity explained its downward adjustment was

[6] Earnings guidance is "information provided by the management of a publicly traded company regarding its expected future results, including estimates of revenues, expenses, margins, and earnings" and "is considered a subjective view on the company's future financial performance, which is exposed to uncertainties and risks." Ex. 21 (Earnings Guidance Article).

[7] EBITDA refers to Earnings Before Interest, Taxes, Depreciation and Amortization.

9

attributable to its sale "close rate f[alling] short in June and July." *Id.* at 4.  Mr. Tangney elaborated:

> [We] found two core reasons.  First, in part, it's the market.  Pharma's shift to digital has slowed.  Post-COVID travel and agency swaps are soaking up budget, while budgetary caution rules the day.  In all, we estimate digital pharma has grown at half the low teens growth rate that we and eMarketer predicted last year.  Second, and more importantly, it's the friction of our full service white glove sales model.  Simply put, during summer upsell season, clients no longer have the time to schedule all of the meetings, legal reviews, reports and QBRs.  Post-COVID, they work from home most of the week and they'd rather log in to a self-service platform 24/7 to monitor their program results and set budgets.  Indeed, our recent channel checks show that banner ads or programmatic in industry parlance, got the incremental spend in the summer.

*Id.* Doximity was not an outlier in reducing its financial guidance in 2023.  Ex. 38 (Rpt.) ¶¶ 91-94.  Rather, other companies in related industries also reduced guidance in the months following August 8, 2023 due to factors consistent with Doximity's explanations for its downward revision of its fiscal year 2024 guidance.  *Id.* Lead Plaintiff alleges that this was a corrective disclosure.  Compl. ¶ 17 ("The truth concealed by Defendants' Class Period misrepresentations was revealed on August 8, 2023[.]").  But none of the statements in the August 8 Disclosure made any reference to the 80% Figure, nor did they disclose, revise, or retract any information about the number of "active members" from the Alleged 80% Misstatements or quarterly active user levels.  *See* Ex. 23 (August 8, 2023 Release); Ex. 22 (August 8, 2023 Earnings Call Tr.).

Doximity's stock price declined from $32.79 at close on August 8, 2023 to $25.30 at close on August 9, 2023.  *See* Compl. ¶ 170.  Ultimately, however, Doximity's actual 2024 fiscal year numbers exceeded its August 8 adjusted guidance: revenue of $475.4 million and adjusted EBITDA of $230.5 million.  *See* Ex. 24 (May 16, 2024 Release) at 1.  Indeed, Doximity's actual adjusted EBITDA even exceeded the initial May 16 Guidance.  *See id*.

**J.** **Market Commentary Did Not Connect the August 8 Disclosure to the Alleged 80% Misstatements**

There is no connection between the August 8 Disclosure and the revelation of facts about the Alleged 80% Misstatements.  Professor Hochberg reviewed 88 analyst reports issued within one month after and news articles published within two days of the August 8 Disclosure, none of which connected the August 8 Disclosure to the 80% Figure, Doximity's quarterly active user

10

levels, Doximity's level of active members, or the percentage of physicians "using" the platform. Ex. 38 (Rpt.) ¶ 86. Rather, analysts attributed the negative news on August 8, 2023 to other unrelated factors, including a slower growth in digital pharma spending and competition with programmatic banner ads, which was consistent with the Company's August 8 Disclosure:

- J.P. Morgan (August 8, 2023): Citing "[d]igital advertising growth below expectations and friction with DOCS' 'white glove' service." Ex. 25 (August 8, 2023 J.P. Morgan Report ) at 1.

- Truist (August 8, 2023): Citing lower expectations on new business, lower volume of renewals, slower growth in digital pharma marketing spending, shifted preference to self-service platforms, macro environment, and competition from programmatic banner ads. Ex. 26 (August 8, 2023 Truist Report) at 1.

- BofA (August 9, 2023): Citing slower growth in digital pharma marketing spending, competition from programmatic banner ads, post-COVID upsell weakness due to macro and operational inefficiencies, lower expectations on new business, and lower volume of renewals. Ex. 27 (August 9, 2023 BoA Report) at 1.

- Guggenheim (August 9, 2023): Downgraded Doximity's rating "on the heels of another disappointing guide" attributable to "lower than expected market growth" and "competitive dynamics shifting." Ex. 28 (August 9, 2023 Guggenheim Report) at 1.

**K. Market Commentary Has Consistently Reported On The 80% Figure Before And Long After the August 8 Disclosure**

Analysts continued to report the 80% Figure in the same way before and after the August 8 Disclosure, including reporting that over 80% of physicians "use" the Doximity platform, further demonstrating that market participants did not view the August 8 Disclosure as correcting any aspect of the Alleged 80% Misstatements:

- William Blair (July 18, 2023 and August 8, 2023): "The *Doximity platform is used by roughly 80% of all U.S. physicians* and 90% of all U.S. medical residents." Ex. 29 (August 8, 2023 William Blair Report ) at 1 (emphasis added); *see also* Ex. 30 (July 18, 2023 William Blair Report) at 1.

