# Exhibit 2

**Page 1**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

-----------------------------------x

IN RE

DOXIMITY, INC.

SECURITIES LITIGATION

Case No. 5:24-cv-02281-NW

-----------------------------------x


            VIDEOTAPED DEPOSITION OF

                 MATTHEW D. CAIN

              New York, New York

              November 10, 2025



Reported By:

ERIC J. FINZ

November 10, 2025

9:02 a.m.

Videotaped Deposition of MATTHEW D. CAIN, taken by Defendants, pursuant to Notice, at the offices of Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York, before ERIC J. FINZ, a Shorthand Reporter and Notary Public within and for the State of New York.

Page 3

A P P E A R A N C E S:

BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP

Attorneys for Plaintiffs

2121 Avenue of the Stars

Los Angeles, California 90067

BY:    JONATHAN D. USLANER, ESQ.

jonathanu@blbglaw.com

MATTHEW W. ARROW, ESQ.

matthewa@blbglaw.com

SIMPSON THACHER & BARTLETT LLP

Attorneys for Defendants Doximity, Inc.,

and Jeffrey Tangney

425 Lexington Avenue

New York, New York 10017

BY:    JONATHAN K. YOUNGWOOD, ESQ.

jyoungwood@stblaw.com

CAMILLE BOLER, ESQ.

camill.boler@stblaw.com

STEPHEN BLAKE, ESQ.

sblake@stblaw.com

BATOUL HUSAIN, ESQ. (Via Zoom)

batoul.husain@stblaw.com

ALSO PRESENT:

ROBERT RUDIS, Videographer

Page 50

MATTHEW D. CAIN

lacks foundation.

A.    I'm not offering any opinions on who created the document or what their stated purpose was.

Q.    What was it -- well, you've answered that.

What was the target market or target -- that's the wrong word -- target audience of the document?

MR. ARROW:  Lacks foundation.

A.    Again, I'm not -- I'm not aware of what the thinking was behind the creation of this document.

Q.    Was the target of this document physicians?

MR. ARROW:  Object to form; lacks foundation.

A.    Again, I'm not aware of what the thinking was behind the creation of the document.

Q.    There is a reference on the title to "Physician Recruiters."  Do you know what a physician recruiter is?

A.    I don't know what the formal

Page 51

MATTHEW D. CAIN

definition of a physician recruiter is.

Q.    Do you have any definition of "physician recruiter"?

A.    Well, one definition could include companies who engage the services of a corporate recruiter to go out and identify candidates to interview for vacant positions.

Q.    Okay.  Is there anything -- a physician recruiter is different than an investor.  Would you agree?

A.    Obviously those could include people who do invest.  But I would agree that, when we generally speak of people, those would generally be two different kinds of people.

Q.    Okay.  And an "analyst" and a "physician recruiter," those would be different descriptive terms.  Correct?

A.    Again, there could be times when they could overlap.  But I would generally describe them as two separate categories.

Q.    Okay.  Are you aware of any

Page 52

MATTHEW D. CAIN

analyst who covered Doximity referring to this document ever?

A.    One of the things that I explain in my report is that analysts use the same terminology interchangeably in terms of active members or active users. But I don't know whether any of those analysts explicitly cited to this document when they were using that language.

Q.    Are you aware of anyone speaking on behalf of Doximity on an analyst call, an earnings call, or in their SEC filings, referring to this document?

A.    Similar to my previous answer, I explain in my report that they did use the terms, "active member" and "active user," interchangeably.  But I don't recall them citing explicit -- whether or not they cited explicitly to this document.

Q.    Or, and I recognize many people can be investors, but can you give

Page 53

MATTHEW D. CAIN

me an example of any investor citing to this document?

A.    Again, similarly, a document evidence of investors using the same terminology in this document.  But I don't know whether or not they cited explicitly to this document.

Q.    Okay.  Let's go on to paragraph 49.

(Cain Exhibit 6 for identification, document headed "Doximity Announces Fiscal 2022 Third Quarter Financial Results.")

BY MR. YOUNGWOOD:

Q.    In paragraph 49, at the sentence ending with footnote 68, you cite to a Doximity.com earnings press release.

Is this that document?

A.    I see it.

Q.    Okay.  And you would agree with me that the paragraph or the sentence you're quoting that begins with "our Telehealth platform grew," and then

Page 54

                    MATTHEW D. CAIN

continues to discuss -- well, that paragraph and refers to 350 active providers, that's a reference to Telehealth, that section of Doximity's business.  Correct?

          A.     I believe that is correct, yes.

          Q.     Okay.  It's not a reference to all providers who might be part of Doximity's platform.  Correct?

          A.     My understanding is that those providers would be included.  But that there would be additional providers who were part of the platform who are not included in that statistic.

          Q.     So where it's using the word "providers," it's not using the word "all users."  Right?

          A.     It says "providers."

          Q.     Right.

                 It's a subset of Doximity's users.  Correct?