- Raymond James (June 6, 2023): "[Doximity's] reach of 80% + of U.S. physicians . . . Doximity has built a *membership network of 1.8+ million medical professionals, including 80%+ physicians in the U.S*." Ex. 31 (June 6, 2023 Raymond James Report) at 1, 2 (emphasis added).

- Raymond James (August 8, 2023): "We're cognizant that *Doximity's moat (80%+ of U.S. physicians on the platform)* and margin profile remain structurally sound bull tenets, and *we don't see any changes to those in light of the F2Q developments*. . . . Doximity has built a membership network of 1.8+ million medical professionals, *including 80%+ physicians in the U.S*." Ex. 32 (August 8, 2023 Raymond James Report) at 1, 7 (emphasis added).

Indeed, market commentators continued to refer to the 80% Figure consistent with the

11

Alleged 80% Misstatements and the SEC 80% Member Disclosure long after the August 8 Disclosure.  For example, commentators have continued to report to date that over 80% of physicians "engage frequently with" or "use" the Doximity platform:

- CNBC (November 1, 2023): "Doximity, the medical website that's **used by more than 80% of U.S. doctors**[.]"  Ex. 33 (November 1, 2023 CNBC Article) (emphasis added).

- China Merchant Securities (February 10, 2025): "Doximity is a trusted networking platform for physicians, **used by over 80% of U.S. doctors**." Ex. 34 (February 10, 2025 China Merchant Securities Report) at 10 (emphasis added).

- Seeking Alpha (May 14, 2025): "Doximity, Inc. is a cloud-based platform **used by 80% of U.S. physicians**, offering marketing, hiring, and virtual patient visit tools."  Ex. 35 (May 14, 2025 Seeking Alpha Article) (emphasis added).

- SVB Leerink (May 16, 2025): "The 'if you build it, they will come' mentality works well when **more than 80% of US doctors engage frequently with your platform**."  Ex. 36 (May 16, 2025 SVB Leerink Report) at 3 (emphasis added).

The analyst and news coverage above demonstrates that no market commentary treated the August 8 Disclosure as revealing new information about the Alleged 80% Misstatements, or attributed the negative news to the 80% Figure, Doximity's level of quarterly active users or "active members," or the percentage of physicians "using" the platform.

## ARGUMENT

A plaintiff seeking class certification must "affirmatively demonstrate his compliance with Rule 23." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). This includes Lead Plaintiff's burden under Rule 23(b)(3) to establish that "[common] questions of law or fact . . . predominate over any questions affecting only individual members," a requirement "far more demanding" than the commonality requirement of Rule 23(a).  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613, 622-24 (1997).  To insure that certification is proper, a court must conduct a "rigorous analysis," which may require "overlap with the merits[.]"  *Comcast*, 569 U.S. at 33-34.

Here, Lead Plaintiff cannot meet Rule 23(b)(3)'s requirements if individualized issues of reliance predominate.  *See Halliburton II*, 573 U.S. at 267 ("To recover damages for violations of section 10(b) and Rule 10b–5, a plaintiff must prove . . . 'reliance upon the misrepresentation or omission[.]'") (citation omitted).  In an effort to avoid proving individual reliance, Lead Plaintiff

has invoked *Basic*'s fraud-on-the-market presumption of class-wide reliance.  *See* Dkt. 85 at 3.[8]

Under the *Basic* presumption, because the price of a security traded in an efficient market[9] will

reflect all publicly available information—including inflation attributable to any material

misstatements—all buyers "may be presumed to have relied" on those misstatements reflected in

the price at the time of purchase.  *See Amgen Inc. v. Conn.t Ret. Plans & Tr. Funds*, 568 U.S. 455,

458 (2013).

    *Basic* can be rebutted.  The Supreme Court has held that "*[a]ny showing* that severs the

link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff . . .

will be sufficient to rebut the [*Basic*] presumption of reliance."  *Halliburton II*, 573 U.S. at 269

(emphasis added).  Consequently, Defendants may rebut the *Basic* presumption by showing, by a

preponderance of the evidence, that "the asserted misrepresentation (or its correction) did not affect

the market price of [Doximity's] stock" or, in other words, that it "had no price impact."  *Id.* at 279-

81.  Absent price impact, "*Basic*'s fundamental premise 'completely collapses, rendering class

certification inappropriate.'"  *Goldman 2021*, 594 U.S. at 119 (citing *Halliburton II*, 573 U.S. at

283).

    Defendants can demonstrate a lack of price impact in two ways: (i) direct evidence

showing no price impact on the "front-end" when the misstatements were made; or (ii) indirect

evidence showing there is no basis to infer that the "back-end" stock drop was triggered by

dissipating misstatement-related inflation.  *See In re Apple Inc. Sec. Litig.*, 2022 WL 354785, at \*7

(N.D. Cal. Feb. 4, 2022) ("[P]rice impact can be observed on the 'front-end' (*i.e.*, misstatements

---

[8] Although Lead Plaintiff alleged a "[c]lass-wide presumption of reliance is also appropriate . . .
under . . . *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972)," Compl. ¶ 178, it
has abandoned this theory on class certification.  Regardless, *Affiliated Ute* does not apply where,
as here, Lead Plaintiff does not "primarily allege omissions."  *See In re Volkswagen "Clean
Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 2 F.4th 1199, 1204 (9th Cir. 2021) ("*Affiliated
Ute* presumption is limited to cases that primarily allege omissions," rather than "mixed" cases with
both omissions and misrepresentations).  Reliance on the *Affiliated Ute* presumption is foreclosed
where Lead Plaintiff's claims flow from the affirmative Alleged 80% Misstatements and Alleged
Record Engagement Misstatements and this action is, at most, a "mixed" case with both omissions
and representations.  *See id.*

[9] Defendants do not challenge that Doximity stock was traded in an efficient market.