          A.     I believe this is a subset of all users.

Page 79

MATTHEW D. CAIN

valuation of the company.

Q.    Okay.  You just said in your last answer that it -- you explained that "the overall market recognized the importance of Doximity's active members." The phrase "active member" is not in any of the excerpts of the analyst reports that you refer to in paragraph 42. Correct?

A.    It's certainly in other analyst reports, and it may be in these analyst reports.  But I'm providing quotes relating to engagement within this section of my -- within this paragraph.

Q.    In 43, paragraph 43, you refer to Doximity's 10-K.

        MR. ARROW:  Object to form.

Q.    Here too you were not able to locate and include in your paragraph a reference to active members.  Correct?

        MR. ARROW:  Objection; mischaracterizes the document.

A.    Again, that was not the word search -- that's not a word search that I

Page 80

MATTHEW D. CAIN

was attempting to conduct for paragraph 43. Paragraph 43 is focusing on engagement and describing how member engagement was a critical component of the company's financial success, including its revenues and how those would be significantly harmed if it did not have the degree of member engagement necessary to drive that type of performance.

Q. But nothing in what you quote in 43 says what level of member engagement was necessary, to use your words, to drive that type of performance?

A. Well, they're drawing a direct connection between financial performance and engagement. So it's essentially a continuous link; higher engagement is going to drive higher expected revenues and financial performance. Lower engagement is going to cause a reduction in expected revenues and financial performance.

Q. Okay. In the next paragraph

MATTHEW D. CAIN

on, you refer to CFO Anna Bryson. Correct?

A.    Yes.

Q.    And she refers to -- she makes a reference to "over 80 percent of physicians."  Right?

A.    Yes.

Q.    She does not say over 80 percent of active physicians or engaged physicians.  Right?

A.    Here she says 80 percent of physicians, that's right.

Q.    And she ties that to a very high ROI for the, you use brackets, but the company's customers.  Correct?

A.    Yes.

Q.    Let's go back to page 12, paragraph 27.  You write, "From an economic and financial perspective, there is a direct economic connection between the information allegedly misrepresented regarding Doximity's active member figures and the information later revealed to investors through the alleged

Page 82

MATTHEW D. CAIN

revelation of the relevant truth."

Do you see that?

A.    I do.

Q.    Did you do an econometric study to support this conclusion in this report?

MR. ARROW:    Object to the form.

A.    Yes, this is building on information provided throughout this report, which included an event study at the front end of the class period, which showed a statistically significant increase in Doximity's stock price. Which is consistent with the front end price impact of the alleged 80 percent active member misstatements.

It also includes an event study at the back end of the class period around the corrective event, showing a statistically significant decline in Doximity's stock price upon the guidance reduction and the layoffs that were announced.

Page 83

MATTHEW D. CAIN

And it also includes the principles of economics, which connect together both the front end and the back end and demonstrate that the degree of active members was directly tied to the value of the company from day one of the class period.

Q.    Well, I think you misunderstood my question.  I'm asking if you did any study that shows having one more active member has an economic impact on the company.  Or two more or ten more or 1 percent.

MR. ARROW:  Object to form.

A.    I do think your question is actually consistent with my previous answer.  The principles of economics and finance that I explain here, as well as the other sections of my report, demonstrate that the company's revenues, financial performance, were directly connected to the amount of active members and their engagement with the platform over the course of the entire class

Page 84

MATTHEW D. CAIN

period.

So any increase or decrease in the level of active members and their engagement would have a direct impact on the expected financial performance of the company and its stock price.

Q.    How much of a direct impact?

A.    Ultimately, I've not quantified any -- I think that speaks to questions about artificial inflation and loss causation and damages, and I've not attempted to quantify the magnitude of those impacts on the stock price at this point in time.

Q.    Because there may have been many factors that affect the stock price?

A.    Well, the reason I've not done that is because I'm still operating in the class certification stage of the case.  And I've not yet been asked to conduct a loss causation or damages analysis.

Q.    But so you haven't done a loss causation or a damages analysis?

Page 85

MATTHEW D. CAIN

A.    That is correct.

MR. ARROW:  Object to form.

A.    That is correct.

Q.    Okay.  Do you have any understanding of Doximity's business model?

MR. ARROW:  Object to form.

A.    I have a high level understanding based on the documents that I've cited in my reports.

Q.    Okay.  Can you, for example, compare Doximity's model as it relates to user metrics and LinkedIn's?

MR. ARROW:  Object to form.

A.    I'm not really sure I understand your question.

Q.    What is the role of targeted advertising in Doximity's business model?

A.    Are you asking generally or about any part of my report specifically?

Q.    I'm asking your understanding of the role of targeted advertising in Doximity's business model.

A.    At a high level, I understand

MATTHEW D. CAIN

staff?

A.    Well, the tweets came from the people who posted them.  But I don't recall who was the first on my team to review those.