13

causing or maintaining inflation) or on the 'back-end' (*i.e.*, a decline in price caused by the corrective disclosures).") (citation omitted); *see In re Chi. Bridge & Iron Co. N.V. Sec. Litig.,* 2020 WL 1329354, at *3 (S.D.N.Y. Mar. 23, 2020).  When assessing price impact, courts "should be open to *all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense" and must consider such evidence.  *Goldman 2021*, 594 U.S. at 122 (citation omitted).  This Court's "task is simply to assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact."  *Id.* at 126-27.

Here, both direct and indirect evidence demonstrate that it is "more likely than not" that the Alleged 80% Misstatements had no price impact.

## I.      THE *BASIC* PRESUMPTION IS REBUTTED BECAUSE THERE IS DIRECT EVIDENCE SHOWING THAT THE ALLEGED 80% MISSTATEMENTS DID NOT HAVE FRONT-END PRICE IMPACT

"[T]he absence of . . . price impact" at the time an alleged misstatement is made—often described as "front-end impact"—is "*direct* evidence that investors did not rely" on that statement. *IBEW Loc. 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 782 (8th Cir. 2016) (emphasis added). In analyzing front-end price impact, courts consider quantitative evidence (*i.e.*, expert "event studies" that measure stock price changes following a publicly reported event) and qualitative evidence (*i.e.*, market reactions, industry context, confounding factors impacting stock price) to determine the extent to which "the security's price was inflated by the misrepresentation."  *In re Nio, Inc. Sec. Litig.*, 2023 WL 5048615, at *14 n.12 (E.D.N.Y. Aug. 8, 2023); *see also Shupe v. Rocket Cos., Inc.*, 752 F. Supp. 3d 735, 779 (E.D. Mich. Sept. 30, 2024) (considering market context and analyst commentary in assessing price impact).

Here, there is no direct evidence of front-end price impact where: (1) market commentary demonstrates that Alleged 80% Misstatements were not value relevant; and (2) the Alleged 80% Misstatements did not cause a positive stock price reaction.

### A.    Market Commentary Demonstrates That the Alleged 80% Misstatements Were Not Relevant to Stock Value

No market commentary supports Lead Plaintiff's assertion that the market considered the Alleged 80% Misstatements as informative on the number or percentage of quarterly active users. *None* of the over 470 analyst reports and news articles Professor Hochberg reviewed equate the Alleged 80% Misstatements as meaning that 80% of U.S. physicians "used Doximity at least quarterly," as Lead Plaintiff argues.  Dkt. 85 at 4; Ex. 38 (Rpt.) ¶ 26.  To the contrary, analysts explicitly acknowledged that Doximity did not disclose standard industry metrics on member engagement or use rates, including daily, monthly, or quarterly active users.  Ex. 38 (Rpt.) ¶¶ 41-42; *see also* Ex. 6 (June 19, 2021 SVB Leerink Report) at 7 ("DOCS will not be providing industry-specific metrics seen across its social media/internet peers[.]").

Indeed, certain analysts used third-party data or independent research, not the Alleged 80% Misstatements, to estimate Doximity's active user levels.  Ex. 38 (Rpt.) ¶ 43; *see also* Ex. 11 (July 19, 2021 Piper Sandler Report) at 7, Exhibit 5 (citing PSC Equity Research and CMS as data sources for Doximity's quarterly active users).  Such evidence demonstrates that the market did not consider the Alleged 80% Misstatements as containing new or value-relevant information about Doximity's quarterly active user levels.  *See Shupe*, 752 F. Supp. 3d at 779 (analyst reports citing third-party evidence forecasting a decline in the company's key metrics suggested that the challenged statements regarding such metrics had no impact on how the market viewed the company's profitability).  Rather, the market treated quarterly active users as undisclosed and uncertain, with many analysts affirmatively questioning or doubting whether 80% of members regularly used the Doximity platform.  Ex. 38 (Rpt.) ¶ 42; *see In re FibroGen Sec. Litig.*, 2024 WL 1064665, at *13-14 (N.D. Cal. Oct. 3, 2023) (finding no price impact upon evidence that analysts understood that the dose mitigation strategy was unproven).