Q.    What are the names of the people who posted them?

A.    I just have the user names in the footnotes below those.

Q.    Do you have any reason to know whether or not they're actually human beings that posted them?

A.    It's not a question that I've asked at this point in time.

Q.    So you don't know if they're people that actually posted them, human beings?

A.    I'm not sure I really understand.  As opposed to what?

Q.    A bot.

A.    Again, it's not a question that I've asked on any of the data sources in my report.

Q.    These are all from November of

Page 110

MATTHEW D. CAIN

2021.  What percentage of Twitter posts in November of 2021 were made by bots?

MR. ARROW:  Objection; lacks foundation.

A.    That's not a question that I've asked.

Q.    Do you have any reason to believe that these posts weren't all made by the same person, if it was even made by a person?

A.    You mean one person with multiple different accounts?

Q.    Yes.

A.    Again, that's not a question that I've tried to ask.

Q.    Let's take a look at some of them, perhaps.

(Cain Exhibit 12 for identification, Twitter post.)

BY MR. YOUNGWOOD:

Q.    Tell me what this is.

A.    This looks like possibly a printout from your firm.

Q.    I'm sorry, I may have given

Page 111

MATTHEW D. CAIN

you the wrong -- sorry.  Hold on a second.

MR. YOUNGWOOD:  We'll get to that.  Just put it aside for now. I've given it to you in the wrong order.

I'm sorry, we may have printed out the wrong material.

Let's just go off the record for a second.

THE VIDEOGRAPHER:  Off the record, 11:59.

(A recess was taken.)

(Discussion off the record.)

THE VIDEO OPERATOR:  On the record, 11:59.

BY MR. YOUNGWOOD:

Q.    In terms of the category of alleged misstatements that we've been discussing today, the 80 percent physicians active members, has the company ever corrected that misstatement?

MR. ARROW:  Object to form.

Q.    In your view.

Page 112

MATTHEW D. CAIN

A.    In my report I point to the allegations in the complaint, which is that at the end of the class period there was a corrective event comprised of the guidance reduction and roughly 10 percent of work force reduction through layoffs. And I also mention a post-class period event from a short seller report providing confirmatory information.

But beyond that, I've not tried to answer that question.

Q.    Okay.  So you have no conclusion, or do you have an opinion as to whether or not the statement was corrected?

A.    Nothing beyond what I've pointed to in terms of the complaint's allegations.  So I do explain in my report that there is the clear economic link and connection between the alleged active -- 80 percent active member misstatements and the corrective event. But beyond that I've not formed any sort of loss causation opinions at this point

Page 113

MATTHEW D. CAIN

in time.

Q.     But does the company ever say we don't have 80 percent active members, or words to that effect?

A.     My recollection is that other market commentators drew that conclusion. But I don't believe that those specific words or phrasing came from the company itself.

Q.     Okay.  By "market commentators," you're not referring to analysts; right?

A.     It would include analysts, yes.

Q.     Okay.  Well, analysts continued to repeat the 80 percent figure after the alleged corrective disclosure; don't they?

MR. ARROW:  Objection; misstates prior testimony.

A.     So I point to a Morgan Stanley analyst report after the class period that is talking about weaker engagement. I point to a --

Page 114

MATTHEW D. CAIN

Q.    Why don't you tell us just for the record what paragraph you're referring to.

A.    Paragraph 59.

Q.    Okay.

A.    I also point in paragraph 64 to a report post-class period that concluded that engagement was falling. Beyond that I've not evaluated the extent to which some analysts may have continued to talk about 80 percent.

Q.    Okay.  So let's just go through each of those you referred to. Paragraph 59, page 27, Morgan Stanley, September 6, 2023.  Is that what you're referring to by Morgan Stanley?

A.    Yes.

Q.    And that says, Doximity does not disclose metrics like monthly active users but discussions with advertising partners suggest weaker engagement could be one factor.

That was what you were referring to?

Page 115

MATTHEW D. CAIN

A.    Yes.

Q.    That doesn't refer to the 80 percent figure.  Right?

A.    Actually, I do think that they are talking about the degree of active members and their level of engagement with the platform.

Q.    So is the Morgan Stanley report the corrective disclosure?

MR. ARROW:  Objection; misstates prior testimony.

A.    No, the corrective event was on August 8, 2023, after market closed. And then I'm providing some quotes from analyst reports and other market commentators that followed the corrective event.

Q.    Okay.  But the August 8th statement, you'd agree with me, doesn't make reference to the 80 percent number being incorrect.  Right?

A.    Well, I do think it is actually connected to that.  They may not use a mirror image disclosure language.

Page 116

MATTHEW D. CAIN

But they are certainly -- the information that came out on the corrective event in terms of the workforce reduction and the guidance reduction, as I explained in my report, are fundamentally connected to the active members and their engagement with the platform.

Q.    Okay.  And so you're saying it's related to a decrease in the number of active members or the number of engaged members?