The references and discussion (or lack thereof) regarding the Alleged 80% Misstatements in market commentary demonstrates that the market did not view such statements as relevant to stock value.  While certain analyst and media reports commented that 80% of physicians "used" the Doximity platform, an element of four of the Alleged 80% Misstatements, such representations were equally if not exclusively based on the SEC 80% Member Disclosure, which is not alleged to

15

be misleading. *See Shupe*, 752 F. Supp. at 779 (no price impact where "analysts referenced [the Company's] *announcement* rather than [the challenged board member's] *statement* when reporting to potential investors."). Indeed, certain analysts described 80% of physicians as "using" the Doximity platform before any Alleged 80% Misstatements were made, demonstrating that such analysts relied solely on the SEC 80% Member Disclosure and precluding any assertion of reliance on the Alleged 80% Misstatements. *See* Ex. 13 (June 15, 2021 Seeking Alpha Article) ("The company wrote in its S-1 that more than 80% of U.S. physicians used the platform as of March 31."); Ex. 37 (June 23, 2021 Seeking Alpha Article) (same). At any rate, reports that 80% of physicians "used" the Doximity platform does not equate to using the platform quarterly, as alleged by Lead Plaintiff. *See In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2024 WL 1342800, at *9 (S.D.N.Y. Mar. 29, 2024) (finding no price impact where no analyst "drew the inference [from alleged misstatements] that Kirkland was not considering acquisitions" as alleged by plaintiff). Of over 480 analyst reports and news articles Defendants' expert reviewed, only one report used the phrase "active members." *See* Ex. 38 (Rpt.) ¶ 50; *see Ramirez v. Exxon Mobil Corp.*, 2023 WL 5415315, at *15 (N.D. Tex. Aug. 21, 2023) (no price impact when an "assessment of a sample of 480 contemporaneous research analyst reports revealed only six containing analyst commentary regarding the NYAG's investigation" at issue). However, that one report—the July 19, 2021 Canaccord report—refers to the 80% Figure throughout the report consistent with the SEC 80% Member Disclosure, which is not alleged to be false or misleading. Ex. 38 (Rpt.) ¶¶ 49-54; Ex. 16 (July 19, 2021 Canaccord Genuity Report) at 1-3. As with the July 19, 2021 Canaccord report, analyst reports and news articles uniformly described the 80% Figure consistent with the SEC 80% Member Disclosure both before and after the date of the first Alleged 80% Misstatement, June 24, 2021. A "common sense" review of such evidence demonstrates that the market did not consider any inconsistent phrasing between the SEC 80% Member Disclosure and the Alleged 80% Misstatements as material to stock value. *See Goldman 2021*, 594 U.S. at 122.

At bottom, the market commentary demonstrates that analysts and market participants did not consider the Alleged 80% Misstatements as revealing new, value relevant information with front-end price impact. Rather, analysts relied on the unchallenged SEC 80% Member Disclosure

16

when commenting on physician membership and use of the Doximity platform.

**B.     The Alleged 80% Misstatements Did Not Cause a Stock Price Increase**

In analyzing front-end price impact, courts must consider both quantitative and qualitative evidence to determine whether challenged misstatements caused "statistically significant increases" in stock price. *See Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 83 (2d Cir. 2023) ("*Goldman 2023*") (no price inflation where "the challenged statements did not cause statistically significant increases in . . . price"). Defendants can show a lack of front-end price impact through a quantitative expert "event study" demonstrating that there was no statistically significant increase in stock price attributable to an alleged misstatement. *See In re Apache Corp. Sec. Litig.*, 2024 WL 532315, at *6-7 (S.D. Tex. Feb. 9, 2024) (no evidence of front-end price impact where the expert's event study showed "no statistically significant increase" following the misrepresentations). Where quantitative evidence shows a price increase, however, the front-end inquiry does not end because the "issue is not whether the price increased after the alleged misstatements, but whether the alleged misstatements impacted the price—a different question." *See Luna v. Carbonite, Inc.*, 2023 WL 4539855, at *9 n.8 (D. Mass. July 14, 2023). To properly attribute stock price movement to an alleged misstatement, "the Court should consider, *inter alia*, the total mix of information the market possessed prior to the disclosure, the market reaction to similar, prior disclosures, and any additional confounding factors that might have impacted the stock price within the event window." *Ramirez*, 2023 WL 5415315, at *15.

Consistent with this framework, Professor Hochberg analyzed whether there was a statistically significant increase in stock price when the Alleged 80% Misstatements were made and, if so, whether market commentary supported that the price increase was attributable to the Alleged 80% Misstatements or other factors. Ex. 38 (Rpt.) ¶¶ 55-74. On the seven days when Alleged Misstatements were made, there was either no statistically significant positive price increase or market commentary demonstrates that the price increase was explained by positive news regarding the Company unrelated to the Alleged 80% Misstatements.