MR. ARROW:  Objection; mischaracterizes prior testimony.

A.    I don't think I said it quite like that.

Q.    Okay.  Well, it's not related to whether or not the 80 percent was accurate or inaccurate.

A.    Is that a question or a statement?

Q.    Yeah, it's a question.

A.    Your question is what?

Q.    This is no reference in the document whatsoever to the 80 percent

MATTHEW D. CAIN

figure, in any document that's tied to August 8.

MR. ARROW:  Objection; mischaracterizes the record.

Q.  Made by the company.  Any statement made by the company on August 8th.  No reference to the 80 percent being inaccurate?

A.  So setting aside all of the market commentary that drew that connection, the company itself on August 8, 2023, talked about workforce reduction, guidance reduction.  And that that was driven by a decline in the company's upsell close rate.  Which is directly connected to the value that advertisers perceived from running advertisements on Doximity's platform.  Which was directly connected to the level of engagement and the level of active members that those advertisements were reaching.

So there is certainly a direct connection, notwithstanding the lack of a

Page 118

MATTHEW D. CAIN

mirror image sort of wording that you're asking about.

Q.    Well, forget mirror image. Any reflection whatsoever, even like the cloudiest day, there is nothing in there; right?

MR. ARROW:  Objection; asked and answered, argumentative.

A.    Again, I think that I'd have to disagree with you.  I'd be happy to direct you to Section F of my report, starting at paragraph 57, where the company itself attributed the shortfall to a decline in the company's upsell close rate.  Which analysts were able to understand was a symptom of the fundamental issue of a lack of active user engagement with the platform.

Q.    Let's go back to the Morgan Stanley in 59.  You'd agree with me they don't discuss 80 percent.  Right?

A.    Again, I disagree because they are all referring back to the information environment that was created by the

MATTHEW D. CAIN

company's statements leading up to this point in time.

Q.    And in fact, when they, at least according to your quote, make a comment on active users, they don't refer to the company's statements, they refer to their own discussions with advertising partners?

A.    Well, they, prior to that sentence, they are talking about the company's disclosures.  But in this sentence they are talking about discussions with advertising partners.

Q.    Okay.

A.    Yes.

Q.    Which you bolded, it's the only thing you bolded in the Morgan Stanley paragraph.

A.    In that paragraph I bolded that, yes.

Q.    But you don't think the Morgan Stanley statement was the corrective disclosure?

MR. ARROW:  Objection;

Page 120

MATTHEW D. CAIN

misstates prior testimony.

A.    The alleged corrective event was the company's August 8, 2023 disclosure.

Q.    Okay.  Which other analysts do you believe specifically refer to the 80 percent figure in connection with what you allege to be, or plaintiffs allege to be the August 8 corrective disclosure?

MR. ARROW:  Objection; misstates prior testimony, misstates the record.

A.    So I also point to, in paragraph 64, the Jehoshaphat report, which is talking about those topics.  And as I mentioned previously, the analyst quotes in paragraph 59 are all talking about the information that is alleged to have been causally connected to the alleged misstatements and the impact that those had on the company's financial performance.

Q.    None of which refer to the 80 percent figure.  Right?

Page 121

MATTHEW D. CAIN

A.    Again, for the reasons I described earlier, I disagree with your characterization.

Q.    You don't think it matters if they refer to the 80 percent figure, as long as the stock went down and somebody spoke, it must be a corrective disclosure?

MR. ARROW:  Objection; misstates prior testimony, argumentative.

A.    That's not what I said.

Q.    Okay.  How do we know if the alleged corrective disclosure was tied to Category 1 of the alleged misstatements or Category 2?

A.    And so when you say Category 1, you're referring to the 80 percent active member misstatements, Category 2 is the record engagement level or growth statements.  Right?

Q.    That's how the plaintiffs pled it and the judge ruled on it, yes.

A.    Okay.  So your question then

Page 122

                    MATTHEW D. CAIN

is, how do we know whether what is

related to one versus the other?

        Q.      These analyst reports that you

are citing to as support for your

conclusion that there was in fact a

corrective disclosure tied to the

misstatements.

                MR. ARROW:  Objection;

     misstates prior testimony,

     misstates the record.

        A.      So my report, as I explain in

my report, I understand that Professor

Hochberg and the defendants are not

challenging the price impact of that

second category of alleged misstatements.

So everything -- all of the evidence that

I am putting forward in this report is

speaking to the question of price impact

of that first category of misstatements.

                But I'm not, certainly not

ruling out the possibility that some of

this evidence may also speak to that

second category of alleged misstatements.

        Q.      Okay.  So paragraph 64, you

Page 123

MATTHEW D. CAIN

refer to the Jehoshaphat report?

MR. USLANER:  Jehoshaphat.

A.    Yes.

Q.    What is Jehoshaphat?

A.    My recollection is that it is a, what some people might say, a pseudo anonymous activist investor or analyst or short seller, an entity that puts out reports based on their research and views of the valuation of companies.