On four of the seven days when Alleged 80% Misstatements were made—August 10, 2021, November 10, 2021, March 11, 2022, and June 6, 2023—there was no statistically significant

17

price reaction. Ex. 38 (Rpt.) ¶ 61. As Professor Hochberg explains, the "absence of statistically significant positive abnormal returns" on such dates "indicates that the market did not interpret these statements as providing new or value relevant information about Doximity." Ex. 38 (Rpt.) ¶ 58; *see also Apache Corp.*, 2024 WL 532315, at *6-7 (finding no front-end impact where there was "no statistically significant increase on 12 of the 13 trading days following the alleged misrepresentations"). On the three remaining days when an Alleged 80% Misstatement was made—June 24, 2021, August 11, 2021, and February 9, 2022—Professor Hochberg determined that Doximity's stock price increased, but she concluded based on a comprehensive review of analyst and news commentary that the price increases were driven by concurrent positive news distinct from the Alleged 80% Misstatements. *See Best Buy Co.*, 818 F.3d at 782-83 (no front-end price impact where other news caused the price reaction); *Apache Corp.*, 2024 WL 532315, at *6 (no evidence of front-end price impact where sources attributed the price increase to other factors). Defendants address in turn the three days where an Alleged 80% Misstatement was made and there was a price increase—June 24, 2021, August 11, 2021, and February 9, 2022.

First, the June 24, 2021 price increase was on the day of and attributable to Doximity's IPO. As Dr. Cain admits in his report, "underwriters tend to underprice initial public offerings," and "[t]he significant price increase" on June 24, 2021 "is consistent with the academic research[.]" Cain Rpt. ¶¶ 98, 100. Consequently, consistent with Dr. Cain's findings, a large price increase on the day of the IPO is not surprising, and thus cannot be tied to any price impact from the Alleged 80% Misstatement made that day. Ex. 38 (Rpt.) ¶ 63; *see Bratya SPRL v. Bed Bath & Beyond Corp.*, 2025 WL 721770, at *5 (D.D.C. Mar. 6, 2025) (no price impact where stock price movement was more likely attributable to short squeeze market dynamics "than a showing that the stock price had been incorporating the alleged misrepresentations."). Moreover, not a single news article quoted, discussed, or mentioned the Alleged 80% Misstatement after it was made on the IPO day, providing additional evidence that the statement did not impact price. *See* Ex. 38 (Rpt.) ¶¶ 63-66; *see Goldman 2023*, 77 F.4th at 104 (where reports did not reference an alleged misstatement, such evidence suggests investors were not misled). Rather, "news outlets continued to describe the 80% Figure in the same way as before, even long after the Alleged Corrective Disclosure" and

consistent with the SEC 80% Member Disclosure, demonstrating that analysts did not rely on the Alleged 80% Misstatement.  Ex. 38 (Rpt.) ¶¶ 26, 52.

Second, the August 11, 2021 price increase was clearly attributable to other unrelated news.  Market commentary demonstrates the price increase was caused by the Company's reporting during after-market hours quarterly earnings call on August 10, 2021 of strong past and projected future revenue growth and an adjusted EBITDA margin.  Ex. 38 (Rpt.) ¶¶ 67-69; *see Apache Corp.*, 2024 WL 532315, at *6 (no evidence of front-end price impact where sources attributed the price increase to an EBITDAX and production beat, not the misrepresentation).  News articles and analyst reports focused on the Company's higher-than-expected earnings results and growth potential, none of which was related to the Alleged 80% Misstatements.  Ex. 38 (Rpt.) ¶¶ 67-69.

Third, the February 9, 2022 price increase cannot be connected to the alleged misstatement.  Indeed, the stock price increased *before* the Alleged 80% Misstatement was made and then *decreased* after the statement, thus precluding any inference of front-end price impact.  Ex. 38 (Rpt.) ¶¶ 70-74.  Market evidence demonstrates that the stock price increase on February 9 was instead driven by the Company announcing strong quarterly earnings results and the acquisition of Amion, a healthcare scheduling platform, during an earnings call after the market closed on February 8, 2022.  *Id.* ¶¶ 70-74.

Altogether, the evidence establishes that none of the Alleged 80% Misstatements caused direct front-end price impact.

## II.    THE *BASIC* PRESUMPTION IS REBUTTED BECAUSE INDIRECT EVIDENCE DEMONSTRATES THAT THE ALLEGED 80% MISSTATEMENTS HAD NO BACK-END PRICE IMPACT

Courts can infer price impact by "looking to changes in the stock price after the truth is finally disclosed" in a corrective disclosure: "if the stock price drops, this 'back-end' price drop serves as indirect evidence of 'front-end' inflation." *Pardi v. Tricida, Inc.*, 2024 WL 4336627, at *7 (N.D. Cal. Sept. 27, 2024).  Such indirect evidence of "back-end" price impact requires proof that the August 8 Disclosure revealed information "(i) corrective of [the Alleged 80% Misstatements], (ii) new (unknown to the market prior to [August 8, 2023]), and (iii) 'value

19

relevant' (*i.e.*, caused at least some of the stock price decline)." *Fibrogen Sec. Litig.*, 2024 WL 1064665, at \*12.

Here, the August 8 Disclosure did not "correct" any portion of the Alleged 80% Misstatements, nor did market commentary connect the stock price decline to any value-relevant information from the August 8 Disclosure that purportedly corrected the Alleged 80% Misstatements.