Q.    Okay.  You said pseudo anonymous.  What does that mean?

A.    So that would refer to the fact that we have the name of the entity that you can track across different reports.  But not necessarily the names of the individuals who are authoring the reports.

Q.    Okay.  Do you know any of the individuals?

A.    No, I don't.

Q.    Do you know anything about them?

A.    I have encountered their

Page 129

MATTHEW D. CAIN

A.    Okay, I see that.

Q.    So you footnoted, you said it's dated April 2024.

A.    Yes.

Q.    Where did you get that from?

A.    I don't recall off the top of my head how we dated this report.

Q.    Is there any reason to think that your footnote is inaccurate?

A.    No.

Q.    Okay.  And in your summary of the Jehoshaphat report, paragraph 64 that we've been looking at, you mention user engagement falling, that's in the third sentence.  But you don't mention the 80 percent figure anywhere in this paragraph.  Correct?

MR. ARROW:  Sorry, counsel, are we looking at the reply report?

MR. YOUNGWOOD:  Thank you. Yes, page 30, paragraph 64, Exhibit 2.

A.    Again, this I think would be similar to -- I've been discussing this

Page 130

MATTHEW D. CAIN

previously.  Certainly these things are intertwined.  But within paragraph 64, I don't believe that I explicitly state 80 percent.

Q.    Paragraph 60, you refer to something called "Doctor Money Matters."  Right?

A.    Yes.

Q.    Who is Doctor Money Matters?

A.    I believe his name was Dr. Patel.  I forget the specific type of doctor he is off the top of my head.

Q.    Okay.  And what are his qualifications to opine on financial matters?

A.    I believe my recollection is that he described himself as both a doctor and an investor and researcher.  But I'd have to go back and review to get anything more specific.

Q.    What did you review to figure out what his credentials were when you prepared your report?

A.    My recollection is that I

Page 131

MATTHEW D. CAIN

reviewed the document that's footnoted here, as well as the complaint in this matter.

Q.    Okay.  Did you take a look at all at his profile page?

A.    It's possible that I did, yes.

Q.    Let's take a look at it.

(Cain Exhibit 14 for identification, document headed "Doctor Money Matters.")

BY MR. YOUNGWOOD:

Q.    Is there anything on this that suggests to you that Doctor Money Matters has any formal training in the field of finance?

A.    So how would you describe "formal training in finance"?

Q.    How about any training in finance.

A.    So he does not disclose his academic background here.  So I'm not really able to form an opinion one way or the other on that question.

Q.    So you have no reason to

Page 132

MATTHEW D. CAIN

believe he's had any training whatsoever in finance?

MR. ARROW:   Objection; misstates prior testimony.

A.   That's not what I said.  What I said is that he does not provide his academic background or qualifications on this page.

Q.   What training do you believe he has in finance?

A.   Like I said before, I've not formed an opinion one way or the other on that question.

Q.   Okay.  He does tell us about himself.  He says that he's a radiologist.

Do you see that?

A.   I do.

Q.   He said before that he was a physician in the United States Air Force.

Do you see that?

A.   Yes.

Q.   And ever since college, he's been interested in finance.

Page 133

MATTHEW D. CAIN

Do you see that?

A.    Yes.

Q.    Though I really just dabbled in the stock market.

Do you see that?

A.    I do.

Q.    So he's, by his own admission, saying he has very limited experience in investing in the stock market.  Correct?

MR. ARROW:  Objection; mischaracterizes the document.

A.    I guess as of 2017 he said that he had dabbled in the stock market.

Q.    Okay.

A.    It's not clear how that may have changed between then and 2023, over six years later.

Q.    Well, do you have any reason to believe that it did change?

A.    Again, I'd have to look back over the more recent postings or evidence to refresh my recollection.  I don't recall one way or another.

Q.    And then he says, "I have

MATTHEW D. CAIN

really spent a lot of time trying to understand personal finance."

Do you see that?

A.    I do.

Q.    And then the next paragraph he kind of tells us what he means by that. He means contract negotiation, salary and employment trends, what to expect if starting a practice.

Do you see that?

MR. ARROW:  Objection; mischaracterizes the document.

A.    I see the, some of those phrases in the next paragraph, yes.

Q.    And then he wants to explore investment options, such as robo advisors, peer-to-peer lending, crowd funding and real estate.

What do you understand him to mean that he wants to explore investment options such as a robo advisor?

A.    That's not a question that I've researched or tried to form an opinion on.

MATTHEW D. CAIN

Q.    Nowhere in here does he suggest that he wants to gain skills understanding the stock market, investments in the stock market and the like.  Correct?

A.    I'd say it's difficult to form an opinion one way or another on how he was describing this in 2017.

Q.    On the pages that follow, he lists certain, I guess, blog postings.  And then podcast episodes.

Do you see that?