### A.     The August 8 Disclosure Did Not "Correct" Any Portion of the Alleged 80% Misstatements.

While Doximity's stock price declined following the August 8 Disclosure, that decline can only provide the basis to infer that the Alleged 80% Misstatements inflated stock price if the August 8 Disclosure actually "corrected" information contained in the Alleged 80% Misstatements. *See Goldman 2021*, 594 U.S. at 123; *Fibrogen Sec. Litig.*, 2024 WL 1064665, at \*12 ("[R]evelations that are not 'corrective' cannot form the basis for a corrective disclosure.").

A back-end price drop only supports an inference of front-end price impact when the corrective disclosure "matches" the earlier misrepresentations. *See Goldman 2021*, 594 U.S. at 123. Avoiding a "mismatch" "requires a "closer fit . . . between the front-and back-end statements" than loss causation. *Goldman 2023*, 77 F.4th at 99 n.11. "To be corrective, the disclosure must relate back to the misrepresentation and not to some other negative information about the company." *Bonanno v. Cellular Biomedicine Grp., Inc.*, 2016 WL 4585753, at \*3 (N.D. Cal. Sept. 2, 2016) (internal quotations omitted). A disclosure is considered corrective when it "reveals *new facts* that, taken as true, render some aspect of the defendant's prior statements false or misleading." *In re BofI Holding, Inc. Secs. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020) (emphasis added); *see also In re Novatel Wireless Secs. Litig.*, 830 F. Supp. 2d 996, 1019 (S.D. Cal. 2011) ("A 'corrective disclosure' . . . reveals the fraud, or at least some aspect of the fraud, to the market."). "[T]he Court must evaluate the front-and back-end statements 'as written'" in evaluating whether they are "sufficient matches to render the front-end statement false." *Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 2025 WL 2554474, at \*31 n.6 (S.D.N.Y. Sept. 4, 2025) (citing *Goldman 2023*, 77 F.4th at 100).

20

Here, nothing on the face of the "as written" August 8 Disclosure supports Lead Plaintiff's assertion that the earnings announcement revealed to the market that "substantially fewer than 80% of U.S. physicians were 'active members,' *i.e.*, used Doximity at least quarterly[.]"  Dkt. 85 at 11; *see* Ex. 23 (August 8, 2023 Release ); Ex. 22 (August 8, 2023 Earnings Call Tr.).  Even putting aside that none of the Alleged 80% Misstatements purport to disclose active user levels, the August 8 Disclosure revealed no information regarding the number or percentage of physician "active members" or quarterly active users such that it could have possibly "corrected" any portion of the Alleged 80% Misstatements.  This categorical mismatch between the front-end misrepresentations and back-end disclosure is fatal to any claim of back-end price impact.  *See In re Qualcomm Inc. Secs. Litig.*, 2023 WL 2583306, at \*12 (S.D. Cal. Mar. 20, 2023) (rejecting plaintiffs' argument regarding the market's alleged interpretation of the misstatements where "that conclusion is not apparent when the alleged misrepresentations and corrective disclosures are viewed side by side").

| Alleged 80% Misstatements & August 8 Disclosure Side By Side | |
|---|---|
| **Alleged 80% Misstatements** | **August 8, 2023 Disclosure** |
| "[O]ver 80% of all U.S. physicians are active members on [Doximity's] platform." Dkt. 75 at 6.<br><br>"[O]ver 80% of all U.S. physicians use [Doximity's] platform." Dkt. 75 at 6. | "[O]ur upsell close rate fell short in June and July. So after growing steadily for a decade, our upsells have now slowed for two years in a row."  Ex. 22 (August 8, 2023 Earnings Call Tr.) at 4.<br><br>"[We've] found two core reasons [for the decline in upsells]. First, . . . [p]harma's shift to digital has slowed. Post-COVID travel and agency swaps are soaking up budget, while budgetary caution rules the day. . . . Second, and more importantly . . . during summer upsell season, clients no longer have the time to schedule all of the meetings, legal reviews, reports and QBRs."  Ex. 22 (August 8, 2023 Earnings Call Tr.) at 4. |

The court's holding in *In re Intuitive Surgical Secs. Litig.*, 2016 WL 7425926 (N.D. Cal. Dec. 22, 2016) is instructive here.  In *Intuitive Surgical*, the court rejected that the company's release of quarterly financial results constituted a corrective disclosure because the "financial information [was] unrelated to allegations of [the company's] safety problems" and were "not corrective of misrepresentations related to safety."  *Id.* at \*16.  The court explained that the "action contain[ed] no alleged misrepresentations related to [the company's] financial condition that a remedial disclosure could correct."  *Id.*  The same is true here.  The August 8 Disclosure revealed nothing more than a downward adjustment from the May 16 Guidance and a reduction in

21

workforce, neither of which have any bearing on the Alleged 80% Misstatements such that the August 8 Disclosure could be considered corrective. *See id.*; *see also Apache Corp.*, 2024 WL 532315, at *9 (finding the *Basic* presumption rebutted where a disclosure "revealing the depths of Apache's financial struggles did not shed any new light on Apache's alleged misrepresentations about Alpine High."). Since the August 8 Disclosure did not mention, let alone correct, any statements concerning the 80% Figure, nor did it disclose, revise, or retract any information about the level of Doximity active users or active members from the Alleged 80% Misstatements, there can be no corrective disclosure. *See In re Concho Res., Inc. Secs. Litig.*, 2025 WL 1040379, at *17 (S.D. Tex. Apr. 7, 2025) (finding that a disclosure was not "corrective" when it "d[id] not even implicitly mention the RSP Acquisition referenced in the [challenged] statements.").