A.    I see some things listed.  But it's a little bit difficult to know what those things are.

Q.    Okay.  Did you look at any of those or read any of those?

A.    The thing that I recall reviewing was what's indicated in paragraph 60 of my report.  60 and 61.

Q.    How did you find this, the same way you found the tweets?

A.    Sorry, the same way I found what?

Page 136

MATTHEW D. CAIN

Q.    The tweets.

A.    My recollection is that this is something that was mentioned in the complaint of this case.  That might have been my first -- first reference to it.

Q.    And -- strike that.

Let's go back to the tweets that you discussed in paragraph -- I'm sorry, before we do that.

I was asking you earlier if analysts post the alleged corrective disclosure continued to refer to the 80 percent of U.S. physicians statement.

Do you recall that?

MR. ARROW:  Objection; misstates prior testimony.

A.    I recall you asking a question related to post-class period analyst reports.

Q.    And the fact is that analysts did continue after August 8 of '24 -- I'm sorry, '23, to continue to refer to that statement that plaintiffs allege was a misstatement and that was then corrected

MATTHEW D. CAIN

paragraph.

Q.    Okay.  And then she gives five more examples, CNBC twice, Stephens, Inc. once, China Merchant Securities once, and Seeking Alpha as recently as May 14 of this year, each referring to the 80 percent of U.S. physicians figure.

A.    I see those bullet points.

Q.    Are those -- is that security fraud in those statements?

A.    I don't really understand what you're asking.

Q.    Is the fact that they're repeating statements like that, do you think that's some support that the securities fraud alleged in this complaint continues through today?

MR. ARROW:  Objection; outside the scope of the report.

A.    I've really no idea how to answer that type of question.

Q.    Okay.  We'll probably get to them after the break.  We've printed them out, the tweets that you look at.

MATTHEW D. CAIN

But you've previously criticized another expert for using internet-type posts such as tweets in the context of expert work.  Right?

A.    I don't recall off the top of my head.

Q.    Okay.  You were an expert in the in re Bed Bath & Beyond Securities Litigation, I think it's on your CV?

A.    Yes, I was.

Q.    And you submitted a report on behalf of the plaintiffs in that litigation.  Right?

A.    Yes.

Q.    And you responded to a report prepared by a Professor Fischel?

A.    Yes.

Q.    And in that report, Professor Fischel linked it to a number of Reddit posts for certain aspects of his analysis.  Correct?

A.    I don't recall off the top of my head.

Q.    Let me give you a copy of your

MATTHEW D. CAIN

report.

(Cain Exhibit 15 for identification, Expert Report of Dr. Cain in in re Bed Bath & Beyond Securities Litigation.)

THE WITNESS:  Okay.

BY MR. YOUNGWOOD:

Q.    I'm going to point you to paragraph 50, that's on page 20.  Take a read.

A.    Okay.

Q.    Bottom of page 20.  You say, "Professor Fischel's selective reliance on a few Reddit posts is subjective, unscientific and not replicable."

Why did you think it was not replicable?

A.    My recollection is that his opinion was relating to a short squeeze in the company's stock price.  And that he was basing his opinion of a short squeeze on this type of evidence.  And my opinion was that he had not scientifically demonstrated that there

MATTHEW D. CAIN

was in fact a short squeeze that occurred in the company's stock.

Q.    Well, that was your overall opinion.  But here you're saying his reliance on a few Reddit posts is subjective, unscientific and not replicable.  What was not replicable about his reliance on these posts?

A.    Yeah, so what I was explaining in this case was that in order for one to form an opinion about whether in fact there was a short squeeze in a company's stock, that it was not sufficient to form that opinion based on what a few people had posted on certain internet forums.

Q.    You -- well, you actually told me you're not sure how you came upon the Twitter posts that are referred to in, for example, paragraph 34 of your report. Can I replicate your search for them?

MR. ARROW:  Objection; misstates prior testimony.

A.    So I don't think that that's what I previously said.  I believe what I

Page 143

MATTHEW D. CAIN

said was that I asked my staff to assist me with the research into the opinions that I'm providing in this report.

I do believe that those examples that I quote are publicly available and so you could replicate the search to locate those.

Q.   What was the search terms they used?

A.   I don't recall off the top of my head --

Q.   Did you ever know?

A.   -- what the terms were they that they were using when they conducted their actual search.

Q.   How do I replicate their search if you won't tell me the terms?

A.   Again, I believe that you can go to Google and search for these types of terms.  Which paragraph were we at, I can try to give you a more specific answer.

Q.   Sorry, I actually gave you the wrong paragraph number.  It's 38, not 34.

MATTHEW D. CAIN

What were the search terms used to find the three tweets you quote in the middle of page 17, paragraph 38?

A.    My recollection is that you could search for 80 percent and come up with a number of quotes on Twitter or X, including these.

Q.    Okay.  So these are all the quotes with 80 percent that hit on Twitter?

MR. ARROW:  Objection; misstates prior testimony.