The August 8 Disclosure announced reduced fiscal year 2024 guidance, planned layoffs, and declining upsells, but attributed none of those factors to the number or percentage of active physician users on the Doximity platform. Instead, during the earnings call, Doximity attributed the negative news to "[p]harma's shift to digital ha[ving] slowed" and "the friction of [its] full-service, white-glove sales model," which led to "banner ads . . . [getting] the incremental spend in the summer." Ex. 22 (August 8, 2023 Earnings Call Tr) at 4; *see Apache Corp.*, 2024 WL 532315, at *11 (defendants presented sufficient evidence that the market moved out of concerns unrelated to the misrepresentations); *Ramirez*, 2023 WL 5415315, at *17 (finding that "confounding factors likely explain the movement in Exxon Mobil's stock price[.]"). Accordingly, there is nothing to suggest that the negative news reported in the August 8 Disclosure was related to the number or percentage of "active members" or otherwise corrected any portion of the Alleged 80% Misstatements.

In sum, Lead Plaintiff does not and cannot point to any "as written" disclosures during the August 8 earnings call that "corrected" the Alleged 80% Misstatements, which forecloses the inference that the back-end price drop dissipated inflation introduced or maintained by the Alleged 80% Misstatements. *See Qualcomm Inc. Secs. Litig.*, 2023 WL 2583306, at *12; *AP-Fonden*, 2025 WL 2554474, at *31 n.6.

22

**B.    Market Commentary Did Not Connect the August 8 Disclosure to the Alleged 80% Misstatements**

Absent a direct or even attenuated connection on the face of the Alleged 80% Misstatements and the purportedly corrective August 8 Disclosure, Lead Plaintiff misrepresents analyst reports and market commentary in a strained and misguided attempt to infer a corrective disclosure.  But none of the market commentary attributed disclosures on the August 8 earnings call—including the downward revision of the fiscal year 2024 guidance, the reduction in workforce, or the upsell decline—to the 80% Figure, Doximity's active user levels, or any purported correction of the Alleged 80% Misstatements.  Ex. 38 (Rpt.) ¶ 86; *see Shupe*, 752 F. Supp. 3d at 781 (the lack of reference to the alleged misrepresentations in reports was "fatal[]" to plaintiff's price-impact claim); *Goldman 2023*, 77 F.4th at 104 (880 analyst reports, "none of which reference[d]" an alleged misstatement, were evidence of no back-end price impact).  Rather, market commentary consistently linked the August 8 stock price decline to other factors, including customer budget shifts in the post-COVID environment, underperforming midyear sales, marketing shifts, and increased competition from programmatic banner advertising.  Ex. 38 (Rpt.) ¶¶ 88-94; *see Ramirez*, 2023 WL 5415315, at *17 (no back-end price impact where "analysts mainly ascribed the earnings shortfall" to factors unrelated to the alleged misrepresentations); *Apache Corp.*, 2024 WL 532315, at *10 (no price impact where analyst reports attributed market moves to other factors because such evidence suggested "what the market considered significant").

Lead Plaintiff seeks to rely on market commentary in an attempt to feign a corrective disclosure by asserting that the market inferred a correction from the August 8 Disclosure where "[a]nalysts and investors . . . did not accept Defendants' stated explanations" and instead attributed negative news in the August 8 Disclosure to "lesser-than-represented active members on the platform."  Compl. ¶¶ 95, 169.  Lead Plaintiff cites market commentary that questioned or expressed skepticism regarding Doximity's explanations for its disclosures on the August 8 earnings call, but such commentary falls short of revealing fraud in the Alleged 80% Misstatements sufficient to render the August 8 Disclosure corrective.  *See Teamsters Local 617 Pension & Funds v. Apollo Grp., Inc.*, 633 F. Supp. 2d 763, 819 (D. Ariz. 2009) (analysts reporting that the company's statements were "questionable" or even "highly questionable" were "not equivalent to

revealing a fraud" sufficient to find a corrective disclosure).[10]  The mere "'risk' or 'potential' for widespread fraudulent conduct" does not constitute a corrective disclosure.  *See Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 (9th Cir. 2008).  Indeed, "[i]f every analyst . . . opinion . . . could form the basis for a corrective disclosure, then every investor who suffers a loss in the financial markets could sue under § 10(b) using an analyst' s negative analysis of public filings as a corrective disclosure.  That cannot be—nor is it—the law.'"  *In re Nektar Therapeutics*, 2020 WL 3962004, *18 (N.D. Cal. July 13, 2020) (quoting *Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013)).  Consequently, Lead Plaintiff's theory of inferring a corrective disclosure from analyst reporting mere skepticism of the Company's stated explanations is not cognizable.