Q.    That probably isn't complete. Tell me the rest of the search terms.

A.    My recollection is that we searched for "80 percent" on Twitter. And that I provided some examples as a reply or a rebuttal to Professor Hochberg's opinions, in which she claims that people were not -- were market commentators, did not consider the 80 percent active member misstatements to have price impact.

What I'm explaining in my

Page 145

MATTHEW D. CAIN

report is that there is ample evidence that she ignored that is contradictory to her opinions.

Q.   But I can't replicate the search your staff did because you don't remember what you told them to do. Right?

MR. ARROW:  Objection; misstates prior testimony.

A.   That is incorrect.

Q.   Tell me exactly what you told them to do, exactly what their instructions were and exactly what they did.

A.   Again, my recollection is that we searched for 80 percent on Twitter and X and Google.  And I'm providing a number of examples of evidence that market commentators did rely on the alleged 80 percent active member misstatements.

Q.   Okay.  The only search term you gave them was 80 percent, and these are the only three hits that came up?

MR. ARROW:  Objection;

MATTHEW D. CAIN

misstates prior testimony.

A.   That's not what I said.

Q.   Okay.  Which part of what I said was wrong?

A.   I did not say that these were the only three hits that came up from that search.

Q.   Okay.  What other ones?

A.   Off the top of my head, I don't have those all memorized.

Q.   How many others?

A.   The same answer.

Q.   Could be a thousand, could be five?

A.   Again, I don't have the number memorized.

Q.   Could be zero?

MR. ARROW:  Objection; mischaracterizes the document.

A.   There were certainly at least three things we found that were responsive within this paragraph.

Q.   Paragraph 62 seems to be another search of X or Twitter.  Do I

MATTHEW D. CAIN

read that correct?  This is of your reply report.  In paragraph 63.

A.    My recollection is that this may have been mentioned in the complaint as well.  But I'd have to go through to refresh my recollection.

Q.    Okay.  So you don't know what the source is of 62 or 63?

MR. ARROW:  Objection; misstates prior testimony.

A.    My recollection is that this is the same as my previous answers, where you can search for the 80 percent figure and identify these types of replies to the post.

Q.    Okay.  So tell me the best you can what instruction -- I'm sorry.

Was this given to you by the plaintiffs' counsel or was it prepared by your staff or did you do it yourself?

A.    I instructed my staff to search for the evidence that's the quotes that I'm reporting in this section of my report.  We all had discussions with

MATTHEW D. CAIN

counsel as part of that process as well.

Q.    And the instructions to your staff were simply type in 80 percent on -- I don't want to put words -- tell me exactly what your instructions were to your staff that generated 62 and 63 in your report.

A.    Again, it was -- these were conversations with both staff and counsel.  I don't know if there's an extent to which those conversations are protected because they involved counsel.

But this is similar to what I described previously when I asked counsel for any documents that were responsive to the questions that I was addressing in this section of the report.  It was the same in terms of those discussions involving my staff.

Q.    But how would I replicate, right, you're an expert, you're doing things to lead to opinions.  And I hope you'd agree with me, you have to tell me how you do them so I can test them.  How

MATTHEW D. CAIN

do I test this?  How do I know what you found?

A.    Sure.  So I guess that in terms of the objective methodological framework that's involved here, is for me, starting with the guidance from the Goldman decisions.  My understanding is that the Goldman decisions instructed experts or provided guidance for experts who were conducting price impact inquiries.  And that that begins with looking at the front end, whether there is evidence of front end price impact.

If there is no evidence of front end price impact, which in this case there actually is clear evidence, very strong evidence of front end price impact.  But if not, then the next step is to look at whether there is a mismatch in genericness and specificity of the alleged misrepresentations and the alleged corrective disclosures.

In this case the alleged misstatements were highly specific and

MATTHEW D. CAIN

not overly generic.

The next step is to look at the -- any evidence of analysts or market commentators referencing or relying on or commenting on or evidence that they viewed the alleged misstatements as important. And that my understanding is that defendants bear the burden of demonstrating a complete absence of price impact.

And as a result -- and consistent with that, that the Goldman courts pointed to an expert analysis which documented that no analysts relied on or referred to the challenged statements in that case.

And as a result, under that framework, in terms of addressing or entering into that objective methodology or framework, if I can put forward evidence that analysts or market commentators referenced or relied upon the alleged misstatements, then that provides further evidence of price

MATTHEW D. CAIN

impact.

So that's I think the objective methodological framework.

Q.    Goldman said you could rely on posts on Twitter?

MR. ARROW:  Objection; calls for a legal opinion.

A.    I don't recall the specific wording of the Goldman decision.  But I do recall it pointing to evidence of market commentary relating to the alleged misstatements.

Q.    I'm just going to try one more time on this, which I think you know is my question, not what Goldman says.

How did you identify the tweets identified on 62 and 63 and tell me in as much detail as you can so that I can replicate it.