Moreover, the market commentary cited by Lead Plaintiff and Dr. Cain falls short of establishing a sufficient connection between the Alleged 80% Misstatements and the August 8 Disclosure to infer any corrective disclosure.  Indeed, none of the purported market evidence Dr. Cain relies on supports that analysts viewed the August 8 Disclosure as correcting any information regarding active user levels in the Alleged 80% Misstatements.  The sole "evidence" Dr. Cain cites that mentions the 80% Figure is a social media post by a doctor—not a securities analyst—with no professional finance background that questioned whether 80% of doctors "use" the Doximity platform.  But this post was not in response to the August 8 Disclosure, nor was it based on any purported correction of the Alleged 80% Misstatements revealed in the August 8 Disclosure.  Ex. 38 (Rpt.) ¶¶ 109-11; *see also* Cain Rpt. ¶ 113.  Rather, the social media post—which can hardly be interpreted as market commentary—was based on the doctor's own outreach to physicians regarding active usage, not any information revealed in the August 8 Disclosure.  *See* Compl. ¶ 95.[11]

---

[10] Dr. Cain cites analyst reports that lowered their target prices after the August 8 Disclosure, reported that results were "shockingly short of expectations," or expressed skepticism of Doximity's stated explanations, but he fails to connect such commentary to any purported correction of the Alleged 80% Misstatements.  Cain Rpt. ¶ 111-12; *see also* Ex. 38 (Rpt.) ¶¶ 96-104.  Nor does he cite any portion of those reports that mention the 80% Figure or any purported disclosure by Doximity of active user or active member levels.  Cain Rpt. ¶ 111-12; *see also* Ex. 38 (Rpt.) ¶¶ 98-103.

[11] Lead Plaintiff and Dr. Cain further cite a short-seller report published nearly eight months after the August 8 Disclosure, which is not credible evidence of how the market processed information

DEFS.' OPP. TO MOTION FOR CLASS CERTIFICATION                    CASE NO. 5:24-cv-02281-NW

Furthermore, Lead Plaintiff and Dr. Cain ignore that market participants continued to describe the 80% Figure in the same way both before and after the August 8 Disclosure, further demonstrating the market did not treat the August 8 Disclosure as revealing new information about the 80% Figure. Ex. 38 (Rpt.) ¶ 86. In fact, analysts continued to comment that over 80% of physicians "use" and "engage frequently" with the Doximity platform, which is consistent with both the SEC 80% Member Disclosures and Alleged 80% Misstatements, long after the August 8 Disclosure, as recently as May 2025. Ex. 38 (Rpt.) ¶ 86; *see also* Ex. 36 (May 16, 2025 SVB Leerink Report) at 3 ("more than 80% of US doctors engage frequently with [Doximity's] platform"); Ex. 34 (February 10, 2025 China Merchant Securities Report) at 10 ("Doximity is a trusted networking platform for physicians, used by over 80% of U.S. doctors."). It belies common sense to conclude that the August 8 Disclosure corrected any part of the Alleged 80% Misstatements when market commentary on the 80% Figure remains consistent with the Alleged 80% Misstatements to this day to this day.

In sum, none of market commentary expressed surprise about the August 8 Disclosure, treated the August 8 Disclosure as revealing new information about the 80% Figure, or attributed the negative news to the 80% Figure, Doximity's level of active members, or the percentage of physicians "using" the platform. The absence of market commentary connecting the August 8 Disclosure to the Alleged 80% Misstatements further demonstrates a lack of indirect evidence of back-end price impact. *See Goldman 2023*, 77 F.4th at 104.

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court deny class certification with respect to the Alleged 80% Misstatements and exclude from the class persons who purchased or acquired Doximity common stock between June 24, 2021 and November 9, 2021.

Dated: September 26, 2025                    Respectfully submitted,

---

at the time of the disclosure. Ex. 38 (Rpt.) ¶¶ 106-08; *see also* Cain Rpt. ¶ 114; Compl. ¶¶ 96-100. Moreover, Lead Plaintiff's claim that the report merely "undermined" the Alleged 80% Misstatements belies Lead Plaintiff's assertion that the August 8 Disclosure eight months prior publicly revealed that such misstatements were false. Compl. ¶ 97.

25

SIMPSON THACHER & BARTLETT LLP

*/s/ Stephen Blake*
Stephen Blake (SBN 260069)
sblake@stblaw.com
Hilary Wong (SBN 336544)
hilary.wong@stblaw.com
Camille Victoria Boler
(SBN 353906)
camille.boler@stblaw.com
2475 Hanover Street
Palo Alto, California 94304
Telephone: (650) 251-5000
Facsimile: (650) 251-5002

Jonathan K. Youngwood (SBN 350373)
425 Lexington Avenue
New York, NY 10017
Telephone: (212) 455-2000
Facsimile: (212) 455-2502
Email: jyoungwood@stblaw.com

Batoul Husain
batoul.husain@stblaw.com
900 G Street, N.W.
Washington, D.C. 20001
Telephone: (202) 636-5500
Facsimile: (202) 636-5502

*Attorneys for Defendants Doximity, Inc., and Jeffrey Tangney*

DEFS.' OPP. TO MOTION FOR CLASS CERTIFICATION                    CASE NO. 5:24-cv-02281-NW