A.    So again, my recollection is that I had conversations with counsel and my support staff, including searching for Doximity and 80 percent on Twitter.  And which generated a number of posts and

Page 152

MATTHEW D. CAIN

replies.

Q.    And so how many posts and replies did that generate that you didn't include in your report?

A.    I've answered that question several times already.

Q.    Well, I asked you about paragraph 38.  I'm asking you about 62.  They're different time frames.

A.    So it's the same --

Q.    Same answer?

A.    Same answer as before.

Q.    Going back to your report in Bed Bath & Beyond.  In addition to calling -- pulling the posts subjective, unscientific and not replicable, you then say, "while he claims these posts are indicative of investor views about BBY, nowhere in his report does he assess whether any of these posts were made by actual investors or class members."

Do you see that?

A.    Which paragraph are we at?

Q.    Paragraph 50 in your report in

MATTHEW D. CAIN

Bed Bath & Beyond, which is marked as Exhibit 15.  It's the second-to-last sentence.  Top of 21.

A.    Okay, I see that.  What was your question?

Q.    That was a criticism you had of Professor Fischel.  Correct?

A.    In terms of his opinions about a short squeeze, yes.

Q.    Okay.  But you too are unable to determine with respect to paragraphs 38, 62 and 63, where you rely on X, Twitter posts, you don't know the actual identity of any of the posters.  Right?

A.    That is correct, I've not evaluated their identities.

Q.    So you don't know if they're human beings?

A.    I don't see why that would be problematic if they were bots.

Q.    Okay.

A.    You know, one thing I would point out in terms of that question is that your expert, Professor Hochberg,

MATTHEW D. CAIN

explicitly relies on analyst reports that were produced by bots in her analysis. So if you wanted to reject bots, then I think you would have to throw out all of her opinions.

Q.    Are those examples you're referring to under the title of a known entity, like a known analyst?

A.    Well, they're listed in her appendix, if you want to go through those we can do that.

Q.    And you don't know if any of the entity or person or bot in 38, 62 or 63, are actually investors in Doximity. Right?

A.    Nothing beyond what they say in those quotes.

Q.    Right.
And you don't know if any of them are members of the class.  Right?

A.    That's correct.

MR. YOUNGWOOD:  Why don't we take a lunch break.

THE VIDEOGRAPHER:  Off the

**Page 155**

**MATTHEW D. CAIN**

record, 12:55, ending Media Unit

No. 3.

(Luncheon recess:  12:55 p.m.)

MATTHEW D. CAIN

that indicates they are a verified member.  But beyond that I've not attempted to, you know, evaluate that type of question.

Q.    Okay.  Do you know if they were verified when they posted this or were they verified at some later date? Do you know when they were verified?

MR. ARROW:  Object to form.

A.    I don't know.

Q.    Okay.  And after Mr. Musk bought Twitter and renamed it X, do you have an understanding of what one has to do to get verified?

A.    I do not know what one has to do to be verified.

Q.    It turned into a cash system, right, you could pay to be verified?

A.    I actually don't know.

Q.    You don't know if this is actually Sanat Dixit, if there is a Sanat Dixit's actual picture; right?

MR. ARROW:  Object to form.

A.    I do not know that person

Page 168

MATTHEW D. CAIN

individually, so I have no idea if that's their picture.

Q.   Or if they are a physician whether they are in the United States, you don't know that either?

MR. ARROW:  Object to form.

A.   I don't know anything about the individuals here.

Q.   And if we continue to go through each of the ones, the quotes that you cite to different, I believe they are all to different users, and I ask similar questions, if you know whether they're an actual person or not, you don't know the answer; right?

MR. ARROW:  Object to form.

A.   Ultimately, it's not something that I've attempted to research or evaluate.

Q.   And you don't know, for example, if perhaps these were posted by a competitor of Doximity?

A.   Again, I've not evaluated the identities of the people here.

MATTHEW D. CAIN

Q.    Okay.  Or a short seller interested in the stock, somebody like that could have posted these; right?

MR. ARROW:  Object to form.

A.    Again, I've not evaluated all of the posters.

Q.    And again, some or all of them may have been written by the same person under different user names; right?

A.    Again, I don't know if that's a possibility.

Q.    Okay.  I was asking you about paragraph 60.  61 cites to the same document.  It has one quote from a user named user Harpoon1986.

Do you see that?

A.    I do.

Q.    And again, you don't know who user Harpoon is, or user Harpoon1986 is; right?

MR. ARROW:  Objection; mischaracterizes the document.

A.    I don't know who that user is.

Q.    If we go back to paragraph 38.

MATTHEW D. CAIN

C E R T I F I C A T E

STATE OF NEW YORK     )

                      : ss.

COUNTY OF NEW YORK   )


I, ERIC J. FINZ, a Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

That MATTHEW D. CAIN, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 11th day of November, 2025.

_____
ERIC J. FINZ